1 | David J. Gottesman (Trial Counsel) (Illinois Bar No. 6182719)
(gottesmand@sec.gov)
2 | Frederick L. Block
Antonia Chion
3 | Robert A. Cohen
Melissa R. Hodgman
4 | David S. Mendel

E-filing

Attorneys for Plaintiff
5 | SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
6 | Washington, DC 20549-4030
Telephone: (202) 551-4470 (Gottesman)
7 | Facsimile: (202) 772-9245 (Gottesman)

FILED

JAN 1 1 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MEJ

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

SECURITIES AND EXCHANGE COMMISSION,     Case No. 11 0137

12 |          Plaintiff,

13 |     vs.                                                    COMPLAINT

14 | KIMON P. DAIFOTIS and RANDALL MERK,      DEMAND FOR JURY TRIAL

15 |          Defendants.

16

17

18 |          Plaintiff Securities and Exchange Commission (the "Commission") alleges:

19 |                    **SUMMARY OF THE ACTION**

20 |          1.     Between 2005 and mid-2008, defendants Kimon Daifotis ("Daifotis") and

21 | Randall Merk ("Merk") were senior officials of Charles Schwab Investment Management,

22 | Inc. ("CSIM"), and employees or officers of Charles Schwab & Co., Inc. ("CS&Co."), both of

23 | which provided investment advisory and other services to Schwab Investments. Daifotis and

24 | Merk engaged in fraudulent and deceptive conduct in violation of the antifraud provisions of

COMPLAINT                                    -1-

1 | the federal securities laws, and also violated and aided and abetted violations of various other

2 | provisions of the securities laws involving shareholder voting rights, disclosure and reporting

3 | requirements.

4 |     2.     Defendants' unlawful conduct primarily relates to the Schwab YieldPlus Fund

5 | ("YieldPlus" or the "Fund"), the former flagship fixed-income mutual fund advised by CSIM

6 | and CS&Co. At its peak in 2007, YieldPlus had $13.5 billion in assets and 200,000 accounts,

7 | and was the largest ultra-short bond fund in its category.

8 | **A.     Fraudulent Offer and Sale of YieldPlus**

9 |     3.     By 2006, Merk, acting knowingly or recklessly, substantially participated in

10 | directing a campaign to offer, sell, and market YieldPlus to the investing public as a cash

11 | alternative or cash equivalent investment, with only "slightly" or "marginally" more risk than

12 | cash products, such as certificates of deposit ("CDs") or money market funds.

13 |     4.     Merk and Daifotis knowingly or recklessly made or substantially participated

14 | in making misrepresentations and omissions of material fact about YieldPlus, such as its

15 | supposedly being comparable to cash investments or money market funds.

16 |     5.     The descriptions of YieldPlus were materially false and misleading because,

17 | for example, YieldPlus was substantially riskier than cash products such as CDs and money

18 | market funds, but defendants failed to disclose the material facts regarding such risks.

19 | **B.     Unlawful Deviations From Fund Concentration Policy**

20 |     6.     Daifotis, as lead portfolio manager, along with CSIM and CS&Co., as the

21 | Fund's advisers, directed the investments of the Fund. Daifotis approved the Fund's

22 | investment in assets that violated the Fund's "concentration policy." The Fund's long-

23 | standing concentration policy provided that the Fund would not invest more than 25 percent

24 | of assets in non-agency, mortgage-backed securities ("MBS"), i.e., MBS issued by private

COMPLAINT                                           -2-

1  entities and not backed by federal agencies or government-sponsored enterprises. Pursuant to

2  Section 13(a) of the Investment Company Act [15 U.S.C. § 80a-13(a)], YieldPlus could not

3  deviate from that policy without first obtaining authorization by a vote of the majority of

4  YieldPlus's outstanding shareholders.

5       7.     Through the knowing or reckless actions of Daifotis, the Fund deviated from

6  its concentration policy by at least early 2006, and violated the Investment Company Act, by

7  investing more than 25 percent of its assets in non-agency MBS without shareholder approval.

8       8.     As a trustee, Merk voted to change the treatment of non-agency MBS and to

9  allow the Fund's investment advisers to concentrate the Fund's assets in those investments,

10  even though the concentration was a deviation from the Fund's concentration policy and was

11  not authorized by a shareholder vote.

12       9.     Daifotis knew, or was reckless in not knowing, that reports and other filings

13  with the Commission effectively masked the Fund's violation of its concentration policy.

14  Although Daifotis reviewed and was able to edit various of such filings, he failed to make

15  those materials adequately or appropriately disclose the deviation.

16       10.     Daifotis also substantially assisted other funds, including but not limited to the

17  Schwab Total Bond Market Fund ("Total Bond Fund"), in violating the Investment Company

18  Act [15 U.S.C. § 80a-13(a)] by deviating from their concentration policy without shareholder

19  approval.

20       11.     Daifotis and Merk knew, or were reckless in not knowing, that they had

21  submitted, or caused to be submitted, false and misleading reports and certifications to the

22  Commission that failed to properly, fully, and accurately disclose the material fact that the

23  funds described above had deviated from their concentration policy without shareholder

24  approval.

COMPLAINT           -3-

**C.    False and Misleading Statements and Other
Fraudulent Conduct During the Fund's Decline**

12.    In the summer of 2007, YieldPlus's net asset value ("NAV") began to decline as its assets lost value. Many investors expected YieldPlus's NAV to fluctuate only minimally, at least in part because of the way the Fund had been marketed. A significant number of investors redeemed their investments when the NAV fell by more than a few pennies. Because YieldPlus did not have cash holdings, the redemptions forced YieldPlus's portfolio managers to sell assets in a depressed market to raise cash.

13.    In a series of communications, including written materials and conference calls between at least August 2007 through at least March 2008, defendants knowingly or recklessly made a series of materially false and misleading statements and omissions of material fact about YieldPlus, and knowingly provided substantial assistance to others' misrepresentations, in an effort to dissuade YieldPlus investors from redeeming their investments. For example, in August 2007, Daifotis assured independent investment advisers and Schwab's registered representatives who were to communicate with Schwab's investors that "we've got very, very, very slight negative flows" from the Fund, or that the Fund had "minimal" outflows, when he knew that the Fund actually was suffering massive outflows.

**D.    Redemptions By Other Schwab-Related Funds**

14.    During the effort to discourage most investors from redeeming their YieldPlus investments, Merk approved a series of redemptions of YieldPlus investments by a group of other Schwab-related mutual funds. Merk did so even though he knew material, nonpublic information about YieldPlus and knew that a portfolio manager involved in the redemptions had material, nonpublic information about the Fund.

COMPLAINT                                          -4-

1    **E.    Impact**

2         15.    During an eight-month period from 2007 to 2008, YieldPlus's NAV dropped

3    28 percent and its assets plummeted from \$13.5 billion to \$1.8 billion. To date, YieldPlus's

4    NAV has declined by 50 percent and its assets are below \$200 million. As a result of

5    defendants' false and misleading statements and other misconduct, YieldPlus's investors lost

6    hundreds of millions of dollars.

7         16.    Unless enjoined, defendants are likely to engage in future violations of the

8    securities laws. Accordingly, as to each defendant, the Commission seeks an injunction

9    against future violations of the particular securities laws identified in the prayer for relief,

10   disgorgement of ill-gotten gains with prejudgment interest, and civil money penalties.

11                              **JURISDICTION AND VENUE**

12        17.    This Court has jurisdiction over this action under Sections 20(b), 20(d) and

13   22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and

14   77v(a)]; Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange

15   Act") [15 U.S.C. §§ 78u(d) and (e), and 78aa]; Sections 42(d), 42(e) and 44 of the Investment

16   Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-41(d), (e) and 80a-

17   43]; and Sections 209(d), 209(e) and 214 of the Investment Advisers Act of 1940 ("Advisers

18   Act") [15 U.S.C. §§ 80b-9(d), (e) and 80b-14]. Defendants have made use, directly or

19   indirectly, of the means or instrumentalities of interstate commerce, of the means or

20   instruments of transportation or communication in interstate commerce, of the mails, or of the

21   facilities of a national securities exchange, in connection with the transactions, acts, practices,

22   and courses of business alleged in this Complaint.

23        18.    Venue is appropriate in this Court under Section 22(a) of the Securities Act [15

24   U.S.C. § 77v(a)]; Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 44 of the

COMPLAINT                                          -5-

1    Investment Company Act [15 U.S.C. § 80a-43]; and Section 214 of the Advisers Act of [15

2    U.S.C. § 80b-14], because certain of the acts or transactions constituting the violations alleged

3    herein occurred in this judicial district.

4                                **INTRADISTRICT ASSIGNMENT**

5        19.      Assignment to the San Francisco Division is appropriate pursuant to Civil

6    Local Rule 3-2(d) because a substantial part of the events or omissions that give rise to the

7    Commission's claims occurred in San Francisco County and one or more related class actions

8    are pending in the San Francisco Division.

9                                       **DEFENDANTS**

10        20.      **Kimon Daifotis,** 51, resides in Corte Madera, California.  Daifotis was

11   employed by CS&Co. and was a Senior Vice-President and Chief Investment Officer – Fixed-

12   income at CSIM until his position was eliminated in July 2008.  At all relevant times until his

13   position was eliminated, Daifotis was lead portfolio manager for YieldPlus, the Total Bond

14   Fund, and the Schwab Short-Term Bond Fund ("Short-Term Bond Fund").  Daifotis was

15   actively involved in the day-to-day operations of YieldPlus, the Total Bond Fund, and the

16   Short-Term Bond Fund.  Among other things, Daifotis was responsible for directing the

17   funds' investments and was actively involved in the offer, sale, and marketing of YieldPlus.

18   From at least July 2007 until his departure, Daifotis reported to Randall Merk.  At all relevant

19   times, Daifotis has had Series 3, 7 and 63 licenses.  Daifotis continues to serve as a paid

20   consultant to Schwab-related entities.

21        21.      **Randall Merk**, 56, resides in Menlo Park, California.  Merk is and at all

22   relevant times was an Executive Vice President at Charles Schwab Corporation and was an

23   Executive Vice President at CS&Co.  From July 2007 until December 2010, Merk served as

24   President of CSIM, and, at all relevant times until 2007, was a trustee of YieldPlus and the

COMPLAINT                                    -6-

1    other funds identified herein. At all relevant times, Merk has had a Series 24 license. Merk

2    was actively involved in the offer, sale, and marketing of YieldPlus.

3                                      **RELEVANT ENTITIES**

4        22.      **Charles Schwab Investment Management, Inc. ("CSIM")** is a San

5    Francisco-based, wholly-owned subsidiary of the Charles Schwab Corporation. CSIM was

6    incorporated in Delaware in October 1989 and has been a registered investment adviser since

7    January 25, 1990. CSIM manages the assets of registered and unregistered investment

8    companies, including YieldPlus, the Total Bond Fund, the Short-Term Bond Fund, and other

9    Schwab Funds. CSIM is the primary investment adviser of those funds.

10        23.      **Charles Schwab & Co., Inc. ("CS&Co.")** is a wholly-owned subsidiary of

11    Schwab Holdings, Inc., which is a wholly-owned subsidiary of the Charles Schwab

12    Corporation. CS&Co. was incorporated in California in 1971. CS&Co. is a registered

13    broker-dealer, transfer agent, and investment adviser. CS&Co. provided advisory,

14    shareholder, and distribution services to the funds described herein, and at all relevant times,

15    served as the distributor and transfer agent for funds, including YieldPlus, the Total Bond

16    Fund, the Short-Term Bond Fund, and other Schwab Funds. CS&Co. also provided personnel

17    who performed advisory, marketing, legal, and compliance services to those funds.

18        24.      **Schwab Investments** is a no-load, open-end management investment company

19    organized as a Massachusetts business trust and is registered under the Investment Company

20    Act as of October 26, 1990. YieldPlus, the Total Bond Fund, and the Short-Term Bond Fund

21    are series of mutual funds issued by Schwab Investments.

22

23

24

1

## FACTUAL ALLEGATIONS

2

### A. False and Misleading Statements and Omissions, and Other Fraudulent Conduct In the Offer and Sale of YieldPlus

3

4

5

6

7

25.     From at least 2005 through at least mid-2008, as discussed below, Daifotis and Merk made, substantially participated in making, or knowingly provided substantial assistance in the making of misrepresentations and omissions of material material fact with regard to the offer and sale of YieldPlus, including but not necessarily limited to those set forth in this Section A.

8

9

10

11

12

26.     As shown below, in statements disseminated to the public, CSIM and CS&Co. described YieldPlus as a cash "alternative" or "equivalent" that generated a premium yield and was only minimally riskier than a money market fund, compared YieldPlus to insured CDs, and emphasized that YieldPlus's NAV was stable because, although it "may fluctuate minimally" and/or would fluctuate, it had fluctuated by only pennies in recent years.

13

14

15

16

17

18

27.     Daifotis and Merk knew, or were reckless in not knowing, about these descriptions and they directly and substantially participated in the making of such statements to the public. Daifotis and Merk reviewed and approved the general approach of describing the Fund in this manner, and they reviewed and approved various specific advertisements containing these mistatements. Various of the false and misleading statements therein were directly attributed to Daifotis, as shown more fully below.

19

20

21

22

23

24

28.     Daifotis and Merk knew, or were reckless in not knowing, that these communications were materially false and misleading because, in the various ways described below, YieldPlus was significantly riskier than money market funds, CDs, and other cash or cash-equivalent products, and its NAV had fluctuated significantly more than the three cents or pennies advertised. For example, at various times between 1999 (when the Fund was

COMPLAINT                                    -8-

1   established) and 2003, the Fund's NAV sometimes fluctuated by six cents or more in just one

2   day, by more than 15 cents in a month, and by 34 cents over a ten-month period. It was

3   misleading and deceptive to characterize YieldPlus as a cash alternative or cash equivalent

4   without fully disclosing the ways in which YieldPlus was fundamentally and substantially

5   riskier than such products.

6       29.     Daifotis and Merk also knew, or were reckless in not knowing, that these

7   statements grew even more misleading over time because the Fund grew riskier as it

8   concentrated in non-agency MBS. Daifotis directed the investments that caused this increased

9   risk, and at least by late August 2006, Merk approved such investments.

10                    **1.    YieldPlus Was Substantially Riskier Than Cash
                             Products, Such as CDs and Money Market Funds**

11      30.     Daifotis and Merk knew, or were reckless in not knowing, that in the ways

12  described below, YieldPlus materially differed from CDs and money market funds in ways

13  which made the Fund fundamentally and significantly riskier than those and other cash or

14  cash-equivalent products to which it was compared.

15      31.     Lack of Insurance. Investments in YieldPlus were not insured, as are CDs.

16      32.     Maturity. From at least 2005 through at least mid-2008, the average maturity

17  of YieldPlus's portfolio was significantly longer than the average maturities of money market

18  funds. During the relevant period, under rules promulgated by the Commission under the

19  Investment Company Act, a money market fund was required to have an average portfolio

20  maturity of no more than 90 days and could not acquire any security with a remaining

21  maturity of more than 397 days.  In contrast, YieldPlus's average maturity was at least one-

22  and-one-half to two years and, by one measure, reached four years in mid-2007, and a

23  substantial portion of the Fund's assets were invested in securities with remaining stated

24

1   maturities of more than 20 years. Ninety percent or more of YieldPlus's holdings could not

2   have been held by a money market fund.

3   33.   The Fund's concentration in non-agency MBS, beginning at least by 2006

4   (described more fully below), which Daifotis directed and Merk ultimately approved in late

5   August 2006, caused the Fund's average maturity to increase.

6   34.   In mid-2007, at the beginning of the period when the Fund's NAV declined

7   dramatically, only 6 percent of YieldPlus's assets—$675 million of $11 billion in assets—

8   were scheduled to mature within the next six months. This was drastically different from a

9   money market fund's average portfolio maturity of 90 days.

10   35.   The longer maturities of the securities owned by YieldPlus exposed the Fund

11   to increased risk, including liquidity and default risk. Such liquidity risk contributed to the

12   Fund's decline during the credit crisis of 2007-2008. For example, when faced with

13   redemptions, a money market fund largely is able to rely on frequently maturing securities to

14   raise cash at par. In contrast, YieldPlus was forced to sell securities in a depressed market

15   because its securities did not mature frequently.

16   36.   Daifotis and Merk knew, or were reckless in not knowing, the facts above.

17   Despite the Fund's longer average maturity, Merk, Daifotis, CSIM, and CS&Co. classified

18   YieldPlus as an ultra-short bond fund because of its short "duration" (which is a measure of

19   interest rate sensitivity, as explained more fully below).

20   37.   Lower Credit Quality Bonds. As Daifotis and Merk knew, or were reckless in

21   not knowing, YieldPlus also was significantly riskier than a money market fund because it

22   invested in lower credit quality bonds. Pursuant to rules under the Investment Company Act,

23   a money market fund may invest in a security only if the fund's board has determined that the

24   security presents minimal credit risks. In contrast, YieldPlus did not make such

COMPLAINT                                    -10-

1 | determinations and was permitted to invest up to 25 percent of assets in below-investment-

2 | grade bonds, and actually invested 15 to 25 percent of YieldPlus in bonds rated BBB (the

3 | lowest investment grade) or lower.

4 |    38. Lack of Risk Management. Daifotis and Merk knew or were reckless in not

5 | knowing that they did not adequately monitor and analyze the risks posed by YieldPlus's

6 | substantial investment in non-agency MBS and lower quality bonds. Just before YieldPlus's

7 | decline began in the summer of 2007, internal auditors warned CSIM and CS&Co. officials,

8 | including Daifotis and Merk, that YieldPlus's portfolio managers were not conducting

9 | sufficient portfolio-wide risk management and scenario-analysis testing regarding the possible

10 | performance of YieldPlus's portfolio during adverse market events. The auditors warned that

11 | this risk was heightened for YieldPlus, due to its "concentration in mortgage securities and

12 | lower credit rated corporate bonds."

13 |    **2.** **Defendants' Roles**

14 |     **a.** **Merk**

15 |    39. Two key departments responsible for YieldPlus reported to Merk. First, the

16 | Senior Vice President for Product Development who was in charge of the CS&Co. product

17 | development and management group responsible for YieldPlus reported to him. This group

18 | was largely responsible for creating and reviewing the statements about YieldPlus that are the

19 | subject of this Complaint. As Merk knew or was reckless in not knowing, the department

20 | relied on him as a fixed-income expert and relied upon him to ensure that that the overall

21 | public message – including characterizations of the Fund that are described herein – were

22 | accurate, complete, and not misleading. Second, the President of CSIM, who supervised the

23 | Fund's portfolio managers, also reported to Merk. Later, shortly before the Fund began its

24 |

1   decline, Merk assumed the position of CSIM President and Daifotis began to report directly to

2   him.

3       40.     In 2006, senior Schwab executives were concerned that a competitor was

4   selling its cash products more successfully than Schwab. Schwab then established, in mid-

5   2006, the "Cash Council." The Cash Council was a committee of high-level executives who

6   met to coordinate, increase, and improve marketing of Schwab's cash products company-

7   wide. Merk was a member of the Cash Council.

8       41.     Merk was very knowledgeable about fixed-income products and, as part of his

9   work on the Cash Council, in 2006, was asked to identify fixed-income products to highlight

10  on Schwab's website to draw attention to cash products at Schwab.

11      42.     In May 2006, Merk identified YieldPlus as such a product. Merk directly and

12  substantially participated in the decision to include YieldPlus on the cash page of the Schwab

13  website. For example, in an email exchange on May 17 and 18, 2006, members of the Cash

14  Council twice requested that Merk identify appropriate products to include in the cash

15  campaign, specifically tasking him with identifying fixed-income products to highlight on the

16  cash page of the Schwab website.

17      43.     In a response on May 18, 2006, Merk endorsed the selection of YieldPlus as a

18  cash product for inclusion on the cash page, sometimes referred to as "cHome." Merk

19  personally informed the Cash Council that he and his team had identified YieldPlus for

20  inclusion in the "[i]ncreased cash promotion." Merk then received a summary of the

21  "[p]roposed cHome cash promotion" that was "[b]ased on the exchanges [above]," and

22  involved "text boxes to enable a cash emphasis," including one text box on the Schwab

23  website for CDs, another for Schwab's money market fund, and a third for YieldPlus.

24      44.     From at least mid-2006, the Cash Council, including Merk, then directed an

COMPLAINT                                    -12-

1  effort to highlight YieldPlus on portions of the Schwab website that discussed cash products,

2  such as by adding links to take investors to pages with YieldPlus information. Merk directly

3  and substantially participated in that effort to highlight YieldPlus. For example, in at least

4  June and August 2006, Merk reviewed and agreed to the marketing plans and the proposed

5  website changes that positioned YieldPlus with CDs and money market funds on the cash

6  page of Schwab's website.

7       45.     In causing YieldPlus to be placed and emphasized on the cash page of the

8  website without substantial disclosures about the difference between YieldPlus and genuine

9  "cash" investments, Merk knowingly or recklessly caused the misrepresentations or omissions

10  of material fact about YieldPlus and the fact that it was significantly riskier than the other

11  products listed, as described above.

12       46.     The Cash Council, including Merk, also directed that sales materials

13  emphasize claims that YieldPlus had a stable NAV. Merk directly and substantially

14  participated in the marketing that resulted from the efforts of the Cash Council. In at least

15  June and August 2006, as a member of the Cash Council and as a Trustee, Merk reviewed and

16  agreed to the content of websites and communications that represented YieldPlus as being a

17  cash-equivalent or cash-alternative investment. Examples are included in Section A.3. below.

18  This was misleading because, especially when compared to cash products identified in the

19  marketing materials, YieldPlus was more prone to substantial NAV fluctuations, as described

20  above.

21       47.     Merk knew, or was reckless in not knowing, that the statements about the

22  Fund's stable NAV were misleading, in part because of the Fund's prior NAV fluctuation. In

23  particular, from 1999 through 2003, the Fund's NAV fluctuated by $0.34, ranging from

24  $10.03 to $9.69, with particular volatility in 2002 and 2003. The NAV also fluctuated

COMPLAINT           -13-

1  significantly within short periods, as described above. The Fund's fluctuations in NAV were
2  material and significant, particularly because the Fund was characterized as a supposed "cash"
3  product, was positioned with CDs and money market funds, which typically have no
4  fluctuation in principal or NAV, respectively, and was characterized as having an NAV that
5  had fluctuated in recent times by only a few cents.

6  48.    The Cash Council, including Merk, also directed an effort in mid-2006 to re-
7  design the Fund's own web-page to highlight the yield that it generated and its supposed
8  narrow NAV fluctuation as described below. Merk was aware of this effort and reviewed the
9  revised web page. Merk knew, or was reckless in not knowing, that the marketing materials
10 that he reviewed were materially false and misleading and contained material omissions, such
11 as those concerning the risks associated with investing in the Fund.

12 49.    Merk (along with Daifotis) directly and substantially participated in the
13 issuance of a "cash/CD/YieldPlus related press release" on August 1, 2006. Merk was the
14 source of the idea to issue the August 1, 2006, press release, and Merk saw the draft and the
15 final language of the press release, but did not correct the misrepresentations and omissions of
16 material fact described below, despite his obligation to do so in light of his knowledge,
17 positions, and responsibilities.

18 50.    Specifically, consistent with the Cash Council's re-focused marketing
19 approach for the Fund, the August 1, 2006, press release misleadingly called the Fund a "cash
20 alternative." Although the press release mentioned a recommended one-year holding period,
21 it also stated that: "Unlike money market funds, ultra-short bond funds are subject to minimal
22 price fluctuations." As Merk knew or was reckless in not knowing, this statement was
23 misleading because it suggested that the Fund's price fluctuations would be limited to
24 "minimal" changes. In stating that, in comparison to a money market fund, YieldPlus's NAV

COMPLAINT                                    -14-

1    would have "minimal" fluctuations, the press release substantially understated the riskiness of

2    the fund and its prior fluctuations, and thus was misleading and omitted material facts.

3         51.    At the August 29, 2006, meeting of the Fund's board of trustees, which Merk

4    attended as a trustee, Merk and the other trustees received documents and presentations

5    concerning the plans to market YieldPlus to retail investors as a cash alternative. As a trustee,

6    Merk was responsible for reviewing the materials and determining, based on his own

7    knowledge and expertise, whether the marketing was truthful and appropriate. This

8    marketing was to take the form of direct mail, email, and statements on the Schwab website.

9         52.    For example, among the board materials that Merk received was a document

10   entitled "Board Marketing Update, Schwab Funds" that was the subject of a presentation at

11   the August 29, 2006, meeting and included summaries of the current and future marketing of

12   YieldPlus. The materials discussed the growth of the YieldPlus Fund and provided a

13   "Marketing Summary" for the second quarter. Among other things, the Marketing Summary

14   listed four planned advertisements. One of those communications was for YieldPlus and

15   read: "Are you sitting on cash? Do you need additional income? Here's a smart solution.

16   The Schwab YieldPlus Fund™." The presentation also included the marketing plans for

17   YieldPlus for the third and fourth quarter of 2006, including marketing YieldPlus as a cash

18   alternative.

19        53.    These marketing plans were carried out through, for example, the publication

20   of the sales and marketing materials described in Section A.3. below, which were materially

21   false and misleading in the ways described below.

22        54.    YieldPlus experienced exceptional growth in the year following the Cash

23   Council's effort to highlight YieldPlus as a cash alternative with a stable NAV. From mid-

24   2006 to mid-2007, YieldPlus assets grew from under $7.5 billion to over $13 billion.

COMPLAINT                                    -15-

1        55.    Also included in the materials given to Merk and the other trustees at the

2    August 29, 2006 meeting was a piece published by Dow Jones on July 19, 2006, based in part

3    upon an interview with Daifotis. The piece was circulated to Merk and others and was

4    characterized as, "Dow Jones feature story on YieldPlus." The Dow Jones piece stated, "[t]he

5    Schwab YieldPlus Fund (SPYSX) is aimed at investors seeking better returns than on money

6    market products, but without significantly more market volatility or risk."

7        56.    Also at the August 29, 2006, meeting of the board of trustees, Merk voted to

8    change the Fund's concentration policy (unlawfully, as described below) to allow the Fund's

9    portfolio managers to concentrate the Fund's investments in non-agency MBS. Most of the

10   Fund's non-agency MBS investments were securities that a money market fund could not own

11   because of the length of their maturities. As a result, the concentration in non-agency MBS

12   made the Fund even less like a money market fund. As a fixed-income expert who

13   participated in the decision to concentrate the Fund's investments in non-agency MBS, Merk

14   knew or was reckless in not knowing that this was a material change that made the Fund even

15   riskier than cash investments and less like the cash investments to which it was being

16   compared. Merk knew or was reckless in not knowing that this change was not revealed in

17   the sales and marketing materials described in Section A.3. below.

18       57.    Merk was obliged to correct any misrepresentations or omissions of material

19   fact in any marketing materials, including those described herein, because of: (1) his senior

20   executive positions as Executive Vice President at Charles Schwab Corporation, Executive

21   Vice President at CS&Co., and trustee of YieldPlus; (2) his responsibilities as an executive

22   overseeing other executives at CSIM; (3) the fact that he knew or was reckless in not knowing

23   that he was relied upon within CSIM, CS&Co., and the Cash Council as a fixed-income

24   expert; and (4) the fact that he knew or was reckless in not knowing that he was relied upon

COMPLAINT    -16-

1   by those within CSIM and CS&Co. who prepared offer, sales, and marketing materials for the

2   Fund to make sure that the overall offer, sale, and marketing message for the Fund, as well as

3   any descriptions of the overall characteristics of the Fund, and its comparison to cash products

4   as described herein, were accurate, complete, and not misleading.

5         58.       In addition to the foregoing, because of Merk's experience managing fixed-

6   income products, Merk was in a unique position to correct the misleading statements in the

7   YieldPlus sales materials, the website, and press releases that he reviewed or of which he was

8   aware, as described above, and to make sure that they contained sufficient disclosures about

9   the riskiness of the Fund, its significant NAV fluctuations, and the differences between the

10   Fund and cash investments.

11        59.       Merk knew, or was reckless in not knowing, that, among other things, CSIM

12   and CS&Co. were issuing sales and marketing materials, displaying a website, and issuing

13   press releases, including those described above and in Section A.3. below, that included

14   materially false and misleading statements and omissions of material fact and would mislead

15   investors regarding the riskiness of the Fund. Yet Merk failed to correct the misleading

16   statements or to make sure that those materials included sufficient disclosures to make them

17   not misleading.

18        60.       As shown above, Merk directly and substantially participated in the

19   preparation of misrepresentations and omissions of material fact about YieldPlus that were

20   disseminated to the public.

21        61.       Merk's actions and failures to act as described herein had the principal purpose

22   and effect of creating a false appearance of fact in furtherance of the scheme to mislead the

23   public about YieldPlus.

24

COMPLAINT                     -17-

1

        **b.**   **Daifotis**

2     62.   Daifotis was actively involved in the day-to-day operations of YieldPlus.

3     63.   Because of Daifotis's knowledge of the Fund, which he helped develop; his

4 day-to-day involvement in, knowledge of and responsibility for the Fund's portfolio,

5 management, and characteristics; and his expertise in fixed-income products (including

6 money market funds), Daifotis was relied on by marketing, compliance and other personnel

7 within CS&Co. and CSIM to substantially participate in determining whether statements in

8 marketing and sales materials, and in other materials describing the Fund's characteristics and

9 performance, were accurate and complete, and Daifotis knew or was reckless in not knowing

10 that he was relied upon in that regard. For example, Daifotis was relied upon to make sure

11 that marketing materials and communications were consistent with the facts concerning the

12 Fund's portfolio, management, and characteristics.

13     64.   In the normal course of business, Daifotis regularly received, reviewed, and

14 contributed to sales and marketing materials regarding YieldPlus and made suggestions and

15 edits to some of them, many of which contained misrepresentations and omissions of material

16 fact, as discussed below.

17     65.   As shown in Section A.3. below, a number of sales and marketing materials

18 disseminated to the public from at least 2005 through at least March 2008 contained

19 statements regarding the nature of YieldPlus that quoted Daifotis or that were directly

20 attributed to Daifotis, some of which included his picture. Daifotis was aware of, or was

21 reckless in not knowing, the content of these statements and that they included materially

22 false and misleading statements and omissions of material fact in, for example, characterizing

23 the Fund as a cash alternative or cash equivalent without disclosing the fundamental and

24 significant differences and risks associated with the Fund. Although Daifotis was in a

COMPLAINT       -18-

1    position to change the content of those materials, he failed to make them accurate, complete,
2    and not misleading.

3    66.    Daifotis (along with Merk) directly and substantially participated in the
4    issuance of the August 1, 2006 "cash/CD/YieldPlus related press release." He participated in
5    the discussions about and drafting of the press release, which, as discussed above, was
6    misleading in calling the Fund a "cash alternative" and stating that it was "subject to minimal
7    price fluctuations," without disclosing the material facts involving the substantially greater
8    riskiness and price fluctuations associated with the Fund.

9    67.    Daifotis saw one or more drafts and the final language of the August 1, 2006
10   Press Release. Daifotis knew or was reckless in not knowing that it was misleading and
11   omitted material facts, in the ways described above, but he did not correct the false and
12   misleading statements and omissions, despite his obligation to do so in light of his knowledge,
13   positions, and responsibilities.

14   68.    In an August 2007 conference call with registered investment advisers,
15   Daifotis admitted that marketing YieldPlus as a money market alternative was misleading but
16   he falsely denied marketing YieldPlus in that manner. He stated: "[W]e do not and have
17   never said this should be marketed as a money market fund alternative. So if anybody ever
18   positioned it that way with [registered representatives], that is certainly not the right way to
19   position this fund." Daifotis knew or was reckless in not knowing that YieldPlus had been
20   marketed as a cash or money market alternative – and indeed as a "cash equivalent" – and that
21   his denial was false and misleading.

22   69.    By no later than the summer of 2007, CSIM, CS&Co. and Daifotis knew that
23   investors were using YieldPlus as an alternative investment to money market funds and CDs.
24   Nonetheless, Daifotis continued to compare YieldPlus to money market funds, as did CSIM

COMPLAINT                                    -19-

1   and CS&Co. Examples include, but are not limited to, Daifotis's comparing YieldPlus to

2   money market funds in August 2007 conference calls primarily with CS&Co. registered

3   representatives and independent advisers, CS&Co.'s and CSIM's including such comparisons

4   in sales materials placed on Schwab.com (including the YieldPlus landing page), the Schwab

5   Mutual Fund Center, and the cash hub of the Schwab Marketplace webpage, and their

6   continuing to market the Fund on the cash page of the public website, as discussed above.

7   Daifotis knew or was reckless in not knowing of these statements and that they were

8   materially misleading and failed to disclose that YieldPlus was significantly riskier than the

9   cash products to which it was being compared, for the reasons discussed above.

10      70.     Daifotis was obliged to make sure that such materials were accurate, complete,

11   and did not contain any misrepresentations or omissions of material fact because of: (1) his

12   senior executive position as Senior Vice-President and Chief Investment Officer – Fixed-

13   income at CSIM; (2) his position as lead portfolio manager for YieldPlus; (3) his active

14   involvement in the day-to-day operations of YieldPlus, including its offer, marketing, and

15   sale; and (4) his knowledge that others within CS&Co. and CSIM relied on him as described

16   above.

17      71.     Daifotis knew, or was reckless in not knowing, that sales materials, the

18   website, press releases, and other communications with investors that he made, reviewed, or

19   of which he was aware, including those described above and in Section A.3. below, included

20   materially false and misleading statements and omissions of material fact and would mislead

21   investors regarding characteristics such as the riskiness of the Fund and other material facts

22   described above, yet he failed to correct the misleading statements or to make sure that those

23   materials included sufficient disclosures to make them not misleading.

24      72.     By reason of the foregoing, and the matters alleged in Section A.3. below,

COMPLAINT                               -20-

1 | Daifotis directly and substantially participated in the preparation of misrepresentations and

2 | omissions of material fact about YieldPlus that were disseminated to the public.

3 |      73.     Daifotis's actions and failures to act as described herein had the principal

4 | purpose and effect of creating a false appearance of fact in furtherance of the scheme to

5 | mislead the public about YieldPlus.

6 |      **3.**     **Misrepresentations and Omissions In Sales**
               **and Marketing Materials For YieldPlus**

7

8 |      74.     The following are examples of false and misleading written and electronic

9 | communications to which the foregoing paragraphs refer. Daifotis and Merk knew about

10 | these communications or were reckless in not knowing about them. In particular, CS&Co.,

11 | with the assistance of CSIM, issued the following on behalf of Schwab Investments (italics

12 | and bold added):

13 |      (a)     From at least late 2006, following the Cash Council's directives,

14 | Schwab's Cash Investments and Strategies page on its public website, which was

15 | reached by selecting the "Cash" tab, included sweep accounts, CDs, a money market

16 | fund and YieldPlus as investment options and read:

17 |      (i)     "Want to make your cash work hard? This section highlights the

18 | different options Schwab offers to get more out of your cash."

19 |      (ii)     The webpage then offered a description of each product,

20 | including: "**Schwab YieldPlus Fund ®** If you're comfortable accepting a

21 | *slightly higher amount of risk* in exchange for a return that is generally better

22 | than the other *cash equivalent investments*, consider this ultra-short bond

23 | fund. This fund consisting of hundreds of bonds that offer enhanced

24 | diversification is best suited for those with investment horizons of one year or

1    more. Note that the Schwab YieldPlus Fund's net asset value will fluctuate."

2        (b)    A brochure mailed to Schwab investors in or about Spring 2006 with the

3    heading, "*STASH YOUR CASH—ULTRA-SHORT BOND FUNDS*" and in which

4    YieldPlus is the only ultra-short bond fund mentioned read:

5            (i)    "In the current uncertain interest rate and investing environment,

6    cash has become an increasingly attractive defensive holding for many

7    investors. *Kimon Daifotis*, chief investment officer and fixed-income portfolio

8    manager of Charles Schwab Investment Management, says investors can

9    receive better returns by using ultra-short bond funds as *an alternative to*

10   *traditional cash holdings, like money market funds and CDs*, though with a

11   *slightly increased risk* to principal."

12       (c)    A brochure mailed to Schwab clients in or about September 2006,

13   entitled "Schwab *YieldPlus Fund* read:  Your cash could be in a much more

14   rewarding position" stated:

15           (i)    "If you're looking for a smart *alternative for your cash*, investing

16   in the Schwab YieldPlus Fund ® could be your answer."

17           (ii)    "YieldPlus can be a great choice for clients with a 12-month or

18   longer investment horizon.  With historically strong performance, it offers

19   higher potential returns than money market funds *with only marginally more*

20   *risk*."

21           (iii)    "YieldPlus is an actively managed mutual fund consisting primarily

22   of *ultrashort duration bonds that mature frequently* to limit interest rate

23   exposure.  Its net asset value (NAV) has fluctuated by no more than $0.03

24   (between $9.65 and $9.68) over the last year ending 06/30/2006, giving it the

COMPLAINT                              -22-

1          performance potential and *relative stability* necessary in today's market."

2          (d)    In June 2006, the YieldPlus page on Schwab's public website read:

3                  (i)    "**Schwab YieldPlus Fund. Discover a smart alternative for**

4          **long-term cash holdings.**"

5                  (ii)    "Looking for a way to earn better yields on your long-term cash

6          *without taking on significantly higher risk*? The Schwab YieldPlus Fund ™

7          seeks to benefit from the current rising–rate environment and can be a smarter

8          *alternative to investing in money market* and long-term bond funds."

9                  (iii)   "The fund offers: *Increased yield potential*—Ultrashort bond

10         funds like YieldPlus Fund have historically provided higher sustained yield

11         versus money market funds, as their short duration helps minimize exposure to

12         falling bond prices as rate rise.  Even though the share *price may fluctuate*

13         *minimally*, these funds offer lower risk than longer-term bonds funds and *only*

14         *marginally higher risk than money market funds.*"

15         (e)    In or about September 2006, an email was sent to investors from Charles

16         Schwab with the subject line "Put your *cash in a stronger position with YieldPlus*."

17         The body of the text included the following claims:

18                  (i)    "Higher income potential, *minimal risk*."

19                  (ii)    "It offers higher potential returns than many money market funds,

20         with *only marginally higher risk*."

21                  (iii)   "YieldPlus primarily consists of ultra-short duration bonds *that*

22         *mature frequently* to limit interest rate risk exposure.  Its net asset value

23         (NAV) has fluctuated by no more than $0.03 (between $9.65 and $9.68) over

24         the past year ending 6/30/2006, giving it the performance potential and *relative*

1    *stability necessary* in today's market."

2            (iv)   "What are the advantages of the Schwab YieldPlus Fund?  High

3        Yield. . . . Strong Ratings. . . . *Minimal Risk*."

4        (f)    In or about September 2005, an advertisement ran with a *picture of*

5    *Daifotis and a quote attributed to him* reading: "'With consistent exceptional

6    performance, The Schwab YieldPlus Fund ™ is a smart *cash alternative* for your

7    clients in the current rising-rate market, providing enhanced yield potential *over*

8    *money market funds.*'"

9        (g)    A September 2005, advertisement included a *picture of Daifotis* and the

10   claim: "It's an ultrashort bond fund, not a money market fund.  It seeks to provide

11   higher yield with *slightly higher risk than a money market fund, but maintains*

12   *minimal fluctuation in share price* and lower risk than a longer-term bond fund."

13       (h)    A brochure mailed to investors in or about January 2006, entitled "Smart

14   cash strategies.  Easy ways to keep your cash working." stated: "Understanding the

15   different roles *that cash plays in* your portfolio can help you make smart decisions

16   about the type of investment that is best suited for your cash.  Use this chart to review

17   some of your choices."  The chart listed YieldPlus with money market funds and CDs

18   as a type of investment cash, and included as suggested uses for such cash:

19   emergency reserves, upcoming tax bills, planned vacations, down payments, future

20   purchases and portfolio diversification.  Next to these uses was a brief explanation of

21   each product.  YieldPlus was described as follows:

22           (i)    "If you're comfortable with accepting a *slightly higher amount of*

23       *risk* in exchange for a return that's generally better than *other cash-equivalent*

24       *investments*, consider this ultra-short bond fund.  The net asset value of the

1             Schwab YieldPlus Fund will fluctuate."

2                (i)        From at least 2005 through at least March 2008, CSIM and CS&Co.

3 listed the Lehman Brothers U.S. Treasury 9-12 Month Index as the benchmark for

4 measurement of YieldPlus's performance. The benchmark was listed on fact sheets

5 for the YieldPlus Fund on Schwab's public website, Schwab.com. This was

6 misleading because it suggested that the Fund invested regularly and substantially in

7 bonds issued by the U.S. Treasury, and that YieldPlus's performance and risk profile

8 would be similar to that of Treasury bonds, neither of which were true. Daifotis

9 participated in selecting the benchmark, and he and Merk knew, or were reckless in

10 not knowing, that use of a 9-12 month Treasury benchmark for the Fund would be

11 misleading for the reasons described above.

12         75.       The sales and marketing materials described in the preceding paragraph were

13 misleading and contained misrepresentations or omissions of material fact in at least the

14 following respects: (a) identifying YieldPlus as a cash-alternative and cash-equivalent

15 investment and asserting that YieldPlus was only slightly or marginally riskier than other cash

16 or cash-like products, such as CDs or money market funds, was false and misleading because

17 YieldPlus in fact was substantially riskier than those products, and the greater risks were not

18 fully or accurately disclosed; (b) asserting that YieldPlus offered enhanced diversification was

19 false and misleading because it deviated from its own concentration policy and its investments

20 were heavily concentrated in residential mortgage-backed securities and financial institutions,

21 which was not adequately disclosed; (c) asserting that YieldPlus consisted primarily of

22 ultrashort duration bonds that matured frequently was false and misleading because it held a

23 large percentage of investments with longer actual maturities, especially in comparison to

24 investments held by money market funds, which was not disclosed; and (d) asserting that

COMPLAINT                   -25-

1   YieldPlus's NAV fluctuated only minimally was false and misleading, and asserting that it

2   fluctuated by only $0.03 in the year ending June 30, 2006 was at best misleading because it

3   had fluctuated much more during other recent periods and was subject to the risk of much

4   greater fluctuation, which was not adequately disclosed.

5       76.     The foregoing sales and marketing materials were reviewed and/or prepared by

6   CS&Co.'s product development and management group. The personnel who prepared such

7   materials, along with others within Schwab who reviewed such materials, relied upon Daifotis

8   and Merk, as described above.

9       77.     At or about the time periods of the sales and marketing materials identified

10   above, Daifotis and Merk knew or were reckless in not knowing that CS&Co. and CSIM were

11   disseminating either those particular marketing and advertising materials or materials

12   containing the substance thereof, and that materials were materially false and misleading in

13   the ways described above.

14       78.     Because of their senior-executive positions and their responsibilities, their

15   knowledge of the Fund and fixed-income products generally, and the fact they knew or were

16   reckless in not knowing that they were relied upon within CSIM and CS&Co. as described

17   above, Daifotis and Merk were obligated to see to it that CSIM and CS&Co. did not make

18   false and misleading statements and omissions about YieldPlus such as those described above.

19   Daifotis and Merk nevertheless, as described above, made or substantially participated in

20   making various of these statements, and knew or were reckless in not knowing that CSIM and

21   CS&Co. were making these statements, but failed to prevent such materials from being

22   disseminated or stop them even after they knew, or were reckless in not knowing, that such

23   misleading statements or omissions of material fact were being disseminated to the public.

24

COMPLAINT               -26-

1        **4.    Misleading Statements and Omissions Regarding**
              **YieldPlus's Weighted Average Maturity**

2        79.    With regard to mutual funds such as YieldPlus, facts pertaining to the term of

3    investments held by the Fund, i.e., the time until maturity of the investments, are material

4    facts.

5        80.    Investors can use weighted average maturity ("WAM") —a measurement of

6    the average length of time until the underlying bonds in a portfolio mature—to evaluate the

7    riskiness of a product. Among similar funds, those with longer WAMs generally involve

8    more risk.

9        81.    For eighteen months, from February 2006 to September 2007, CSIM and

10   CS&Co., with Daifotis's substantial participation, misstated YieldPlus's WAM in

11   communications designed for investors, including but not limited to marketing materials on

12   the public website (as explained more fully below) and one Commission filing, a Form N-

13   CSR Annual Report dated August 31, 2007.

14       82.    In early 2006, the YieldPlus Fund's WAM tripled to over one to two years in

15   length because of a change in the calculation method used by Schwab Investment's new fund

16   accountant. Investors complained about the increase, some even telling CSIM and CS&Co.

17   that they might invest in CDs instead of YieldPlus as a result of the longer WAM.

18       83.    Because of the response of investors and representatives to the longer WAM,

19   between at least November 2005 and February 2006, Daifotis suggested to others at CSIM

20   and CS&Co. that "duration" be included instead of or in addition to WAM.

21       84.    "Duration" is a ratio that measures interest-rate sensitivity affected by hedging

22   techniques, but is not a measure of maturity or any other unit of time.

23       85.    Despite owning many long-maturity bonds, YieldPlus was classified as an

24

COMPLAINT                                    -27-

1   ultra-short fund because of its low duration. To keep YieldPlus's duration low, YieldPlus

2   "shorted" Treasury futures. By selling Treasury futures short (which means selling the

3   futures contracts without owning them, and profiting if the value of the securities declines),

4   CSIM and CS&Co. hedged the interest rate risk of the securities in YieldPlus's portfolio.

5   This may have reduced YieldPlus's exposure to interest rate risk, but it did not mitigate the

6   liquidity risk and other risks posed by the bonds held by YieldPlus, especially those with

7   longer maturities.

8       86.   The numerals reflecting YieldPlus's duration (which generally ranged from 0.4

9   to 0.6) were significantly lower than the numerals reflecting the Fund's WAM (i.e., 1.2 to

10  over 4.2 by some calculations).

11      87.   Based on Daifotis's suggestion in or about January 2006, CSIM and CS&Co.

12  then began listing YieldPlus's "duration" in place of its WAM in various sales materials, such

13  as tables on its public website listing Schwab funds and their attributes. Daifotis also

14  discussed with CS&Co. and CSIM officials how to make that change.

15      88.   CSIM and CS&Co. replaced WAM with duration only for YieldPlus, not for

16  any other fund. In some communications, CSIM and CS&Co. noted the replacement with a

17  footnote indicating that duration, not WAM, was listed, while in other communications,

18  CSIM and CS&Co. failed even to disclose that they had made such a substitution.

19      89.   From at least February 2006 through September 2007, CSIM and CS&Co.

20  listed a duration figure of 0.5 in place of WAM, without any notation of the replacement, on

21  Schwab's external website available to the public, Schwab.com. The duration figure was

22  included in tables of multiple Schwab investments, allowing comparisons of the products and

23  quick review of their attributes (including WAM and performance data). The tables listed the

24  investment products by categories and included columns for yield or performance data as well

COMPLAINT                                -28-

1     as the WAM for each product. But the website did not disclose that YieldPlus's duration had

2     replaced WAM figures.

3          90.     Because duration figures had replaced WAM figures for YieldPlus but that

4     change was not disclosed, the website and tables deceptively appeared to still be listing WAM

5     figures for the Fund. The mere fact that CSIM and CS&Co. were listing a duration figure

6     instead of WAM for YieldPlus was a material fact. Their failure to disclose that fact, and to

7     explain the differences between "duration" and WAM, caused these communications with

8     investors to be deceptive and misleading.

9          91.     Because the numerals reflecting duration (i.e., 0.4 to 0.6) were significantly

10     lower than the numerals that would have reflected WAM (i.e., 1.2 to 4.2 years), this made the

11     materials appear to indicate that YieldPlus held investments with maturities of a few months

12     to six months, when in fact the maturities were at least three times that.

13          92.     Further, CSIM and CS&Co. also listed a duration figure of 0.5 in place of

14     WAM, without any notation of the replacement, in a Commission filing, a Form N-CSR

15     Annual Report dated August 31, 2007, and filed with the Commission on November 2, 2007.

16          93.     CSIM and CS&Co. also listed a duration figure of 0.5 in place of WAM,

17     without any notation of the replacement in Schwab's publicly distributed magazine, entitled

18     "*On Investing,*" including at least the issued dated March 21, 2007.

19          94.     Also for the period of at least February 2006 to at least September 2007, on the

20     Schwab Mutual Fund Center website, CSIM and CS&Co. replaced WAM with duration in

21     tables listing data for Schwab products. Again, they made the replacement only for

22     YieldPlus, not other products. Although they included a footnote noting the change, they

23     failed to make the change obvious or to explain its import.

24          95.     Thus, even when CSIM and CS&Co. included a footnote indicating that

COMPLAINT                  -29-

1　　duration was listed for YieldPlus instead of WAM, their failure to explain the difference

2　　between the two measures was materially misleading.

3　　　　96.　　The difference between duration and WAM greatly confused many investors

4　　and even CS&Co. representatives, who erroneously believed that YieldPlus's short duration

5　　meant that it held only short-maturity bonds.

6　　　　97.　　The duration number that CSIM and CS&Co. listed was false and misleading

7　　in another way because the figure itself was false. Although YieldPlus's duration fluctuated,

8　　CSIM and CS&Co. hard-coded the number "0.5" into tables and documents discussed above.

9　　This misleadingly suggested to investors that YieldPlus's duration (or WAM, when the

10　　footnote was omitted) was absolutely constant, implying a stability that did not exist.

11　　　　98.　　Having been a lead decision-maker in deciding to replace WAM with duration,

12　　Daifotis knew or was reckless in not knowing that that the materials described above,

13　　including the Schwab.com website, the November 2, 2007 Form N-CSR, and the issues of the

14　　*On Investing* publication listed duration figures in place of WAM but did not disclose that

15　　change. Indeed, the November 2, 2007 Form N-CSR even bore Daifotis's picture, thus

16　　attributing the contents to him.

17　　　　99.　　Daifotis also knew or was reckless in not knowing that replacement of a 0.5

18　　WAM with duration figures without disclosing the change and fully explaining the duration

19　　figures in the above-described materials was false and misleading because, as discussed

20　　above, the Fund's WAM was substantially longer than that.

21　　　　100.　　Daifotis knew or was reckless in not knowing that CSIM and CS&Co. listed a

22　　hard-coded duration figure of 0.5 on the Schwab Mutual Fund Center website, without

23　　explaining the nature of duration or how it differed from WAM figures, as described above,

24　　and that it was misleading to fail to fully explain those things and to list a hard-coded figure

COMPLAINT　　　　　　　　　　　-30-

1   that actually fluctuated.

2       101.    Daifotis failed to correct the misrepresentations or omissions regarding the

3   listing of duration figures, as described above, despite his obligation to do so as a result of his

4   senior executive position, his involvement in causing the change to be made, his

5   responsibilities and the fact that, as he knew or was reckless in not knowing, he was relied

6   upon within CSIM and CS&Co. to make sure that information about the Fund that was

7   disseminated to the public was accurate, complete, and not misleading.

8       102.    As a result of the foregoing, CS&Co. employees, including, but not limited to

9   registered representatives and regional bond specialists, communicated incorrect information

10  to investors.  For example, during one telephone call, on or about July 24, 2007, a CS&Co.

11  representative told a Schwab customer that the Fund invested in bonds with maturities of 180

12  days or less.  This was false because many of the Fund's holdings had maturities much longer

13  than 180 days.

14      **B.    Unlawful Deviation From Concentration Policy**

15          **1.    Background**

16      103.    Section 8 of the Investment Company Act [15 U.S.C. §80a-8] requires that a

17  fund's registration statement contain a recital of certain investment policies, including its

18  policy regarding concentration of investments in particular industries, fundamental investment

19  policies or any investment policy that is only changeable if authorized by a shareholder vote.

20  Section 13(a)(3) of the Investment Company Act [15 U.S.C. § 80a-13(a)(3)] states that a fund

21  may not "deviate from" these investment policies unless authorized by a shareholder vote.

22      104.    To comply with Section 8, Schwab Investments recited a single concentration

23  policy for its taxable bond funds, including YieldPlus, the Total Bond Fund, and the Short-

24  Term Bond Fund, in a registration statement shared by all of the funds.  The registration

COMPLAINT                                -31-

1    statement was filed with the Commission when the funds were created, which was 1999 for

2    YieldPlus, 1997 for the Total Bond Fund, and 1991 for the Short-Term Bond Fund, and

3    updated registration statements were filed at least annually. They were available to the

4    public.

5         105.    All registration statements filed for the above-mentioned funds from each of

6    their inceptions stated that the funds would not concentrate more than 25 percent of their

7    assets in any industry.

8         106.    For five years prior to August 2006, the registration statements also stated that,

9    "for the purpose of its concentration policy," each fund would treat non-agency MBS as an

10   industry. As a result, the bond funds, including YieldPlus, the Total Bond Fund, and the

11   Short-Term Bond Fund, could not invest more than 25 percent of portfolio assets in non-

12   agency MBS.

13        107.    The concentration policy and treatment of non-agency MBS as an industry

14   were material facts that impacted the riskiness, desirability and performance potential of the

15   funds.

16              **2.    YieldPlus Invested More Than**
                **25 Percent of Assets in Non-Agency MBS**
17

18        108.    Schwab Investments, in violation of Section 13(a)(3) of the Investment

19   Company Act [15 U.S.C. § 80a-13(a)(3)], deviated from YieldPlus's concentration policy by

     at least early 2006 when it invested more than 25 percent of its assets in non-agency MBS.
20
     Contemporaneous documents, including quarterly review power point presentations for
21
     YieldPlus dated March 31, 2006, and June 30, 2006, created by Fund portfolio managers, and
22
     that Daifotis reviewed or was reckless if he did not review, reflected the deviation in charts
23
     summarizing the Fund's holdings, which conflicted with holding percentages reported in
24

COMPLAINT                          -32-

1    documents that Schwab Investments filed with the Commission.

2         109.    By at least March 2006, Daifotis directed YieldPlus's investments that caused

3    it to deviate from its concentration policy and violate Section 13(a)(3) of the Investment

4    Company Act [15 U.S.C. § 80a-13(a)(3)], and he knew or was reckless in not knowing that

5    this was the result of his actions.

6         110.    Moreover, YieldPlus deviated from its concentration policy partly because

7    Daifotis and the portfolio managers that he supervised failed to classify some securities as

8    non-agency MBS for purposes of YieldPlus's concentration policy.  For example, from at

9    least 2005 through mid-2008, Daifotis and the portfolio managers he supervised excluded two

10   entire categories of securities, commercial MBS and subprime MBS, when calculating the

11   percentage of assets invested in non-agency MBS, even though those categories should have

12   been included as non-agency MBS.  If these categories of MBS were included in the

13   calculation of non-agency MBS, YieldPlus's total non-agency MBS holdings significantly

14   exceeded 25 percent by early 2006, as Daifotis knew or was reckless in not knowing.

15        111.    In addition, some securities were moved among classifications in filings with

16   the Commission, thus masking the improper concentration, as Daifotis knew or was reckless

17   in not knowing.  Consistently classifying the securities as MBS would have disclosed that

18   YieldPlus had exceeded its concentration limit.

19        112.    As a result of the foregoing, CSIM and CS&Co. filed reports with the

20   Commission that substantially understated the actual percentage of YieldPlus's total non-

21   agency MBS holdings, making those reports materially false and misleading because they

22   falsely made it appear that non-agency MBS did not make up more than 25 percent of

23   YieldPlus's holdings.

24        113.    In particular, from at least late 2005 through mid-2008, the annual registration

COMPLAINT                              -33-

1   statement amendments filed each November on Form N-1A and supplemented as necessary,

2   the annual and semi-annual Certified Shareholder Reports filed on Form N-CSR as of

3   February 28 and August 31 of each year, and the annual and semi-annual Quarterly Schedule

4   of Portfolio Holdings filed on Form N-Q as of May 31 and November 31 of each year, were

5   false and misleading in indicating that YieldPlus's non-agency MBS holdings did not exceed

6   25 percent, when in fact YieldPlus's non-agency MBS holdings substantially exceeded 25

7   percent.

8       114.    During the time period that the above-referenced reports were being filed with

9   the Commission, Daifotis knew or was reckless in not knowing that YieldPlus investments

10  that he directed, the improper classification of assets that he and his portfolio managers

11  directed, and the improper shifting of classification of assets, as described above, were

12  causing such false reports to be filed with the Commission. Daifotis thereby substantially

13  participated in the creation of the false reports described above.

14      115.    From at least March 2006, CSIM, CS&Co. and Daifotis knew, or were reckless

15  in not knowing, that YieldPlus had deviated from its recited concentration policy without

16  shareholder approval. CSIM, CS&Co., and Daifotis knew or were reckless in not knowing,

17  that YieldPlus's filings with the Commission, including but not necessarily limited to those

18  discussed above, contained material misstatements and omissions about YieldPlus's

19  concentration in non-agency MBS.

20              **3.    Schwab Investments' Invalid Change of the**
                 **Concentration Policy Without Shareholder Approval**
21

22      116.    After exceeding the 25 percent limit, the board of trustees of Schwab

    Investments, including Merk, voted in August 2006 to stop treating non-agency MBS as an
23
    industry and allow the funds to invest more than 25 percent of assets in non-agency MBS for
24

COMPLAINT                           -34-

1  funds including YieldPlus, the Total Bond Fund and the Short Term Bond Fund.

2  117.  By at least August 2006, Daifotis and another CSIM portfolio manager

3  recommended the change and Daifotis presented the recommendation to the board. Daifotis

4  did not inform the board that, as Daifotis knew or was reckless in not knowing, YieldPlus

5  already had deviated from the concentration policy.

6  118.  The board voted in August 2006 to approve the change, but did not seek

7  shareholder approval to allow the funds to invest over 25 percent of their assets in non-agency

8  MBS as required by Section 13(a) of the Investment Company Act.

9  119.  This vote was improper and invalid because, under Section 13(a) of the

10  Investment Company Act [15 U.S.C. §80a-13(a)], any such change in concentration policy

11  had to be approved by a shareholder vote.

12  120.  YieldPlus's investment in non-agency MBS ballooned after the purported

13  change, approaching 50 percent within a year.

14  121.  By at least November 2006, the Total Bond Fund and the Short Term Bond

15  Fund, which were governed by the same prospectus, also exceeded 25 percent of assets

16  invested in non-agency MBS in violation of the concentration policy.

17  **4.  Failure to Properly Disclose the Change of Concentration Policy**

18  122.  Not only was Section 13(a) of the Investment Company Act violated as set

19  forth above, defendants also signed or substantially participated in the submission of one or

20  more false documents to the Commission regarding the deviation from the concentration

21  policy, including but not necessarily limited to those set forth below.

22  123.  As a trustee, Merk, among others, authorized his signature on and the filing of

23  one or more documents that contained material misstatements or omissions concerning the

24  concentration policy, including filings on Form 485B on November 15, 2006. The filing was

COMPLAINT                                    -35-

1   misleading because it failed to properly and adequately disclose to the Commission or the
2   public the material facts that Merk and the other trustees had voted to materially change the
3   funds' concentration policies, and that the funds had not obtained the required shareholder
4   approval for the change and had taken on the additional risk, and that YieldPlus already had
5   deviated from the concentration policy.

6       124.    Moreover, Merk knew, or was reckless in not knowing, that the Form 485B
7   filing contained a false certification that the filing did not contain any material changes.
8   Merk's signature appears on the same page as the certification that the document contained no
9   material changes. Merk allowed his signature to be affixed to the document even though he
10  knew that the trustees had voted to change the funds' concentration policy and knew, or was
11  reckless in not knowing, that it was a material change and that, therefore, the certification in
12  the Form 485B was false.

13      125.    Daifotis reviewed the November 2006 Form 485B before it was filed and he
14  was specifically asked to review and comment on the language concerning the change to the
15  concentration policy and the related additional risk disclosure. Although Daifotis knew or
16  was reckless in not knowing that the document was false and misleading for the reasons stated
17  above, and that it was to be filed with the Commission, Daifotis failed to make the changes
18  that would have been necessary to prevent the document from being false and misleading,
19  such as disclosing that the Form 485B contained a material change to the funds' concentration
20  policy, and that YieldPlus already had deviated from the policy.

21      126.    In light of Merk's and Daifotis's executive-level positions and responsibilities,
22  as described above, and the fact that they knew or were reckless in not knowing that others
23  within CSIM and CS&Co. who prepared such documents relied on them to make sure that
24  statements that they reviewed or that they were asked or able to review were factually

COMPLAINT                          -36-

1    accurate, complete, and not misleading, Daifotis and Merk were obligated to see to it that the

2    filings described above did not contain misrepresentations or omissions of material fact.

3           **C.**      **Fraudulent Statements and Conduct**
                   **Regarding YieldPlus During its Decline**

4

                 **1.**      **The Decline**

5

6         127.     Due, in part, to the misrepresentations and omissions described above, such as

the misleading comparisons of YieldPlus to cash investments, the false descriptions of

7

YieldPlus as only marginally riskier than a money market fund, the false statements that its

8

NAV was unlikely to fluctuate by more than a few pennies, the understatement of YieldPlus's

9

WAM, and the failure to seek shareholder approval for YieldPlus's concentration in non-

10

agency MBS, and YieldPlus's historical performance, many YieldPlus investors expected that

11

YieldPlus would experience minimal NAV fluctuations.

12

        128.     When YieldPlus's NAV began to decline in the summer of 2007, many

13

investors redeemed their holdings.

14

        129.     Daifotis and Merk believed that they needed investor redemptions to diminish.

15

For example, early in the crisis, a senior portfolio manager for YieldPlus sent an email to

16

Daifotis, Merk and others stating that, "we need flows to stabiliz[e]." Shortly after, Daifotis

17

sent an email to Merk stating that, "[i]f the Advisor community starts to bail out, who [sic]

18

has been stable to this point, we will be in trouble."

19

        130.     In response, as detailed below, CSIM and CS&Co. held a series of conference

20

calls, spoke with individual customers and advisers, issued written materials, and circulated

21

internal talking points regarding the Fund's decline.

22

        131.     As described more fully below, Daifotis and Merk played key roles in this

23

communication effort and knew or were reckless in not knowing that statements that they

24

COMPLAINT                      -37-

1    made, or statements for which they knowingly provided substantial assistance, contained

2    misrepresentations and omissions of material fact.

3         132.    Daifotis was the primary face of CSIM and CS&Co.'s statements. He led

4    conference calls discussing YieldPlus's status, personally made misrepresentations and

5    omissions of material fact, received daily updates about YieldPlus's level of redemptions and

6    cash status, and authored or reviewed most of the documents circulated to investors, advisers

7    and CS&Co. representatives.

8         133.    Merk authored, reviewed, and/or approved a number of the public statements

9    and internal talking points that contained misrepresentations and omissions of material fact.

10   He received daily updates concerning the Fund, monitored the Fund's performance and

11   participated in crafting the public response. He also supervised Daifotis during the relevant

12   period.

13        134.    The defendants made, substantially participated in making, or knowingly

14   provided substantial assistance in the making of misrepresentations or omissions of material

15   fact during the period of the Fund's decline, including but not necessarily limited to those set

16   forth in sections C.2. and C.3. below.

17             **2.    False Statements and Omissions About the Level of Redemptions**

18        135.    Prominent among the false statements early in the crisis were two false

19   statements by Daifotis about YieldPlus's level of redemptions in two prescheduled conference

20   calls on August 14 and 16, 2007, with large groups of registered representatives and

21   independent investment advisers. The calls were intended to respond to investors' questions

22   and concerns about YieldPlus.

23        136.    From August 1 through 14, 2007, investors redeemed almost $1.2 billion in

24   assets, or approximately 10 percent of Fund assets. Because YieldPlus had a negative cash

COMPLAINT                                  -38-

1   position as of July 31, 2007, it had to sell assets to meet the redemptions and prepare for more

2   redemptions. During that two-week period, YieldPlus sold over \$2.1 billion in portfolio

3   securities, representing 16 percent of assets. YieldPlus's portfolio managers had never before

4   sold a significant percentage of Fund assets.

5       137.   Because redemptions were a growing concern, Daifotis monitored redemption

6   levels multiple times per day in August 2007, and thus was well aware of the high level of

7   redemptions.

8       138.   Six days before the August 14, 2007 conference call, Daifotis and Merk

9   received the email from a portfolio manager stating that, "we need flows to stabiliz[e]."

10      139.   Three days before the August 14, 2007 conference call, Daifotis sent an email

11   to Merk in which he said that, "[i]f the Advisor community starts to bail out, who has been

12   stable to this point, we will be in trouble."

13      140.   On August 12, 2007, two days before the first conference call, Daifotis sent an

14   email editing a set of questions and answers ("Q&A") to be posted on the Schwab.com

15   website and thus available to the public. The edits removed redemption information from the

16   Q&A and, in the email, Daifotis explained, "*I don't want anyone to sense that we are having*

17   *outflows.*" (emphasis added).

18      141.   On August 14, 2007, Daifotis held a prescheduled conference call with a large

19   number of independent registered investment advisers to discuss YieldPlus. During the call,

20   an adviser asked Daifotis, "how expensive have your redemptions been since the decline?"

21   During his answer, Daifotis responded that some advisers had purchased more shares, and that

22   "we've got *very, very, very slight* negative flows over the course of the last week or two."

23   (emphasis added).

24      142.   Two days later, on August 16, 2007, Daifotis held a similar conference call

COMPLAINT               -39-

1   with a large number of CS&Co. registered representatives. In that call, a representative asked

2   "what are the net outflows of the Schwab Yield Plus fund to date?" During his answer,

3   Daifotis stated, "[i]t's not that much.... So *outflows have been minimal*" (emphasis added).

4        143.   Daifotis knew or was reckless in not knowing that his statements were

5   materially false and misleading because YieldPlus was experiencing tremendous,

6   unprecedented outflows, which required over $2 billion in asset sales in only two weeks, and

7   therefore could not fairly be described as "very, very, very slight" or "minimal."

8        144.   Daifotis's false statements were communicated to YieldPlus investors, and

9   Daifotis knew or was reckless in not knowing that this would occur. For example, in the

10   week after the conference calls, a CS&Co. representative told a YieldPlus investor during a

11   telephone call: "And what we really have to be concerned about, is what have the outflows

12   been on the fund. And surprisingly—and this—Kim Daifotis, who is the head of Schwab

13   Investment Management said that he was very surprised, and he said the redemptions were

14   negligible on the fund."

15              **3.**     **Other Fraudulent Statements and Conduct During the Decline**

16        145.   <u>August 2007 Q&A on the Website.</u> In early August 2007, CS&Co. published

17   on the Schwab website a Q&A, which was available to the public, that listed Merk as the

18   author. Merk reviewed and edited the document before it was published. Among other false

19   and misleading statements and omissions, the Q&A stated that the "fund's short maturity

20   structure has mitigated much of the price erosion that some other ultrashort bond funds have

21   experienced." This remained on the Schwab website through at least March 2008.

22        146.   When he made the statement described above, Merk knew or was reckless in

23   not knowing that his statement was false and misleading because YieldPlus did not have a

24   short maturity structure, especially compared to money market funds. Rather, as described

COMPLAINT            -40-

1  above, it held many long-term bonds with stated maturities of twenty years or more, and used

2  interest rate hedging strategies to limit YieldPlus's duration.

3       147.    Merk's statement also was false and misleading because YieldPlus was

4  performing worse than most of its peers. For example, the day after the Q&A piece was

5  posted, Merk received statistics showing that YieldPlus was ranked in the bottom 15 percent

6  percentile of its peers. In light of Merk's statement about YieldPlus's performance in relation

7  to other funds, it was a material omission to not disclose the fact that the large majority of

8  peer funds had performed better, and this made Merk's statement on that point materially

9  misleading. Merk, however, did not remove his misleading statement from Schwab's

10  website, and the false statement remained on the website through at least March 2008.

11       148.    In addition to being on the Schwab website, the false statements were

12  communicated to YieldPlus investors, as Merk knew or was reckless in not knowing would

13  result from his having posted the statements. For example, on August 21, 2007, a CS&Co.

14  representative told a YieldPlus investor during a telephone call: "And if we take a look at the

15  peer group of ultrashort term bond funds, this has actually performed much better than all the

16  other ultrashort term bond funds, because it does have a very quality portfolio."

17       149.    <u>November 2007 Talking Points.</u> In late November 2007, CS&Co. and CSIM

18  circulated a set of internal talking points that were used by Schwab employees when

19  discussing YieldPlus with investors. Before circulation, both Daifotis and Merk reviewed the

20  talking points, which covered half of the one-page document, the rest of which mainly

21  contained standard disclosure language and a chart entitled "Average Annualized Total

22  Returns." Merk suggested an edit and then approved the talking points. The document stated

23  that:

24          •    "The portfolio management team has confidence in the Fund's strategy given

COMPLAINT                 -41-

1        our outlook for the fixed-income markets."

2        •        "Despite the recent spike in bond market volatility, history suggests this is a

3        temporary condition."

4        •        YieldPlus's unrealized loss, which made up 75 percent of YieldPlus's losses,

5        was a "paper loss."

6        •        "Since last summer, the Fund has maintained a higher than normal cash

7        position, in an effort to capitalize on investment opportunities and to

8        effectively manage potential redemption requests."

9        •        "The portfolio is highly diversified with approximately 400 securities across a

10       wide range of sectors and industries."

11       150.    The talking points contained a number of false and misleading statements and

12   omissions of material fact, including but not necessarily limited to the following:

13               (a)      The statement that the portfolio management team had "confidence" in

14   YieldPlus was, at best, misleading because it omitted the material fact that the

15   portfolio management team's contemporaneous internal discussions stated the

16   opposite.  For example, in one email sent days before Merk approved the talking

17   points, the portfolio manager assigned to give daily updates on the Fund reported to

18   Daifotis, Merk, and other senior executives that raising cash "was like pulling teeth"

19   and that "[l]iquidity is AWFUL ....period."  In a second email sent that week, the

20   same portfolio manager reported to Daifotis that "it[']s not better today and likely

21   won't be for some time."  In a third email that he sent shortly before the talking points

22   were finalized, he reported to Daifotis, Merk, and others that "we are hostage to the

23   market at this point and can't improve the NAV."  The statement also was misleading

24

COMPLAINT                                       -42-

1    because it omitted material facts concerning the high level of redemptions and the fact

2    that many of the Fund's best assets were being sold at depressed prices in order to

3    meet redemptions.

4          (b)    The statements that YieldPlus's losses to date were "paper loss[es]"

5    and were "unrealized" were at best misleading because they omitted the material fact

6    that, by that time, YieldPlus had sold its safest, most liquid assets, which made the

7    portfolio more vulnerable to further declines. YieldPlus had sold its safest assets

8    because it needed to raise cash to meet redemptions and the safest assets were easiest

9    to sell.

10         (c)    The statement that YieldPlus was raising cash "since last summer" to

11   take advantage of buying opportunities was false, misleading, and omitted material

12   facts. During August 2007, Merk had instructed the portfolio management team to

13   focus on selling assets to raise cash, and to stop buying bonds. The false statement

14   was repeated in a November 2007 document labeled a "Manager's Discussion," which

15   stated that "[w]e continue to maintain higher-than-normal cash positions in an effort to

16   capitalize on purchasing opportunities in the current market environment and to

17   effectively manage the timing of any redemption requests." YieldPlus was not

18   looking for "current" buying opportunities.

19         (d)    The statement that YieldPlus was "highly diversified" was misleading

20   and omitted material facts. Combining YieldPlus's MBS and its ownership of

21   corporate bonds issued by financial institutions, over 75 percent of YieldPlus's assets

22   were tied to the real estate and financial sectors.

23       151.    As Daifotis and Merk knew or were reckless in not knowing would occur,

24   CS&Co.'s representatives repeated the substance of the talking points and other misleading

COMPLAINT          -43-

1   communications in at least November 2007 when communicating with investors about

2   YieldPlus in telephone calls regarding concern over YieldPlus's performance and general

3   reviews of portfolios that held YieldPlus.

4   152.   In light of their senior executive positions and responsibilities, and the fact that

5   they knew or were reckless in not knowing that they were relied upon within CSIM and

6   CS&Co. to convey accurate, complete, and not misleading information about the Fund, as

7   described above, Daifotis and Merk were obligated to make sure that the November 2007

8   talking points – which they reviewed and Merk approved – were accurate, complete, and not

9   misleading in the ways described above. Daifotis and Merk failed to carry out that obligation

10  because they allowed the talking points to be issued without correcting the above-described

11  misrepresentations and omissions.

12  153.   November 15, 2007 Email Regarding Sales at Distressed Prices. Also in

13  November 2007, Daifotis and Merk knew or were reckless in not knowing that Fund

14  representatives were misleading the public by understating the stress that YieldPlus was

15  experiencing because, among other things, representatives were being told to inform investors

16  that YieldPlus was not forced to sell assets at distressed prices to meet redemptions. One

17  November 15, 2007, email, a copy of which was sent to Daifotis and Merk, was sent to

18  CS&Co. representatives telling them that "[t]he portfolio managers have not been forced into

19  selling securities at distressed prices to meet client redemptions." Daifotis and Merk knew or

20  were reckless in not knowing that the substance of this would be communicated to the public.

21  154.   As Daifotis and Merk knew or were reckless in not knowing, the statement in

22  the November 15, 2007 email was false, misleading, and omitted material facts. Only one day

23  before that November 15, 2007 email was sent, the YieldPlus portfolio manager assigned to

24  preparing a daily update told Daifotis, Merk and others that "we are selling securities that are

COMPLAINT                                    -44-

1    'money-good' high quality assets at depressed prices." The same portfolio manager told

2    Merk, two weeks prior, that "almost every sale in YP [YieldPlus] has been of a good bond at

3    depressed prices. We've had no choice but to sell or not provide daily liquidity to

4    shareholders."

5         155.    Even though Daifotis and Merk knew or were reckless in not knowing that the

6    Fund was selling "good bond[s] at depressed prices," Daifotis and Merk did not correct the

7    statement that they saw going to the representatives in November 2007 that the Fund was not

8    being forced to sell securities at distressed prices to meet redemptions, and they failed to

9    ensure that that the statement included the material facts mentioned above. In light of their

10   senior executive positions and responsibilities, as described above, and the fact that they knew

11   or were reckless in not knowing that that they were relied upon within CSIM and CS&Co. to

12   convey accurate, complete, and not misleading information about the Fund, as described

13   above, Daifotis and Merk were obligated to make sure that the November 15, 2007 email was

14   accurate, complete, and not misleading, but they failed to do so.

15        156.    This misstatement was communicated to Schwab investors. For example, in

16   March 2008, a Schwab representative told a YieldPlus investor in a telephone call that,

17   "Schwab hasn't been a forced seller into the lower prices, just selling those that have dropped

18   a lot in price. We haven't been forced to sell those to raise cash to meet redemptions, in that

19   manner."

20        157.    Omission of Facts Regarding Alt-A MBS Investments. Also misleading was

21   frequent emphasis of YieldPlus's "minimal" subprime holdings, which constituted

22   approximately 6 percent of Fund assets, but omitting to state that, although YieldPlus

23   arguably had modest subprime holdings, approximately one-third of YieldPlus's assets were

24   invested in Alt-A securities, another type of security backed by lower quality residential

COMPLAINT                                    -45-

mortgages that were suffering price declines, which were similar to subprime mortgages and which posed risks similar to those of subprime mortgages.

158. The early-August 2007 Q&A, discussed above, which identified Merk as the author, included a discussion of YieldPlus's subprime holdings without references to the related substantial Alt-A MBS investment. As Merk knew or was reckless in not knowing, because this communication stressed the "minimal" exposure to "subprime" holdings, the Q&A was misleading and deceptive because it omitted the material fact that the Fund had a large percentage of Alt-A MBS securities, which exposed the Fund to risks similar to those of subprime assets.

159. A November 2007 "Manager's Discussion" reviewed by Daifotis was issued to the public under his title, "Manager," and Merk also received a copy. Thus, Daifotis and Merk knew of or were reckless in not knowing the contents of the document. The Manager's discussion, which was made available to the public and posted on Schwab's external website, also emphasized the Fund's minimal subprime holdings, stating that they were approximately 5 percent of the Fund's holdings. This document also omitted the material fact that that the Fund had a large percentage of Alt-A MBS securities, which exposed the Fund to risks similar to those of subprime assets. It was misleading to state that the Fund held only 5 percent in subprime assets without also disclosing the Fund's large holdings of Alt-A MBS securities.

160. Daifotis and Merk knew or were reckless in not knowing the contents of the August and November documents described above, as well as other documents that contained similar material omissions regarding the Fund's Alt-A holdings. In light of their senior-level executive positions and responsibilities, as described above, and the fact that they knew or were reckless in not knowing that they were relied upon within CSIM and CS&Co. to ensure that such materials were accurate, complete, and not misleading, they were obligated to make

1  sure that the documents cited above did not contain false or misleading statements or

2  omissions, but they failed to do so. In particular, in connection with the documents'

3  statements about the Fund's minimal subprime holdings, they should have made sure that the

4  documents disclosed the Fund's substantial Alt-A holdings.

5       **D.    Redemptions by Schwab-Related Funds**

6       161.    While Daifotis and Merk were telling investors that they had confidence in

7  YieldPlus and to maintain a patient, long-term perspective on their investments, and while

8  Merk and Daifotis knew that CSIM and CS&Co. were making those statements to investors, a

9  number of Schwab-related Funds with material nonpublic information about the adverse

10 condition of YieldPlus redeemed their investments in YieldPlus.

11      162.    For example, Schwab's five target date and retirement funds ("Target Date

12 Funds") redeemed investments in YieldPlus in March 2008, after its senior portfolio manager

13 received material, nonpublic information about YieldPlus. The Target Date Funds' senior

14 portfolio manager was the Chief Investment Officer for Equities ("CIO-Equities") at the time.

15      163.    Both the CIO-Equities and Daifotis reported directly to Merk during

16 YieldPlus's decline, and the CIO-Equities learned material nonpublic information about

17 YieldPlus from Daifotis in regular meetings with Merk and his direct reports in at least

18 February and March 2008.

19      164.    During these meetings, Daifotis discussed YieldPlus, its NAV decline, high

20 redemption levels, and plans to satisfy redemptions by selling assets.

21      165.    While in possession of this information, the CIO-Equities approved the

22 recommendation of another portfolio manager to redeem the Target Date Funds' investments

23 in YieldPlus and personally arranged to expedite the redemptions. This material information

24 was not disclosed to the public at that time.

COMPLAINT                                -47-

1          166.    The CIO-Equities informed Merk of his intention to redeem.

2          167.    CSIM and CS&Co. served as investment advisers to YieldPlus and thus owed

3     a fiduciary duty to YieldPlus, as did Merk because of his position as a trustee of YieldPlus

4     and as a senior officer of CSIM and CS&Co.

5          168.    Despite Merk's awareness of the foregoing, and his knowledge that the CIO-

6     Equities learned material, nonpublic information about YieldPlus during the meetings of the

7     Merk reports, Merk approved the Target Date Funds' redemptions of investments in

8     YieldPlus.

9          169.    Merk failed to disclose to YieldPlus's board of trustees and to the investors in

10    YieldPlus the material fact that the Target Date Funds were redeeming investments in

11    YieldPlus after their senior portfolio manager had learned material nonpublic information

12    about YieldPlus.

13         170.    The material nonpublic information that was shared during the meetings with

14    Merk and Merk's direct reports belonged to YieldPlus and should not have been shared with

15    other investors — such as the CIO-Equities, who managed funds that invested in YieldPlus —

16    without the permission of YieldPlus's trustees. The trustees had not been informed of the

17    disclosure of the Fund's information and had not approved such disclosure.

18         171.    This unauthorized disclosure harmed YieldPlus because it contributed to the

19    Target Date Funds' decision to redeem their YieldPlus investments. These redemptions

20    harmed YieldPlus because they came at a time when YieldPlus was struggling to raise cash to

21    meet redemptions by selling bonds in a declining market.

22         172.    Through the actions of Merk, who was a senior officer of CSIM and CS&Co.,

23    in permitting the unauthorized disclosure of material nonpublic information and in approving

24    the Target Date Fund's redemptions in YieldPlus when he possessed material nonpublic

COMPLAINT                                      -48-

1   information and was aware of the unauthorized disclosures of material nonpublic information,

2   CSIM and CS&Co. breached the fiduciary duties that they owed to YieldPlus in their roles as

3   the Fund's investment advisers, and they violated Section 206(1) and (2) of the Investment

4   Advisers Act Act [15 U.S.C. § 80b-6(1) and (2)].

5                         **FIRST CLAIM FOR RELIEF**
                          (Against Daifotis and Merk)

6

7              Violations of Section 10(b) of the Exchange Act
     [15 U.S.C. §78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

8       173.   The Commission realleges and incorporates by reference paragraphs 1 through

9   172 above.

10       174.   Daifotis and Merk, directly or indirectly, in connection with the purchase or

11   sale of securities, by the use of means or instrumentalities of interstate commerce, or the

12   mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue

13   statements of material facts or omitted to state material facts necessary in order to make the

14   statements made, in the light of the circumstances under which they were made, not

15   misleading; or (c) engaged in acts, practices, or courses of business which operated or would

16   operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

17       175.   By reason of the foregoing, Daifotis and Merk violated Section 10(b) of the

18   Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

19                     **SECOND CLAIM FOR RELIEF**
                       (Against Daifotis and Merk)

20        Aiding and Abetting Violations of Section 10(b) of the Exchange Act
    [15 U.S.C. §78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

21

22       176.   The Commission realleges and incorporates by reference paragraphs 1 through

23   175 above.

24       177.   CSIM and CS&Co., directly or indirectly, in connection with the purchase or

1   sale of securities, by the use of means or instrumentalities of interstate commerce, or the

2   mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue

3   statements of material facts or omitted to state material facts necessary in order to make the

4   statements made, in the light of the circumstances under which they were made, not

5   misleading; or (c) engaged in acts, practices, or courses of business which operated or would

6   operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

7       178.    By reason of the conduct described above, Daifotis and Merk knowingly

8   provided substantial assistance to CSIM and CS&Co. in violation of Section 10(b) of the

9   Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and

10  thus aided and abetted such violations.

11      179.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §

12  78t(e)], Daifotis and Merk are liable for such violations.

13                          **THIRD CLAIM FOR RELIEF**
                            (Against Daifotis and Merk)
14
                    Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
15
16      180.    The Commission realleges and incorporates by reference Paragraphs 1 through

    179 above.
17
        181.    Daifotis and Merk, directly or indirectly, in the offer or sale of securities, by
18
    use of the means or instruments of transportation or communication in interstate commerce or
19
    by use of the mails, (a) employed devices, schemes, or artifices to defraud; (b) obtained
20
    money or property by means of untrue statements of material fact or by omitting to state a
21
    material fact necessary in order to make the statements made, in light of the circumstances
22
    under which they were made, not misleading; or (c) engaged in transactions, practices, or
23
    courses of business which operated or would operate as a fraud or deceit upon the purchasers.
24

COMPLAINT                              -50-

1   182.   By reason of the foregoing, Daifotis and Merk violated Section 17(a) of the

2   Securities Act [15 U.S.C. § 77q(a)].

3                    **FOURTH CLAIM FOR RELIEF**
                            (Against Merk)

4                    Aiding and Abetting Violations of
5       Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)]

6   183.   The Commission realleges and incorporates by reference Paragraphs 1 through

7   182 above.

8   184.   CSIM and CS&Co., while acting as investment advisers, directly or indirectly,

9   by use of the mails or means or instrumentality of interstate commerce:  (a) employed

10  devices, schemes, or artifices to defraud a client or clients or prospective clients; and/or (b)

11  engaged in transactions, practices or courses of business which operated as a fraud or deceit

12  upon a client or clients or prospective clients.

13  185.   By reason of the foregoing, and in particular, Merk's conduct as described in

14  Section D, above, CSIM and CS&Co. violated Sections 206(1) and 206(2) of the Advisers

15  Act [15 U.S.C. § 80b-6(1) and (2)].

16  186.   By reason of the conduct described above, Merk knowingly aided, abetted,

17  counseled, commanded, induced, or procured said violation by CSIM and CS&Co.

18  187.   Accordingly, pursuant to Section 209 of the Advisers Act [15 U.S.C. 80b-9],

19  Merk is liable for such violations.

20                   **FIFTH CLAIM FOR RELIEF**
                        (Against Daifotis and Merk)

21                   Aiding and Abetting Violations of
           Section 206(4) [15 U.S.C. § 80b-6(4)] of the Advisers Act
22         and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] Thereunder

23  188.   The Commission realleges and incorporates by reference Paragraphs 1 through

24  187 above.

COMPLAINT                        -51-

1    189.    CSIM and CS&Co., while acting as investment advisers, directly or indirectly,

2    by use of the mails or means or instrumentality of interstate commerce, engaged in acts,

3    practices, or courses of business that were fraudulent, deceptive or manipulative.

4    190.    CSIM and CS&Co., while acting as investment advisers to pooled

5    investment vehicles: (a) made untrue statements of material facts or omitted to state material

6    facts necessary in order to make the statements made, in the light of the circumstances under

7    which they were made, not misleading, to investors or prospective investors in the pooled

8    investment vehicle; or (b) engaged in acts, practices, or courses of business that were

9    fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the

10   pooled investment vehicle. CSIM and CS&Co. thereby violated Section 206(4) [15 U.S.C. §

11   80b-6(4)] of the Advisers Act and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

12   191.    By reason of the conduct described above, Daifotis and Merk knowingly

13   aided, abetted, counseled, commanded, induced, or procured said violations by CSIM and

14   CS&Co., and thus aided and abetted such violations.

15   192.    Accordingly, pursuant to Section 209 of the Advisers Act [15 U.S.C. 80b-9],

16   Daifotis and Merk are liable for such violations.

17   **SIXTH CLAIM FOR RELIEF**
     (Against Daifotis and Merk)

18   Violations of Section 34(b) of the Investment Company Act [15 U.S.C. §80a-33(b)]

19   193.    The Commission realleges and incorporates by reference Paragraphs 1 through

20   192 above.

21   194.    In registration statements, applications, reports, accounts, records, or other

22   documents filed or transmitted pursuant to the Investment Company Act, Daifotis and Merk

23   made untrue statements of material fact, and/or omitted facts necessary in order to prevent

24

COMPLAINT                              -52-

1 | statements made, in the light of the circumstances under which they were made, from being

2 | materially misleading.

3 |     195.    By reason of the foregoing, Daifotis and Merk violated Section 34(b) of the

4 | Investment Company Act [15 U.S.C. §80a-33(b)].

5 | <div align="center">**SEVENTH CLAIM FOR RELIEF**
(Against Daifotis and Merk)</div>

6

7 | <div align="center">Aiding and Abetting Violations of
Section 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-33(b)]</div>

8 |     196.    The Commission realleges and incorporates by reference Paragraphs 1 through

9 | 195 above.

10 |     197.    Schwab Investments, CSIM and CS&Co. made untrue statements of material

11 | fact, and/or omitted facts necessary in order to prevent statements made, in the light of the

12 | circumstances under which they were made, from being materially misleading, in registration

13 | statements, applications, reports, accounts, records, or other documents filed or transmitted

14 | pursuant to the Investment Company Act.

15 |     198.    Schwab Investments, CSIM and CS&Co. thereby violated Section 34(b) of the

16 | Investment Company Act [15 U.S.C. §80a-33(b)].

17 |     199.    Daifotis and Merk knowingly provided substantial assistance to Schwab

18 | Investments, CSIM and CS&Co., and thereby aided and abetted said violations of Section

19 | 34(b) of the Investment Company Act [15 U.S.C. §80a-33(b)].

20 |     200.    Accordingly, pursuant to Section 48(b) of the Investment Company Act [15

21 | U.S.C. §80a-47(b), as amended pursuant to Section 929M of the Dodd-Frank Wall Street

22 | Reform and Consumer Protection Act (the "Dodd-Frank Act"), Public Law 111-203, 2010

23 | HR 4173 (July 2010)], Daifotis and Merk are liable for such violations.

24

COMPLAINT                     -53-

1

## EIGHTH CLAIM FOR RELIEF
(Against Daifotis)

2

3

Aiding and Abetting Violations of
Section 13(a) of the Investment Company Act [15 U.S.C. §§ 80a-13(a)]

4

5

201.    The Commission realleges and incorporates by reference Paragraphs 1 through 200 above.

6

7

8

9

10

202.    Schwab Investments deviated from its policy in respect of concentration of investments in a particular industry or group of industries as recited in its registration statement, deviated from an investment policy which is changeable only if authorized by shareholder vote, and deviated from a policy recited in its registration statement pursuant to Section 8(b) of the Investment Company Act [15 U.S.C. § 80a-8(b)].

11

12

203.    By reason of the foregoing, Schwab Investments violated Section 13(a) of the Investment Company Act [15 U.S.C. § 80a-13(a)]

13

14

15

16

204.    By reason of the foregoing, and, in particular, Daifotis's conduct as described in Section B, above, Daifotis knowingly provided substantial assistance to Schwab Investments and thereby aided and abetted Schwab Investments in its violations of Section 13(a) of the Investment Company Act [15 U.S.C. § 80a-13(a)].

17

18

19

205.    Accordingly, Daifotis is liable for such violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. 80a-47(b)], as amended pursuant to Section 929M of the Dodd-Frank Act.

20

21

22

23

24

1 | **PRAYER FOR RELIEF**

2 | WHEREFORE, the Commission respectfully requests that this Court:

3 | I.

4 | Find that defendants Daifotis and Merk committed the violations alleged;

5 | II.

6 | Permanently enjoin Daifotis from directly or indirectly violating Section 17(a) of the

7 | Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)],

8 | and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 34(b) of the Investment

9 | Company Act [15 U.S.C. § 80a-33(b)], Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-

10 | 6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and from aiding and abetting

11 | violations of Section 13(a) of the Investment Company Act [15 U.S.C. §§ 80a-13(a) and 80a-

12 | 33(b)].

13 | III.

14 | Permanently enjoin Merk from directly or indirectly violating Section 17(a) of the

15 | Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)],

16 | and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 206(1), (2) and (4) of the

17 | Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], Rule 206(4)-8 thereunder [17 C.F.R. §

18 | 275.206(4)-8],and Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)];

19 | IV.

20 | Order Daifotis and Merk to pay civil penalties pursuant to Section 20(d) of the

21 | Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)],

22 | Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 42(e) of the Investment

23 | Company Act [15 U.S.C. § 80a-41(e)];

24 |

COMPLAINT                                    -55-

1 |                                       V.

2 |        Order Daifotis and Merk to disgorge any ill-gotten gains, including prejudgment

3 | interest;

4 |                                       VI.

5 |        Retain jurisdiction of this action in accordance with the principles of equity and the

6 | Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

7 | and decrees that may be entered, or to entertain any suitable application or motion for

8 | additional relief within the jurisdiction of this Court; and

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

COMPLAINT                                      -56-

1    VII.

2    Grant such other and further relief as this Court may determine to be just and

3    necessary.

4    **JURY DEMAND**

5    Plaintiff respectfully demands trial by jury on all issues in this case triable by a

6    jury.

7    DATED: January 11, 2011                      Respectfully Submitted,

8

9

        David J. Gottesman
10      Frederick L. Block
        Antonia Chion
11      Robert A. Cohen
        Melissa R. Hodgman
12      David S. Mendel

13      Attorneys for Plaintiff
        SECURITIES AND EXCHANGE
14      COMMISSION
        100 F Street, N.E.
15      Washington, DC 20549-4030
        Telephone: (202) 551-4470 (Gottesman)
16      Facsimile: (202) 772-9245 (Gottesman)

17

18

19

20

21

22

23

24
                                    –57–

COMPLAINT