1  David J. Gottesman (Trial Counsel) (Illinois Bar No. 6182719)
   (gottesmand@sec.gov)
2  Frederick L. Block
   Robert A. Cohen
3  Melissa R. Hodgman

4  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
   100 F Street, N.E.
5  Washington, DC 20549-4030
   Telephone:  (202) 551-4470 (Gottesman)
6  Facsimile:  (202) 772-9245 (Gottesman)

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

                    SAN FRANCISCO DIVISION
10

11 SECURITIES AND EXCHANGE COMMISSION,        Case No. 11cv0137 WHA

12              Plaintiff,

13        vs.                                 **FIRST AMENDED COMPLAINT**

14 KIMON P. DAIFOTIS and RANDALL MERK,

15              Defendants.

16

17

18        Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC"), for

19 its First Amended Complaint, alleges:

20                     <u>**SUMMARY OF THE ACTION**</u>

21        1.       Between at least 2005 and mid-2008, defendants Kimon Daifotis ("Daifotis")

22 and Randall Merk ("Merk") were senior officials of Schwab Investments and Charles Schwab

23 Investment Management, Inc. ("CSIM"), and employees or officers of Charles Schwab & Co.,

24

1  Inc. ("CS&Co."). CSIM and CS&Co. provided investment advisory and other services to

2  Schwab Investments. Daifotis and Merk engaged in fraudulent and deceptive conduct in

3  violation of the antifraud, disclosure and reporting requirements of the federal securities laws.

4        2.      Defendants' unlawful conduct primarily relates to the Schwab YieldPlus Fund

5  ("YieldPlus" or the "Fund"), the former flagship fixed-income mutual fund advised by CSIM

6  and CS&Co. At its peak in 2007, YieldPlus had $13.5 billion in assets and over 200,000

7  shareholders, and was the largest ultra-short bond fund in its category.

8  **<u>Fraudulent Offer and Sale of YieldPlus</u>**

9        3.      Daifotis and Merk knowingly or recklessly made misrepresentations and

10  misleading omissions of material fact about YieldPlus, and they caused, substantially

11  participated in, or provided substantial assistance to the making of misleading statements

12  about YieldPlus to the investing public. Such misrepresentations and misleading statements

13  included assertions that YieldPlus supposedly was comparable to cash investments, with only

14  "slightly" or "marginally" more risk than money market funds or certificates of deposit

15  ("CDs"), that the Fund was diversified, and that it held mostly securities that were liquid and

16  had very short maturities.

17        4.      The descriptions of YieldPlus were materially false and misleading because,

18  for example, YieldPlus was substantially riskier than cash products such as CDs and money

19  market funds, its assets were largely longer-term securities that, at least by late 2007, were not

20  liquid, and its holdings were not diversified, but defendants failed to disclose these and other

21  material facts regarding the riskiness and other characteristics of YieldPlus.

22

23

24

**Fraudulent Conduct In Connection With
Unlawful Deviation From Concentration Policy**

5.      Daifotis, as lead portfolio manager, along with CSIM and CS&Co., as the Fund's advisers, directed the investments of the Fund.  Daifotis directed and approved the Fund's investment in assets that violated the Fund's "concentration policy."  The Fund's long-standing concentration policy provided that the Fund would not invest more than 25 percent of assets in non-agency, mortgage-backed securities ("MBS"), i.e., MBS issued by private entities and not backed by federal agencies or government-sponsored enterprises.  Pursuant to Section 13(a) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-13(a)], YieldPlus could not deviate from that policy without first obtaining authorization by a vote of the majority of YieldPlus's outstanding shareholders.

6.      Daifotis directed the making of YieldPlus's investments  that caused the Fund to deviate from its concentration policy by at least early 2006, by investing more than 25 percent of its assets in non-agency MBS without shareholder approval.

7.      As a trustee, Merk voted to change the treatment of non-agency MBS and to allow the Fund's investment advisers to concentrate the Fund's assets in those investments, even though the concentration was a deviation from the Fund's concentration policy and was not authorized by a shareholder vote.

8.      Daifotis also substantially assisted other funds, including but not limited to the Schwab Total Bond Market Fund ("Total Bond Fund"), in violating the Investment Company Act by deviating from their concentration policy without shareholder approval.

9.      Daifotis and Merk knew, or were reckless in not knowing, that they had submitted, or caused to be submitted, false and misleading reports and certifications to the Commission, and documents issued to the public, that masked and failed to properly, fully,

and accurately disclose the material fact that the funds described above had deviated from their concentration policy without shareholder approval.

### False and Misleading Statements and Other
### Fraudulent Conduct During the Fund's Decline

10.     In the summer of 2007, YieldPlus's net asset value ("NAV") began to decline as its assets lost value.  Many investors expected YieldPlus's NAV to fluctuate only minimally, at least in part because of the way the Fund had been marketed.  A significant number of investors redeemed their investments when the NAV fell by more than a few pennies.  Because YieldPlus did not have cash holdings, the redemptions forced YieldPlus's portfolio managers to sell assets in a depressed market to raise cash.

11.     In a series of communications, including written materials and conference calls between at least August 2007 through at least March 2008, defendants knowingly or recklessly made a series of materially false and misleading statements and omissions of material fact about YieldPlus, and caused, substantially participated in, or  provided substantial assistance to others' misrepresentations, in an effort to dissuade YieldPlus investors from redeeming their investments.  For example, in August 2007, Daifotis assured independent investment advisers and Schwab's registered representatives who were to communicate with Schwab's investors that "we've got very, very, very slight negative flows" from the Fund, or that the Fund had "minimal" outflows, when he knew that the Fund actually was suffering massive outflows.

### Redemptions By Other Schwab-Related Funds

12.     During the effort to discourage most investors from redeeming their YieldPlus investments, Merk approved a series of redemptions of YieldPlus investments by a group of other Schwab-related mutual funds.  Merk did so even though he knew material, nonpublic

1    information about YieldPlus and knew that a portfolio manager involved in the redemption

2    decisions had material, nonpublic information about the Fund.

3                                      **Impact**

4            13.      During an eight-month period from 2007 to 2008, YieldPlus's NAV dropped

5    28 percent and its assets plummeted from $13.5 billion to $1.8 billion.  To date YieldPlus's

6    NAV has declined by 50 percent and its assets are below $140 million.  As a result of

7    defendants' false and misleading statements and other misconduct, YieldPlus's investors lost

8    hundreds of millions of dollars.

9            14.      Unless enjoined, defendants are likely to engage in future violations of the

10   securities laws.  Accordingly, as to each defendant, the Commission seeks an injunction

11   against future violations of the particular securities laws identified in the prayer for relief,

12   disgorgement of ill-gotten gains with prejudgment interest, and civil money penalties.

13                          **JURISDICTION AND VENUE**

14           15.      This Court has jurisdiction over this action under Sections 20(b), 20(d) and

15   22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and

16   77v(a)]; Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange

17   Act") [15 U.S.C. §§ 78u(d) and (e), and 78aa]; Sections 42(d), 42(e) and 44 of the Investment

18   Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-41(d), (e) and 80a-

19   43]; and Sections 209(d), 209(e) and 214 of the Investment Advisers Act of 1940 ("Advisers

20   Act") [15 U.S.C. §§ 80b-9(d), (e) and 80b-14].  Defendants have made use, directly or

21   indirectly, of the means or instrumentalities of interstate commerce, of the means or

22   instruments of transportation or communication in interstate commerce, of the mails, or of the

23

24

1    facilities of a national securities exchange, in connection with the transactions, acts, practices,

2    and courses of business alleged in this Complaint.

3           16.    Venue is appropriate in this Court under Section 22(a) of the Securities Act [15

4    U.S.C. § 77v(a)]; Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 44 of the

5    Investment Company Act [15 U.S.C. § 80a-43]; and Section 214 of the Advisers Act of [15

6    U.S.C. § 80b-14], because certain of the acts or transactions constituting the violations alleged

7    herein occurred in this judicial district.

8                           **INTRADISTRICT ASSIGNMENT**

9           17.    Assignment to the San Francisco Division is appropriate pursuant to Civil

10   Local Rule 3-2(d) because a substantial part of the events or omissions that give rise to the

11   Commission's claims occurred in San Francisco County and one or more related class actions

12   are pending in the San Francisco Division.

13                                  **DEFENDANTS**

14          18.    **Kimon Daifotis,** 52, resides in Corte Madera, California.  Daifotis was

15   employed by CS&Co. and was a Senior Vice-President and Chief Investment Officer – Fixed-

16   Income at CSIM until his position was eliminated in July 2008.  At all relevant times until his

17   position was eliminated, Daifotis was lead portfolio manager for YieldPlus, the Total Bond

18   Fund, and the Schwab Short-Term Bond Fund ("Short-Term Bond Fund"), and supervised the

19   other portfolio managers for the funds.   Daifotis was Senior Vice President and Chief

20   Investment Officer of Schwab Investments from at least 2004 until July 2008.  Daifotis was

21   actively involved in the day-to-day operations of YieldPlus, the Total Bond Fund, and the

22   Short-Term Bond Fund.  Among other things, Daifotis was responsible for directing the

23   funds' investments and was actively involved in the offer, sale, and marketing of YieldPlus.

24

1   From at least July 2007 until his departure, Daifotis reported directly to Merk.  At all relevant

2   times, Daifotis has had Series 3, 7, and 63 licenses.  Daifotis served as a paid consultant to

3   Schwab-related entities concerning the litigations, arbitrations, and investigations related to

4   the funds' declines.

5          19.     **Randall Merk**, 57, resides in Menlo Park, California.  At relevant times, Merk

6   was an Executive Vice President at Charles Schwab Corporation and at CS&Co.  From

7   September 2002 until July 2004 and from July 2007 until at least December 2010, Merk

8   served as President and Chief Executive Officer ("CEO") of CSIM, and from at least July

9   2004 until July 2007, Merk was the executive to whom the President and CEO of CSIM

10  reported.  From at least July 2007 until at least July 2008, Merk was the President and CEO of

11  Schwab Investments.  From at least May 2005 until at least 2007, Merk was a trustee of

12  YieldPlus and the other funds identified herein.  At all relevant times, Merk has had a Series

13  24 license.  Merk was actively involved in the offer, sale, and marketing of YieldPlus.

14                              **<u>RELEVANT ENTITIES</u>**

15         20.     **Charles Schwab Investment Management, Inc. ("CSIM")** is a San

16  Francisco-based, wholly-owned subsidiary of the Charles Schwab Corporation.  CSIM was

17  incorporated in Delaware in October 1989 and has been a registered investment adviser since

18  January 25, 1990.  CSIM manages the assets of registered and unregistered investment

19  companies, including YieldPlus, the Total Bond Fund, the Short-Term Bond Fund, and other

20  Schwab funds.  CSIM is the primary investment adviser of those funds.

21         21.     **Charles Schwab & Co., Inc. ("CS&Co.")** is a wholly-owned subsidiary of

22  Schwab Holdings, Inc., which is a wholly-owned subsidiary of the Charles Schwab

23  Corporation.  CS&Co. was incorporated in California in 1971.  CS&Co. is a registered

24

broker-dealer, transfer agent, and investment adviser.  CS&Co. provided advisory,

shareholder, distribution, and other services to the funds described herein, and at all relevant

times, served as the distributor and transfer agent for funds, including YieldPlus, the Total

Bond Fund, the Short-Term Bond Fund, and other Schwab Funds.  CS&Co. also provided

personnel who performed advisory, marketing, legal, and compliance services to those funds.

22.     **Schwab Investments** is a no-load, open-end management investment company

organized as a Massachusetts business trust and is registered under the Investment Company

Act as of October 26, 1990.  YieldPlus, the Total Bond Fund, and the Short-Term Bond Fund

are series of mutual funds issued by Schwab Investments.

23.     Schwab Investments, CS&Co., and CSIM are sometimes referred to herein

collectively as the "Schwab Entities."

## FACTUAL ALLEGATIONS

**A.      False and Misleading Statements and Omissions, and**
**Other Fraudulent Conduct In the Offer and Sale of YieldPlus**

24.     From at least 2005 through at least mid-2008, as discussed below, Daifotis and

Merk made, caused, or substantially participated or assisted in the making of

misrepresentations and omissions of material fact with regard to the offer and sale of

YieldPlus, including, but not necessarily limited to, those set forth in this Section A.

25.     As shown below, in statements disseminated to the public, the Schwab

Entities, Daifotis, and Merk described YieldPlus as a cash "alternative" or "equivalent" that

generated a premium yield and was only minimally riskier than a money market fund,

compared YieldPlus to insured CDs, and emphasized that YieldPlus's NAV was stable

because, although it "may fluctuate minimally" and/or would fluctuate, it had fluctuated by

1    only pennies in recent years.  The statements presented YieldPlus as being a diversified fund

2    holding liquid, mostly very short-maturity assets.

3        26.    Daifotis and Merk knew, or were reckless in not knowing, about these

4    descriptions and they made such statements, or caused, substantially participated, or provided

5    substantial assistance in the making of such statements; reviewed and approved the general

6    approach of describing the Fund in this manner; and/or they reviewed, edited, and approved

7    various specific communications containing these misstatements.

8        27.    Daifotis and Merk knew, or were reckless in not knowing, that these

9    communications were materially false and misleading because, in the various ways described

10   below, YieldPlus was significantly riskier than money market funds, CDs, and other cash or

11   cash-equivalent products, and its NAV had fluctuated significantly more than the three cents

12   or pennies advertised.  For example, at various times between 1999 (when the Fund was

13   established) and 2003, the Fund's NAV sometimes fluctuated by six cents or more in just one

14   day, by more than 15 cents in a month, and by 34 cents over a ten-month period.  It was

15   misleading and deceptive to characterize YieldPlus as a cash alternative or cash equivalent

16   that had the other characteristics described herein without fully disclosing the ways in which

17   YieldPlus was fundamentally and substantially riskier than genuine "cash-alternative" or

18   "cash-equivalent" products.

19       28.    Daifotis and Merk also knew, or were reckless in not knowing, that these

20   statements grew even more misleading over time because the Fund grew riskier as it took on

21   additional risk by, among other things, concentrating in non-agency MBS.  Daifotis directed

22   the investments that caused this increased risk and caused, or substantially participated or

23   provided substantial assistance in the making of materially false and misleading statements

24

FIRST AMENDED COMPLAINT                    -9-                    CASE NO. 11CV0137

1   and omissions concerning the funds' concentration in non-agency MBS.  Merk directly or

2   indirectly supervised Daifotis and, by at least August 2006, approved such investments and

3   signed or caused, substantially participated in, or provided substantial assistance to the

4   making of filings and other communications that contained the material misstatements and

5   omissions concerning the funds' concentration in non-agency MBS.

6           **1.    YieldPlus Was Substantially Riskier Than Cash**
                    **Products, Such as CDs and Money Market Funds**
7
            29.     Daifotis and Merk knew, or were reckless in not knowing, that, in the ways
8
    described below, YieldPlus differed materially from CDs and money market funds in ways
9
    which made the Fund fundamentally and significantly riskier than those and other cash-
10
    equivalent or cash-alternative products to which it was compared.
11
            30.     Lack of Insurance.  Investments in YieldPlus were not insured, as are CDs.
12
            31.     Maturity.  From at least 2005 through at least mid-2008, the average maturity
13
    of YieldPlus's portfolio was significantly longer than the average maturities of money market
14
    funds.  During the relevant period, under rules promulgated by the Commission under the
15
    Investment Company Act, a money market fund was required to have an average portfolio
16
    maturity of no more than 90 days and could not acquire any security with a remaining
17
    maturity of more than 397 days.   In contrast, YieldPlus's holdings had significantly longer
18
    average maturities, and a substantial portion of the Fund's assets were invested in securities
19
    that were not scheduled to mature for decades.  Ninety percent or more of YieldPlus's
20
    holdings could not have been held by a money market fund because of their maturities.
21
            32.     The Fund's concentration in non-agency MBS, beginning at least by 2006
22
    (described more fully below), which Daifotis and Merk directed, controlled, and/or approved,
23
    caused the Fund's average maturity to increase.
24

33.     In mid-2007, at the beginning of the period when the Fund's NAV declined dramatically, only 6 percent of YieldPlus's assets—$675 million of $11 billion in assets—were scheduled to mature within the next six months.  This was drastically different from a money market fund's average portfolio maturity of 90 days.

34.     The longer maturities of the securities owned by YieldPlus exposed the Fund to increased risk, including liquidity and default risk.  Such liquidity risk contributed to the Fund's decline during the credit crisis of 2007-2008.  For example, when faced with redemptions, a money market fund largely is able to rely on frequently maturing securities to raise cash at par.  In contrast, YieldPlus was forced to sell securities in a depressed market because its securities did not mature frequently.

35.     Daifotis and Merk knew, or were reckless in not knowing, the facts above. Despite the Fund's longer average maturity, Merk, Daifotis, and the Schwab Entities classified YieldPlus as an ultra-short bond fund because of its short "duration" (which is a measure of interest rate sensitivity, as explained more fully below).

36.     Lower Credit Quality Bonds.  As Daifotis and Merk knew, or were reckless in not knowing, YieldPlus also was significantly riskier than a money market fund because it invested in lower credit quality bonds.  Pursuant to rules under the Investment Company Act, a money market fund could invest in a security only if the fund's board has determined that the security presents minimal credit risks.  In contrast, YieldPlus did not make such determinations and was permitted to invest up to 25 percent of assets in below-investment-grade bonds, and actually invested 15 to 25 percent of YieldPlus in bonds rated BBB (the lowest investment grade) or lower.

37.     Lack of Risk Management.  Daifotis and Merk knew, or were reckless in not

1    knowing, that they did not adequately monitor and analyze the risks posed by YieldPlus's

2    substantial investment in non-agency MBS and lower quality bonds.  Just before YieldPlus's

3    decline began in the summer of 2007, internal auditors warned the Schwab Entities' officials,

4    including Daifotis and Merk, that YieldPlus's portfolio managers were not conducting

5    sufficient portfolio-wide risk management and scenario-analysis testing regarding the possible

6    performance of YieldPlus's portfolio during adverse market events.  The auditors warned that

7    this risk was heightened for YieldPlus, due to its "concentration in mortgage securities and

8    lower credit rated corporate bonds."

9                    **2.**       **Defendants' Roles**

10                       **a.**       **Merk**

11          38.       At all relevant times, Merk was an Executive Vice President at Charles

12    Schwab Corporation.

13          39.       Merk was an Executive Vice President of CS&Co. for the period from at least

14    January 2005 through at least December 2010, and President of the Investment Management

15    Services division within CS&Co. for the period from at least January 2005 through at least

16    July 2008.  From September 2002 through at least December 2010, Merk possessed, directly

17    or indirectly, the power to direct, control, or cause the direction of CS&Co.'s management,

18    policies, communications, and the actions of its employees.

19          40.       Daifotis was an officer of CSIM and Schwab Investments who reported

20    directly to Merk from July 2007 until Daifotis left the company in mid-2008.  From at least

21    2004 until July 2007, Daifotis reported directly to the then-President and CEO of CSIM, who

22    reported directly to Merk.  As President and CEO of CSIM or as the executive to whom the

23    President and CEO of CSIM reported, Merk possessed, directly or indirectly, the power to

24

FIRST AMENDED COMPLAINT                    -12-                    CASE NO. 11CV0137

1  direct, control, or cause the direction of Daifotis from at least 2004 through Daifotis's

2  departure in mid-2008.

3      41.   Merk was a trustee of Schwab Investments (of which YieldPlus and the other

4  funds described herein were series) from at least May 2005 to at least 2007, and was one of

5  only two inside trustees of Schwab Investments, and was the only inside trustee who, at times

6  as a CS&Co., CSIM and Schwab Investment executive, had day-to-day responsibility for the

7  Fund, including its management and marketing. Between at least July 2007 and at least July

8  2008, Merk was President and CEO of Schwab Investments. During the times that Merk was

9  President and CEO of Schwab Investments, and/or was a trustee of YieldPlus and other funds,

10  Merk possessed, directly or indirectly, the power to direct, control, or cause the direction of

11  Schwab Investments, including the management and policies of YieldPlus and the other bond

12  funds.

13      42.   Merk supervised the staff largely responsible for and, at times, had day-to-day

14  involvement in the management and marketing of the Fund. In that context, Merk

15  participated in decision-making or was responsible for exercising proper oversight of the

16  entity and its advisers. Merk participated in decision-making as a trustee regarding Schwab

17  Investments' filings with the Commission, and Merk signed Schwab Investment's filings with

18  the Commission from time to time, as set forth below.

19      43.   Merk had overall authority and responsibility for the marketing and

20  management of YieldPlus and the other bond funds during the relevant period. Merk

21  participated in the day-to-day affairs of CSIM, CS&Co., and Schwab Investments, had power

22  to control corporate actions, and was involved in the decisions and actions that gave rise to the

23  violations described herein, as described more fully below. Moreover, Merk had actual

24

1   authority over the preparation and presentation to the public of marketing communications

2   and changes to the funds' investments and fundamental policies and procedures.

3        44.    As shown more fully below, Merk was involved in the formulation of many of

4   the misrepresentations and omissions that are the subject of this action. Merk particularly

5   exercised day-to-day control over statements made about YieldPlus during the period of its

6   decline beginning in or about August 2007.

7        45.    Merk had day-to-day control over CSIM and CS&Co and could veto any plan

8   or strategy of CSIM and its portfolio managers, including Daifotis, or of the CS&Co.

9   marketing employees under his control.

10       46.    Two key departments responsible for YieldPlus reported to Merk. First, the

11  Senior Vice President for Product Development who was in charge of the CS&Co. product

12  development and management group responsible for marketing YieldPlus reported to him.

13  This group was largely responsible for creating and reviewing the statements about YieldPlus

14  that are the subject of this First Amended Complaint. As Merk knew, or was reckless in not

15  knowing, the department relied on him as a fixed-income expert and relied upon him to

16  ensure that that the overall public message – including characterizations of the Fund that are

17  described herein – were accurate, complete, and not misleading. Second, during the relevant

18  period, the funds' portfolio managers, including Daifotis, either reported directly to Merk or

19  indirectly through the President of CSIM, who reported directly to Merk. Later, shortly

20  before the Fund began its decline, Merk assumed the position of CSIM President and Daifotis

21  began to report directly to him again.

22       47.    In 2006, senior Schwab executives were concerned that a competitor was

23  selling its cash products more successfully than Schwab. In response, Schwab established the

24

1    "Cash Council" in mid-2006.  The Cash Council was a committee of high-level executives

2    who met to coordinate, increase, and improve marketing of Schwab's cash products company-

3    wide.  Merk was a member of the Cash Council.

4        48.    Merk was very knowledgeable about fixed-income products and, as part of his

5    work on the Cash Council in 2006, was asked to identify fixed-income products to highlight

6    on Schwab's website to draw attention to cash products at Schwab.

7        49.    In May 2006, Merk identified YieldPlus as such a product.  Merk directly and

8    substantially participated in the decision to include YieldPlus on the cash page of the Schwab

9    website.  For example, in an email exchange on May 17 and 18, 2006, members of the Cash

10   Council twice requested that Merk identify appropriate products to include in the cash

11   campaign, specifically tasking him with identifying fixed-income products to highlight on the

12   cash page of the Schwab website.

13       50.    In a response on May 18, 2006, Merk endorsed the selection of YieldPlus as a

14   cash product for inclusion on the cash page, sometimes referred to as "cHome."  Merk

15   personally informed the Cash Council that he and his team had identified YieldPlus for

16   inclusion in the "[i]ncreased cash promotion."  Merk then received a summary of the

17   "[p]roposed cHome cash promotion" that was "[b]ased on the exchanges [above]," and

18   involved "text boxes to enable a cash emphasis," including one text box on the Schwab

19   website for CDs, another for Schwab's money market fund, and a third for YieldPlus.

20       51.    From at least mid-2006, the Cash Council, including Merk, then directed an

21   effort to highlight YieldPlus on portions of the Schwab website that discussed cash products,

22   such as by adding links to take investors to pages with YieldPlus information.  Merk directly

23   and substantially participated in that effort to highlight YieldPlus.  For example, in at least

24

1   June and August 2006, Merk reviewed and agreed to the marketing plans and the proposed

2   website changes that positioned YieldPlus with CDs and money market funds on the cash

3   page of Schwab's website.

4         52.    In causing YieldPlus to be placed and emphasized on the cash page of the

5   website without substantial disclosures about the difference between YieldPlus and genuine

6   "cash" investments, Merk knowingly or recklessly caused or substantially participated or

7   provided substantial assistance in the making of the misrepresentations or omissions of

8   material fact about YieldPlus and the fact that it was significantly riskier than the other

9   products listed, as described above.

10        53.    The Cash Council, including Merk, also directed that sales materials

11  emphasize claims that YieldPlus had a stable NAV.  Merk caused or substantially participated

12  or provided substantial assistance in the marketing that resulted from the efforts of the Cash

13  Council.  In at least June and August 2006, as a member of the Cash Council and as a Trustee,

14  Merk reviewed and agreed to the content of websites and communications that represented

15  YieldPlus as being a cash-equivalent or cash-alternative investment.  Examples are in Section

16  A.5. below.  This was misleading because, especially when compared to cash products

17  identified in the marketing materials, YieldPlus was more prone to substantial NAV

18  fluctuations, as described above.

19        54.    Merk knew, or was reckless in not knowing, that the statements about the

20  Fund's stable NAV were misleading, in part because of the Fund's prior NAV fluctuation.  In

21  particular, from 1999 through 2003, the Fund's NAV fluctuated by $0.34, ranging from

22  $10.03 to $9.69, with particular volatility in 2002 and 2003.  The NAV also fluctuated

23  significantly within short periods, as described above.  The Fund's fluctuations in NAV were

24

1    material and significant, particularly because the Fund was characterized as a supposed "cash"

2    product; was positioned with CDs and money market funds, which typically have no

3    fluctuation in principal or NAV, respectively; and was characterized as having an NAV that

4    had fluctuated by only a few cents in recent times.

5          55.    As part of the same effort in mid-2006, the Cash Council, including Merk, also

6    directed an effort in mid-2006 to re-design the Fund's own web-page to highlight the yield

7    that it generated and its supposed narrow NAV fluctuation as described below.  Merk was

8    aware of this effort and reviewed the revised web page.  Merk knew, or was reckless in not

9    knowing, that the marketing materials that he reviewed were materially false and misleading

10   and contained material omissions, such as those concerning the risks associated with investing

11   in the Fund.

12         56.    Merk (along with Daifotis) directly and substantially participated in the

13   issuance of a "cash/CD/YieldPlus related press release" on August 1, 2006.  Merk was the

14   source of the idea to issue the August 1, 2006, press release, and Merk saw the draft and the

15   final language of the press release, but did not correct the misrepresentations and omissions of

16   material fact described below, despite his obligation to do so in light of his knowledge,

17   positions, and responsibilities.

18         57.    Specifically, consistent with the Cash Council's re-focused marketing

19   approach for the Fund, the August 1, 2006, press release misleadingly called the Fund a "cash

20   alternative."  Although the press release mentioned a recommended one-year holding period,

21   it also stated that:  "Unlike money market funds, ultra-short bond funds are subject to minimal

22   price fluctuations."  As Merk knew, or was reckless in not knowing, this statement was

23   misleading because it suggested that the Fund's price fluctuations would be limited to

24

FIRST AMENDED COMPLAINT                    -17-                    CASE No. 11cv0137

1   "minimal" changes.  In stating that, in comparison to a money market fund, YieldPlus's NAV

2   would have "minimal" fluctuations, the press release substantially understated the riskiness of

3   the fund and its prior fluctuations, and thus was misleading and omitted material facts.

4         58.   At the August 29, 2006, meeting of the Fund's board of trustees, Merk and the

5   other trustees received documents and presentations concerning the plans to market YieldPlus

6   to retail investors as a cash alternative.  This marketing was to take the form of direct mail,

7   email, and statements on the Schwab website.  As a trustee, Merk was responsible for

8   reviewing the materials and determining, based on his own knowledge and expertise, whether

9   the marketing was truthful and appropriate.  As one of two inside trustees and as the executive

10  with control over the marketing and portfolio management groups responsible for YieldPlus,

11  Merk had additional information concerning and control over the broader marketing,

12  characteristics, and management of the Fund that he was required to consider in evaluating the

13  communications and strategies.

14        59.   For example, among the board materials that Merk received was a document

15  entitled "Board Marketing Update, Schwab Funds" that was the subject of a presentation at

16  the August 29, 2006, meeting and included summaries of the current and future marketing of

17  YieldPlus.  The materials discussed the growth of the Fund and provided a "Marketing

18  Summary" for the second quarter.  Among other things, the Marketing Summary listed four

19  planned advertisements.  One of those communications was for YieldPlus and read:  "Are you

20  sitting on cash?  Do you need additional income?  Here's a smart solution. The Schwab

21  YieldPlus Fund™."  The presentation also included the marketing plans for YieldPlus for the

22  third and fourth quarter of 2006, including marketing YieldPlus as a cash alternative.

23        60.   These marketing plans were carried out through, for example, the publication

24

1  of the sales and marketing materials described in Section A.5. below, which were materially

2  false and misleading in the ways described below.

3        61.    YieldPlus experienced exceptional growth in the year following the Cash

4  Council's effort to highlight YieldPlus as a cash alternative with a stable NAV. From mid-

5  2006 to mid-2007, YieldPlus assets grew from under $7.5 billion to over $13 billion.

6        62.    Also included in the materials given to Merk and the other trustees at the

7  August 29, 2006, meeting was an article published by Dow Jones on July 18, 2006, based in

8  part upon an interview with Daifotis. The piece was circulated to Merk and others and was

9  characterized as, "Dow Jones feature story on YieldPlus." The Dow Jones piece stated, "[t]he

10  Schwab YieldPlus Fund (SPYSX) is aimed at investors seeking better returns than on money

11  market products, but without significantly more market volatility or risk."

12        63.    Also at the August 29, 2006, meeting of the board of trustees, Merk voted to

13  change the Fund's concentration policy (unlawfully, as described below) to allow the Fund's

14  portfolio managers to concentrate the Fund's investments in non-agency MBS. Most of the

15  Fund's non-agency MBS investments were securities that a money market fund could not own

16  because of the length of their maturities. As a result, the concentration in non-agency MBS

17  made the Fund even less like a money market fund. As a fixed-income expert, and the

18  executive to whom the portfolio managers ultimately reported, who participated in the

19  decision to concentrate the Fund's investments in non-agency MBS, Merk knew, or was

20  reckless in not knowing, that this was a material change that made the Fund even riskier than

21  and less like the cash investments to which it was being compared. Merk knew, or was

22  reckless in not knowing, that this change was not revealed in the sales and marketing

23  materials described above and in Section A.5. below.

24

FIRST AMENDED COMPLAINT       -19-      CASE NO. 11CV0137

1    64.    Merk was obliged to correct any misrepresentations or omissions of material

2    fact in any marketing materials, including those described herein, because of:  (1) his senior

3    executive positions as Executive Vice President at Charles Schwab Corporation, Executive

4    Vice President at CS&Co., and trustee, CEO and President of Schwab Investments; (2) his

5    responsibilities as an executive overseeing other executives and departments at the Schwab

6    Entities; (3) the fact that he knew, or was reckless in not knowing, that he was relied upon

7    within CSIM, CS&Co., and the Cash Council as a fixed-income expert; and (4) the fact that

8    he knew, or was reckless in not knowing, that he was relied upon by those within the Schwab

9    Entities who prepared offer, sales, and marketing materials for the Fund to make sure that the

10   overall offer, sale, and marketing message for the Fund, as well as any descriptions of the

11   overall characteristics of the Fund, and its comparison to cash products as described herein,

12   were accurate, complete, and not misleading.

13   65.    In addition to the foregoing, because of Merk's experience managing fixed-

14   income products, Merk was in a unique position to correct the misleading statements in the

15   YieldPlus communications, sales and marketing materials, the website, and press releases that

16   he reviewed or of which he was aware, as described above, and to make sure that they

17   contained sufficient disclosures about the riskiness of the Fund, its significant NAV

18   fluctuations, and the differences between the Fund and cash investments.

19   66.    Merk knew, or was reckless in not knowing, that, among other things, the

20   Schwab Entities and Daifotis were issuing communications, sales and marketing materials,

21   displaying a website, and issuing press releases, including those described above and in

22   Section A.5. below, that included materially false and misleading statements and omissions of

23   material fact and would mislead investors regarding the riskiness of the Fund.  Yet Merk

24

1    failed to correct the misleading statements or to make sure that those materials included

2    sufficient disclosures to make them not misleading.

3          67.    As shown above, Merk directly and substantially participated or provided

4    substantial assistance in the preparation of and caused misrepresentations and omissions of

5    material fact about YieldPlus to be made in communications and materials that were

6    disseminated to the public, as described below.

7          68.    Merk's actions and failures to act as described herein had the principal purpose

8    and effect of creating a false appearance of fact in furtherance of the efforts to mislead the

9    public about YieldPlus.

10                       **b.    <u>Daifotis</u>**

11         69.    Daifotis was actively involved in the day-to-day operations of YieldPlus.

12         70.    Because of Daifotis's knowledge of the Fund, which he helped develop; his

13   day-to-day involvement in, knowledge of, and responsibility for the Fund's portfolio,

14   management, characteristics and other managers; and his expertise in fixed-income products

15   (including money market funds), Daifotis was relied on by marketing, compliance, and other

16   personnel within CS&Co. and CSIM to substantially participate in providing information and

17   determining whether statements in marketing and sales materials, and in other materials

18   describing the Fund's characteristics and performance, were accurate and complete, and

19   Daifotis knew, or was reckless in not knowing, that he was relied upon in those regards.  For

20   example, Daifotis was relied upon to provide content and data for marketing communications

21   and materials and to make sure that marketing materials and communications were consistent

22   with the facts concerning the Fund's portfolio, management, and characteristics.

23         71.    In the normal course of business, Daifotis regularly received, reviewed, and,

24

1   directly or indirectly, contributed to sales and marketing materials regarding YieldPlus.

2   Daifotis also made suggestions and edits to some of them.  Many of those communications

3   and materials contained misrepresentations and omissions of material fact, as discussed

4   below.

5          72.     As shown in Section A.3. below, a number of sales and marketing

6   communications and materials disseminated to the public from at least 2005 through at least

7   March 2008 contained statements regarding the nature of YieldPlus that quoted Daifotis or

8   that were directly attributed to Daifotis, some of which also included his picture.  Daifotis

9   directly or indirectly provided, was aware of, or was reckless in not knowing, the content of

10   these statements and that they included materially false and misleading statements and

11   omissions of material fact in, for example, characterizing the Fund as a cash alternative or

12   cash equivalent without disclosing the fundamental and significant differences and risks

13   associated with the Fund.  Although Daifotis was in a position to create and change the

14   content of those materials, he failed to make them accurate, complete, and not misleading.

15          73.     Daifotis provided, or caused his subordinates to provide, information about

16   YieldPlus's characteristics, its performance, and its assets for use in marketing and other

17   materials that the Schwab Entities issued or filed, as described in Sections A.5. and A.6.,

18   below, and in materials that Merk signed, as described in Section A.4., below.

19          74.     Daifotis (along with Merk) directly and substantially participated in the

20   issuance of the August 1, 2006 "cash/CD/YieldPlus related press release."  He participated in

21   the discussions about and drafting of the press release, which, as discussed above, was

22   misleading in calling the Fund a "cash alternative" and stating that it was "subject to minimal

23   price fluctuations," without disclosing the material facts involving the substantially greater

24

1   riskiness and price fluctuations associated with the Fund.

2       75.     Daifotis saw one or more drafts and the final language of the August 1, 2006,

3   Press Release.  Daifotis knew, or was reckless in not knowing, that it was misleading and

4   omitted material facts, in the ways described above, but he did not correct the false and

5   misleading statements and omissions, despite his obligation to do so in light of his knowledge,

6   positions, and responsibilities.

7       76.     In an August 2007 conference call with registered investment advisers,

8   Daifotis admitted that marketing YieldPlus as a money market alternative was misleading but

9   he falsely denied marketing YieldPlus in that manner.  He stated:  "[W]e have never market

10  [sic] this as an alternative to a money market fund. . . .  So, we do not and have never said this

11  should be a money market fund alternative.  So if anybody ever positioned it that way with

12  [registered representatives], that is certainly not the right way to position this fund."  Daifotis

13  knew, or was reckless in not knowing, that he and others had marketed YieldPlus as a cash or

14  money market alternative – and indeed as a "cash equivalent" – and that his denial was false

15  and misleading.

16      77.     By no later than September 2006, CSIM, CS&Co. and Daifotis knew that

17  investors were using YieldPlus as an alternative investment to money market funds and by at

18  least summer 2007, as an alternative to CDs.  Nonetheless, Daifotis continued to compare

19  YieldPlus to money market funds, as did the Schwab Entities.  Examples include, but are not

20  limited to, Daifotis's comparing YieldPlus to money market funds in a March 2006 webcast,

21  in August 2007 conference calls primarily with CS&Co. registered representatives and

22  independent advisers, CS&Co.'s and CSIM's including such comparisons in sales materials

23  placed on Schwab.com (including the YieldPlus landing page), the Schwab Mutual Fund

24

1  Center, and the cash hub of the Schwab Marketplace webpage, and their continuing to market

2  the Fund on the cash page of the public website, as discussed above.  Daifotis knew, or was

3  reckless in not knowing, of these statements and that they were materially misleading and

4  failed to disclose that YieldPlus was significantly riskier than the cash products to which it

5  was being compared, for the reasons discussed above.

6          78.     Daifotis was obliged to make sure that such materials were accurate, complete,

7  and did not contain any misrepresentations or omissions of material fact because of:  (1) his

8  senior executive position as Senior Vice-President and Chief Investment Officer – Fixed-

9  income at CSIM and Schwab Investments; (2) his position as lead portfolio manager for

10  YieldPlus; (3) his active involvement in the day-to-day operations of YieldPlus, including its

11  offer, marketing, and sale; and (4) his knowledge that others within CS&Co., CSIM and

12  Schwab Investments relied on him as described above.

13          79.     Daifotis knew, or was reckless in not knowing, that sales materials, the

14  website, press releases, and other communications with investors that he made, reviewed, or

15  of which he was aware, or for which he directly or indirectly provided information or

16  otherwise caused to be made, including those described above and in Sections A.3., A.4., A.5.

17  and A.6. below, included materially false and misleading statements and omissions of

18  material fact and would mislead investors regarding characteristics such as the riskiness of the

19  Fund and other material facts described above, yet he failed to correct the misleading

20  statements or to make sure that those materials included sufficient disclosures to make them

21  not misleading.

22          80.     By reason of the foregoing, and the matters alleged in Sections A.3., A.4., A.5,

23  and A.6. below, Daifotis made, caused, substantially participated, or provided substantial

24

1   assistance in the making of  misrepresentations and omissions of material fact about YieldPlus

2   that were disseminated to the public.

3        81.      Daifotis's actions and failures to act as described herein had the principal

4   purpose and effect of creating a false appearance of fact in furtherance of the efforts to

5   mislead the public about YieldPlus.

6                  **3.       Misrepresentations and Omissions Attributed to Daifotis**

7        82.      Daifotis regularly spoke about and marketed the YieldPlus Fund at meetings,

8   conferences, symposiums, and sales events with Schwab Registered Representatives,

9   Regional Bond Specialists, Registered Investment Advisors (who were independent advisers,

10  not employed by Schwab), the media, and investors.  During such events, Daifotis made oral

11  statements and displayed slides as part of his presentation.  Daifotis intended and knew that

12  his statements were likely to be communicated to investors.

13       83.      For example, from at least January 2005 through July 2008, Daifotis appeared

14  and spoke about the Fund at a number of events, including, but not limited to, events at the

15  following locations on or about the dates indicated:  New York in November 2005 and July,

16  August and December 2006; Denver in March 2006 and March and May 2007; Chicago in

17  April and October 2006; the Midwest Region in April 2006 and March and April 2007; Dallas

18  in May and June 2006; Orlando in May 2007; Phoenix in May 2007; Indianapolis in May

19  2007; Portland and Seattle in May 2007; CSIM Media Events in May and June 2007; Annual

20  Schwab Fixed Income Sales Meetings in October 2005; and Schwab IMPACT Conferences in

21  November 2004, September 2005, and October and November 2006 .

22

23

24

84.     At the events described in preceding paragraphs, Daifotis's oral statements and/or the slides he presented and displayed asserted that YieldPlus had characteristics or attributes, including but not necessarily limited to the following statements (italics and bold added), which were false and misleading in the ways described in paragraph 87 below. Daifotis:

(a)     Stated that YieldPlus was a ***long-term cash alternative***;

(b)     Compared YieldPlus to ***money market funds;***

(c)     In some presentations, his slides included a table that indicated that YieldPlus could fit into a portfolio as "***Short-Term Cash (Money Market)***" investment;

(d)     Characterized YieldPlus as an ultrashort bond fund, and indicated that such funds offer "***industry diversification***," thus indicating that YieldPlus had that characteristic.

(e)     Characterized YieldPlus as an ultrashort bond fund, and indicated that such funds "limit interest rate risk by ***maintaining average maturity between 91 and 365 days,***" thus indicating that YieldPlus had that characteristic.

85.     Examples of Daifotis making statements regarding YieldPlus which were false and misleading in the ways described in paragraph 87 below include, but are not necessarily limited to the following (italics and bold added):

(a)     Daifotis made presentations in March 2007 to audiences in Denver and Cincinnati and possibly other locations, and also in May 2007 to audiences in Orlando, Denver, Phoenix and Indianapolis.  The presentation included Daifotis displaying slides that attributed their contents to him.  In his oral statements and/or those slides,

Daifotis **characterized YieldPlus as an ultrashort bond fund**, and:

(i)     Stated that ultrashort bond funds such as YieldPlus have the characteristic of "**industry diversification**."  Daifotis thus indicated that YieldPlus had that characteristic.

(ii)     Stated that ultrashort bond funds "[g]enerally provide higher yields and total return than **other longer-term cash alternatives, such as a money market fund and improved liquidity compared to a long-term CD."**  Daifotis thus indicated that YieldPlus had those characteristics.

(b)    On or about September 20, 2006, Daifotis made a webcast oral presentation to Schwab Financial Consultants and independent Registered Investment Advisors, which also was published on the Schwab website.  Daifotis's presentation included his displaying of slides that attributed their contents to him.  In his presentation, Daifotis stated or the slides which he displayed, and which were attributed to him by name, stated:

(i)  YieldPlus was an **ultrashort bond fund**;

(ii)  "An ultra short bond fund has to maintain an **average maturity between three months and one year**" and "it also can have **a slightly longer maturity than what a money fund can invest in**."

(iii)  "We have essentially been using this [ultrashort bond fund] as more of a **long term cash [sic] for our money market holders**."

(iv)  YieldPlus was managed "**without putting a great deal of capital at risk**."

(v)  "[A]ny cash that is beyond probably **six months of liquidity needs,**

1    you might want to consider putting in to an ultra short bond fund if you're

2    looking for a little bit higher yield."

3    Daifotis thus indicated that YieldPlus had those characteristics. Additionally, the

4    slides that Daifotis displayed in his September 20, 2006 webcast:

5    (vi) Characterized YieldPlus as an ultrashort bond fund, and indicated

6    that such funds "limit interest rate risk by *maintaining average maturity*

7    *between 91 and 365 days,*" thus attributing that characteristic to YieldPlus.

8    (vii) Stated that YieldPlus had "*minimal principal fluctuation without*

9    *sacrificing liquidity*."

10    86.    The following are other examples of written and electronic communications

11    that attributed statements to Daifotis, or oral statements personally made by Daifotis (italics

12    and bold added), which were false and misleading in the ways described in paragraph 87

13    below:

14    *(a)    March 10, 2008, letter.* On March 10, 2008, Daifotis (along with

15    Merk) signed a letter issued to YieldPlus investors, stating that "*YieldPlus is a highly*

16    *diversified fund*."

17    *(b)    June 2007 website attributing statements to Daifotis.* On or about

18    June 30, 2007, the Schwab internal website, which was available to Schwab Financial

19    Consultants and independent Registered Investment Advisers, included a document

20    entitled "Schwab Mutual Fund Commentary," that attributed statements to Daifotis.

21    Included were statements that:

22    (i) "[YieldPlus] management seeks to dampen volatility via

23    *diversification* (in terms of both sectors and credit quality)"; and

24

1    (ii) "[A] *stable NAV is one of the top priorities for the management*

2    team given that many *investors are looking for a higher yielding money*

3    *market alternative.*"

4    *(c)    Spring 2006 brochure.*  A brochure mailed to Schwab investors in or

5    about Spring 2006 with the heading, "*STASH YOUR CASH—ULTRA-SHORT*

6    *BOND FUNDS*" -- and in which YieldPlus is the only ultra-short bond fund

7    mentioned -- included statements directly attributed to Daifotis, and read:

8    (i)    "In the current uncertain interest rate and investing environment,

9    cash has become an increasingly attractive defensive holding for many

10    investors.  *Kimon Daifotis*, chief investment officer and fixed-income portfolio

11    manager of Charles Schwab Investment Management, says investors can

12    potentially receive better returns by using ultra-short bond funds as *an*

13    *alternative to traditional cash holdings, like money market funds and CDs*,

14    though with a *slightly increased risk* to principal."  Daifotis thus indicated that

15    YieldPlus had those characteristics.

16    (ii)  "Ultra-short bond funds were designed to provide an *alternative to*

17    *cash* . . . ." through strategies including "*Sector* and credit *diversification.*"

18    Daifotis thus indicated that YieldPlus had those characteristics.

19    (iii)  An "ultra-short bond fund, like Schwab's YieldPlus Select, may

20    experience a decline in share price and under-perform the total return of a

21    *money market fund in shorter-term holding periods of a month or a*

22    *quarter.*"

23    *(d)    "White Papers" attributed to Daifotis.*  On or about December 31,

24

1    2005, the Schwab Entities sent investors a "white paper" along with a letter that

2    attributed the contents of the white paper to Daifotis. The white paper:

3             (i)  Characterized YieldPlus as an "***ultrashort bond fund***," and described

4             ultrashort bond funds as "***an alternative to cash***," "a ***cash alternative with a***

5             ***modest increase in risk.***"

6             (ii)  Characterized ultrashort bond funds as having investments "that are

7             ***just outside the approved limits of money funds***," and as being "an

8             ***alternative approach*** to holding ***long-term cash in a money market fund*** for

9             those investors with a holding period of at least a year and who can tolerate

10            ***minimal price fluctuations***."

11            (iii) Characterized ultra-short bond funds as having ***sector*** and credit

12            ***diversification***.

13            (iii)  Stated, "[b]ecause ultra-short bond funds have fluctuating NAVs it

14            is entirely possible that ***for shorter-term holding periods of say a month or a***

15            ***quarter*** they may experience a ***decline in share price*** and under-perform the

16            total return of a ***money market fund***."

17   Daifotis thus indicated that YieldPlus had those characteristics. Similar statements

18   were included in other White Papers including but not necessarily limited to those

19   dated September 30, 2005, March 31, 2006, June 30, 2006, September 30, 2006, and

20   June 30, 2007.

21            *(e)    **December 2005 website quoting Daifotis.**  On or about December 23,

22   2005, the Schwab internal website, which was available to Schwab Financial

23   Consultants and independent Registered Investment Advisers, ***quoted Daifotis as***

24

1     *referring to YieldPlus as a "smart cash alternative* for your clients."

2           *(f)*     *November 2005 report attributed to Daifotis.*  Similarly, a document

3 entitled, "The Schwab Report" and dated November 30, 2005, was distributed to

4 investors and attributed its statements to Daifotis.  It bore the heading (in all capitals)

5 "**ULTRA-SHORT BOND FUNDS AS A CASH ALTERNATIVE**," and included

6 statements that an "ultrashort bond fund" is a "potentially better alternative to other

7 *cash options* when the expected holding period is one year or longer" because, for

8 example, ultrashort bond funds are "*free to use many investments just outside the*

9 *approved limits of money market funds.*"  The document stated that "Daifotis is

10 available for general commentary on the benefits and drawback of these funds, as well

11 as *Schwab's own ultra-short bond alternative, the Schwab YieldPlus fund*."  Daifotis

12 thus indicated that YieldPlus was a "cash alternative" that had the characteristics

13 stated.

14           **(g)**     *September 2005 advertisement quoting Daifotis.*  In or about September

15 2005, an advertisement ran with a *picture of Daifotis and a quote attributed to him*

16 reading:  "'With consistent exceptional performance, The Schwab YieldPlus Fund ™

17 is a smart *cash alternative* for your clients in the current rising-rate market, providing

18 enhanced yield potential *over money market funds.*'"

19     87.     As Daifotis knew, or was reckless in not knowing, the statements made by or

20 attributed to Daifotis, as described in the preceding paragraphs, were misleading and

21 contained misrepresentations or omissions of material fact that made the statements

22 misleading in light of the circumstances under which they were made, in at least the following

23 respects:

24

1       **(a)  Maturities.**  Suggesting that YieldPlus's holdings had an average

2   maturity between "91 and 365 days" was false and misleading because, during the

3   relevant period, more than half of its assets were long term securities that subjected it

4   to severe interest rate, liquidity, and credit risk.

5       **(b)  Comparisons to Ultrashort Bond Funds.**  Suggesting that YieldPlus had

6   had or abided by what Daifotis claimed were the characteristics or limitations of

7   ultrashort bond funds was false and deceptive because YieldPlus did not have or abide

8   by many of the key characteristics and restrictions that Daifotis stated, but this was not

9   fully or adequately disclosed.  For example, unlike Daifotis's characterization of

10  ultrashort bond funds, YieldPlus's holdings had an average maturity far in excess of

11  three months to one year, it was not as diversified, and its assets were subject to much

12  greater liquidity risk and other risks, in contrast to the characteristics that Daifotis

13  attributed to ultrashort bond funds.

14      **(c)  Comparison to Money Markets and CDs.**  Characterizing YieldPlus as a

15  "money market alternative" or comparing YieldPlus to money market funds or CDs

16  was false and misleading because YieldPlus in fact was substantially different and

17  riskier than those products, and the significant differences and greater risks were not

18  fully or accurately disclosed.  For example, YieldPlus's assets could not fairly be

19  characterized as "just outside the approved the limits of money funds" because the

20  Fund held a very large percentage of investments that were far outside the limits of,

21  and significantly riskier than, the investments that money funds could hold, and

22  Daifotis's statements and the documents described above failed to disclose those facts.

23  Suggesting that YieldPlus's holdings would have a "slightly longer maturity than what

24

a money fund can invest in" was false and misleading because at the relevant times, YieldPlus had heavy concentrations of assets that were far outside of the maturity limitations of money market funds. Daifotis's statements to the effect that YieldPlus "may" under-perform in comparison to money market funds or experience a "decline in share price" in "shorter term holding periods of a month or a quarter," was deceptive and misleading because YieldPlus's holdings created a significant risk that YieldPlus would under-perform or experience price declines over much longer periods of time, and an investor would not be able to avoid losses simply by holding onto YieldPlus for more than, e.g., a "month" or a "quarter."

(d)   *Cash Alternative or Cash Equivalent, and Risks.*  Statements identifying YieldPlus as a cash-alternative, or cash-equivalent investment, or appropriate for "short term cash," or asserting that YieldPlus was only slightly, marginally or modestly riskier than cash or cash-like products, such as CDs or money market funds, or that YieldPlus did not put "a great deal of capital at risk" were false and misleading because YieldPlus in fact was substantially riskier than those products or genuine cash alternatives, and the greater risks were not fully or accurately disclosed. Similarly, asserting that YieldPlus was appropriate for cash beyond "six months of liquidity needs" was false and misleading because YieldPlus held assets that were subject to liquidity or other risks that made YieldPlus inappropriate for such investments.

(e)   *Diversification.*  Asserting that YieldPlus was "highly diversified" or offered "diversification" or was false and misleading because YieldPlus deviated from its own concentration policy and its investments were heavily concentrated in residential mortgage-backed securities and financial institutions, which was not

1    adequately disclosed.

2         (*f*)   ***Liquidity.***   Asserting that YieldPlus offered "improved liquidity

3    compared to a long-term CD" or that investors would not be "sacrificing liquidity"

4    was misleading.  Because YieldPlus held a large percentage of longer-term and other

5    risky assets, investors in the Fund were at risk of fluctuations of price and even

6    principal.  As a result, YieldPlus did not offer true liquidity because, unlike a CD

7    investor, YieldPlus investors could not reasonably expect to redeem their holdings

8    without risking experiencing a loss.  This significant risk was omitted from Daifotis's

9    statements, making them misleading and deceptive.

10        (*g*)   ***Holding Period.***  Asserting that YieldPlus was appropriate for "short

11   term" investing, or for cash beyond "six months of liquidity needs" was false and

12   misleading because YieldPlus held assets that were subject to liquidity or other risks

13   that made YieldPlus inappropriate for such investments.

14        (*h*)   ***Stable NAV and Price or Principal Fluctuation .***  Asserting that

15   YieldPlus had or would have "minimal" price or principal fluctuations was false and

16   misleading because YieldPlus experienced significant price fluctuations and had

17   significant risk of substantial principal fluctuations.  Asserting in June 2007 that a

18   stable NAV was one of the top priorities for the management team also was

19   misleading because YieldPlus's investments could not fairly be expected to lead to a

20   stable NAV.

21

22

23

24

1    **4.    Misrepresentations and Omissions Attributed to Merk**

2        88.    The following are written and electronic communications that attributed

3    statements to Merk (italics and bold added) which were false and misleading in the ways

4    described in paragraph 89 below:

5        **(a)    *March 10, 2008 letter.*** On March 10, 2008, Merk (along with

6    Daifotis) signed a letter issued to YieldPlus investors, stating that "***YieldPlus is a***

7    ***highly diversified fund.***"

8        **(b)    *December 14, 2007 and January 14, 2008 letters.*** On December 14,

9    2007, and again on January 24, 2008, Merk signed letters issued to YieldPlus

10    investors, stating that the "investment process" for YieldPlus "emphasizes ***liquidity***,

11    high-quality investments and ***diversification***."

12        **(c)    *October 16, 2007 Form N-CSR.*** On or about October 16, 2007, Merk

13    signed a Form N-CSR for the year ending August 31, 2007, which was filed with the

14    SEC. The form asserted that ***60.3%*** of YieldPlus's holdings had ***maturities of "0-6***

15    ***months.***" It included a chart purporting to show the composition of YieldPlus's

16    holdings "by maturity." The chart included four categories: "0-6 months," "7-18

17    months," "19-30 months," and "More than 30 Months." The chart failed to disclose

18    that a large percentage of YieldPlus's holdings would not mature for many years or

19    decades. Specifically, the use of "More than 30 Months" as the longest category

20    masked that fact. Using "More than 30 Months" as the catchall category for

21    YieldPlus's securities having the longest maturities was also particularly misleading

22    given the actual length of the maturities and in light of the marketing of the Fund as

23    money-market or cash-alternative. Additionally, as described below, the form

24

1    misrepresented the Weighted Average Maturity of the Fund's holdings, indicating that

2    half of the Fund's holdings would mature within six months.

3         **(d)**    ***April 21, 2008 Form N-CSR.***  On or about April 21, 2008, Merk

4    signed a Form N-CSR for the period of September 1, 2007 through February 29, 2008,

5    which was filed with the SEC.  The form asserted that ***63.7%*** of YieldPlus's holdings

6    had ***maturities of "0-6 months."***  The Form included a similar chart of YieldPlus's

7    holdings "by maturity," as described in the preceding sub-paragraph.

8         **(e)**    ***November 15, 2006 Form N-1A.***  On or about November 15, 2006,

9    Merk signed as trustee a Form N-1A (amendment to registration statement) filed

10   November 15, 2006, which stated that YieldPlus's "investment strategy is designed to

11   offer higher yields than a money market fund while seeking ***minimal changes in***

12   ***share*** price."  Also as described below, the document was misleading with regard to

13   the change in and deviation from the Fund's concentration policy.

14        **(f)**    ***November 14, 2007 Form N-1A.***  On or about November 14, 2007,

15   Merk signed as trustee, CEO and President of Schwab Investments a Form N-1A

16   (amendment to registration statement) filed November 14, 2006, which stated that

17   YieldPlus's "investment strategy is designed to offer higher yields than a money

18   market fund while seeking ***minimal changes in share*** price."

19        89.    As Merk knew, or was reckless in not knowing, the statements attributed to

20   Merk, as described in the preceding paragraph, were misleading and contained

21   misrepresentations or omissions of material fact that made the statements misleading in light

22   of the circumstances under which they were made, in at least the following respects:

23        (a)    ***Diversification.***  Asserting that YieldPlus was "highly diversified" or

24

FIRST AMENDED COMPLAINT                    -36-                    CASE NO. 11CV0137

1    offered "diversification" was false and misleading because YieldPlus deviated from its

2    own concentration policy and its investments were heavily concentrated in residential

3    mortgage-backed securities and financial institutions, which was not adequately

4    disclosed;

5         (b)    *Liquidity.*  Asserting, particularly in or after August 2007, that

6    YieldPlus "emphasizes liquidity" – thus implying that its assets were liquid – was

7    false and misleading because YieldPlus held a large percentage of long-term assets

8    that were illiquid, and were becoming increasingly illiquid, which was omitted from

9    Merk's statements above.

10        (c)    *Maturities.*  The Forms N-CSR identified above materially overstated the

11   percentages of YieldPlus's assets that had "maturities" of "0-6 months" and included

12   incorrect figures for each of the other maturity ranges.  In fact, YieldPlus held much

13   higher percentages of long-term securities than indicated, and very little in the way of

14   maturities with maturities of zero to six months.  The forms also were misleading in

15   including a chart purporting to show the composition of YieldPlus's holdings "by

16   maturity," in which the longest maturity was "More than 30 months."  This

17   misleadingly concealed the fact that YieldPlus held large percentages of securities that

18   would not mature for decades.  Using "More than 30 Months" as the catchall category

19   for YieldPlus's securities having the longest maturities was also particularly

20   misleading given the actual length of the maturities and in light of the marketing of the

21   Fund as money-market or cash-alternative.

22        (d)    *Minimal Changes in Share Price.*  It was false and misleading to

23   assert that the Funds investment strategy included seeking "minimal changes in share

24

price" given the characteristics of the Fund's holdings at the time those statements were made.

### 5.    Other Misrepresentations and Omissions In Sales and Marketing Materials For YieldPlus

90.    The following are examples of other false and misleading written and electronic communications issued by the Schwab Entities (italics and bold added) which were false and misleading in the ways described in paragraph 91 below:

(a)    On or about the last day of each quarter from at least September 30, 2005 through March 31, 2008, the Schwab Entities issued fact sheets that stated that YieldPlus seeks "high current income consistent with ***minimal changes in share price***" and, in several of those documents, stated that the Fund had a **"*diversified portfolio*"** and held a substantial portion of assets with maturities six months or under and listed the remaining securities in categories under 60 months.  For example, in some of the fact sheets the percentage of the Fund's portfolio with ***maturities between zero to 6 months was listed as 67.5%*** (9/30/2005 fact sheet), ***42.8%*** (12/31/2006 fact sheet), ***37.5%*** (3/31/2007 fact sheet), and ***57.9%*** (6/30/07 fact sheet).

(b)    The following annual and semi-annual reports filed by Schwab Investments for funds including YieldPlus included charts and statements purportedly indicating the percentages of the Fund's assets supposedly falling into each of four categories, "0-6 months," "7-18 months," "19-30 months," and "More than 30 Months."  Each stated false and misleading figures for each of those categories.  The chart failed to disclose that a large percentage of YieldPlus's holdings would not mature for many years or decades.  Among other things, the reports contained these statements:

1            (i)      The Semiannual Report dated February 28, 2005, which

2    asserted that **68%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

3            (ii)      The Annual Report dated August 31, 2005, which asserted that

4    **64%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

5            (iii)      The Semiannual Report dated February 28, 2006, which

6    asserted that **66.5%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

7            (iv)      The Annual Report dated August 31, 2006, which asserted that

8    **57.1%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

9            (v)      The Semiannual Report dated February 28, 2007, which

10   asserted that **41.8%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

11           (vi)      The Annual Report dated August 31, 2007, which asserted that

12   **60.3%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

13           (vii)      The Semiannual Report dated February 29, 2008, which

14   asserted that **63.7%** of YieldPlus's holdings had ***maturities of "0-6 months.***"

15           (c)      The Form N-CSR for the period of September 1, 2006 through

16   February 28, 2007, which was filed with the SEC on or about May 3, 2007, asserted

17   that **41.8%** of YieldPlus's holdings had ***maturities of "0-6 months.***"  It included a

18   chart purporting to show the composition of YieldPlus's holdings "by maturity."  The

19   chart included four categories:  "0-6 months," "7-18 months," "19-30 months," and

20   "More than 30 Months."  The chart failed to disclose that a large percentage of

21   YieldPlus's holdings would not mature for many years or decades.

22           (d)      Beginning at least by mid-2006, Schwab Investments and CS&Co.

23   placed on the Schwab website available to the public a page that referenced YieldPlus

24

1    alongside CDs and money market funds, and stated:  "Schwab YieldPlus Fund®  If

2    you're comfortable accepting a *slightly higher amount of risk* in exchange for a return

3    that's generally *better than the other cash equivalent investments,* consider this ultra-

4    short term bond fund.  This fund consisting of hundreds of bonds that offer *enhanced*

5    *diversification*  . . . ."

6           (e)     From at least late 2006, following the Cash Council's directives,

7    Schwab Investments and CS&Co. included the following on Schwab's Cash

8    Investments and Strategies page on its public website, which was reached by selecting

9    the "Cash" tab, and which included sweep accounts, CDs, a money market fund and

10   YieldPlus as investment options and read:

11                  (i)     "Want to make your cash work harder?  This section highlights

12          the different options Schwab offers to get more out of your cash."

13                  (ii)    The webpage then offered a description of each product,

14          including:  "**Schwab YieldPlus Fund ®**  If you're comfortable accepting a

15          *slightly higher amount of risk* in exchange for a return that is generally better

16          than the other *cash equivalent investments*, consider this ultra-short bond

17          fund.  This fund consisting of hundreds of bonds that offer enhanced

18          *diversification* is best suited for those with investment horizons of one year or

19          more.  Note that the Schwab YieldPlus Fund's net asset value will fluctuate."

20          (f)     A brochure mailed to Schwab clients in or about September 2006,

21   entitled "Schwab *YieldPlus Fund* read:  Your cash could be in a much more

22   rewarding position" stated:

23                  (i)     "If you're looking for a smart *alternative for your cash*, investing

24

1    in the Schwab YieldPlus Fund ® could be your answer."

2         (ii)    "YieldPlus can be a great choice for clients with a 12-month or

3    longer investment horizon.  With historically strong performance, it offers

4    higher potential returns than money market funds *with only marginally more*

5    *risk*."

6         (iii)   "YieldPlus is an actively managed mutual fund consisting primarily

7    of *ultrashort duration bonds that mature frequently* to limit interest rate

8    exposure.  Its net asset value (NAV) has fluctuated by no more than $0.03

9    (between $9.65 and $9.68) over the last year ending 06/30/2006, giving it the

10   performance potential and *relative stability* necessary in today's market."

11   (g)    In June 2006, the YieldPlus page on Schwab's public website read:

12        (i)    "**Schwab YieldPlus Fund.  Discover a smart alternative for**

13   **long-term cash holdings."**

14        (ii)    "Looking for a way to earn better yields on your long-term cash

15   *without taking on significantly higher risk*?  The Schwab YieldPlus Fund ™

16   seeks to benefit from the current rising–rate environment and can be a smarter

17   *alternative to investing in money market* and long-term bond funds."

18        (iii)   "The fund offers:  *Increased yield potential* – Ultrashort bond

19   funds like YieldPlus Fund have historically provided higher sustained yield

20   versus money market funds, as their short duration helps minimize exposure to

21   falling bond prices as rate rise.  Even though the share *price may fluctuate*

22   *minimally*, these funds offer lower risk than longer-term bonds funds and *only*

23   *marginally higher risk than money market funds*."

24

FIRST AMENDED COMPLAINT                    -41-                    CASE NO. 11cv0137

(h)     In or about September 2006, an email was sent to investors from Charles
Schwab with the subject line "Put your **cash in a stronger position with YieldPlus**."
The body of the text included the following claims:

    (i)     "Higher income potential, **minimal risk**."

    (ii)    "It offers higher potential returns than many money market funds,
with **only marginally higher risk**."

    (iii)   "YieldPlus primarily consists of ultra-short duration bonds **that
mature frequently** to limit interest rate risk exposure.  Its net asset value
(NAV) has fluctuated by no more than $0.03 (between $9.65 and $9.68) over
the past year ending 6/30/2006, giving it the performance potential and **relative
stability necessary** in today's market."

    (iv)    "What are the advantages of the Schwab YieldPlus Fund?  High
Yield. . . .  Strong Ratings. . . .  **Minimal Risk**."

(i)     A May 2005, advertisement included a **picture of Daifotis, along with
his title**, immediately next to which appeared the claim:  "It's an ultrashort bond fund,
not a money market fund.  It seeks to provide higher yield with **slightly higher risk
than a money market fund, but maintains minimal fluctuation in share price** and
lower risk than a longer-term bond fund."

(j)     In the summer of 2005, Schwab Investments and CS&Co. included on
the Schwab public website a piece entitled, "Put your cash to work in a Schwab
YieldPlus Fund."  The publication stated:

    (i)     "[M]any investors have turned to potentially higher-yielding
ultrashort bond funds **for long-term cash**.  The Schwab YieldPlus Fund ® can

1    be a smart alternative for you if you're willing to **take on a bit more risk and**

2    **can tolerate minimal fluctuation in share price**."

3        (ii) "While not a money fund, Schwab YieldPlus funds seek higher

4    yields with **slightly higher risks than money market funds, but lower risks**

5    **than longer-term bond funds**."

6        (iii) YieldPlus was "[m]anaged by the fixed income portfolio team led by

7    Kim Daifotis."

8        (k)    A brochure mailed to investors in or about January 2006, entitled "Smart

9    cash strategies.  Easy ways to keep your cash working." stated:  "Understanding the

10   different roles **that cash plays in** your portfolio can help you make smart decisions

11   about the type of investment that is best suited for your cash.  Use this chart to review

12   some of your choices."  The chart listed YieldPlus with money market funds and CDs

13   as a type of investment cash, and included as suggested uses for such cash:

14   emergency reserves, upcoming tax bills, planned vacations, down payments, future

15   purchases, and portfolio diversification.  Next to these uses was a brief explanation of

16   each product.  YieldPlus was described as follows:

17       "If you're comfortable with accepting a **slightly higher amount of
         risk** in exchange for a return that's generally better than **other**
18       **cash-equivalent investments**, consider this ultra-short bond fund.
         The net asset value of the Schwab YieldPlus Fund will fluctuate."

19

20       (l)       From at least 2005 through at least March 2008, the Schwab Entities

21   listed the Lehman Brothers U.S. Treasury 9-12 Month Index as the benchmark for

22   measurement of YieldPlus's performance.  The benchmark was listed on (i) various

23   documents on Schwab's public website, Schwab.com, including but not limited to

24   "fact sheets," (ii) for at least a number of months in 2006, in documents entitled,

1   "Charles Schwab Investment Management Perspectives," (iii) in charts used during

2   presentations by Daifotis to investment advisers or regional bond specialists in or

3   about October 2006, (iv) in Daifotis's November 2007 "Manager's Discussion"

4   identified below, and (v) in prospectuses issued by Schwab Investments annually each

5   November between 2004 and at least 2008, and in amendments or supplements to the

6   prospectuses dated on or about September 15, 2005, April 2, 2007, July 13, 2007, and

7   June 13, 2008.

8          (m)     From at least 2005 through at least 2008, the annual registration

9   statement amendments filed each November on Form N-1A and supplemented as

10   necessary, stated that YieldPlus's "investment strategy is designed to offer higher

11   yields than a money market fund while seeking ***minimal changes in share price."***

12          91.     The sales and marketing materials described in the preceding paragraph were

13   misleading and contained misrepresentations or omissions of material fact that made the

14   statements misleading in light of the circumstances under which they were made, in at least

15   the following respects:

16          ***(a)     Changes in Price or NAV.***  Asserting that YieldPlus would have

17   "minimal" or "slight" changes or fluctuations in share price or NAV; that its

18   investment strategy was to seek "minimal changes in share price;" or that it offered

19   "relative stability," was false and misleading because YieldPlus was at great risk of

20   having substantial decreases in share price or NAV, which was not adequately

21   disclosed, and because the Fund had previously experienced more than just "minimal"

22   share price fluctuations.

23          ***(b)     Maturity.***  The annual and semi-annual reports and the Forms N-CSR

24

1    stated false percentages of assets held by YieldPlus falling into the four categories, "0-

2    6 months," "7-18 months," "19-30 months," and "More than 30 Months."  The

3    documents' figures for the "0-6 months" category were particularly misleading

4    because they grossly overstated the percentage of assets in that category, and the

5    documents understated the percentage of very long term securities held by YieldPlus.

6    This was particularly deceptive in light of the fact that the Fund had been marketed as

7    having short-term holdings and being a "cash alternative."   In fact, YieldPlus's assets

8    had far longer maturities, which posed significant risks to the value of investments in

9    YieldPlus.  It was false to assert that YieldPlus consisted "primarily" of "ultrashort

10   duration bonds that mature frequently," because YieldPlus actually held a large

11   percentage of very long-term assets that did not mature frequently.  Using "More than

12   30 Months" as the catchall category for YieldPlus's securities having the longest

13   maturities was also particularly misleading given the actual length of the maturities

14   and in light of the marketing of the Fund as money-market or cash-alternative.

15            *(c)*    ***Diversification.***  Asserting that YieldPlus had a "diversified portfolio," or

16   offered "diversification" or "enhanced diversification" was false and misleading

17   because YieldPlus deviated from its own concentration policy and its investments

18   were heavily concentrated in residential mortgage-backed securities and financial

19   institutions, which was not adequately disclosed;

20            *(d)*    ***Cash Alternative or Cash Equivalent, and Risks.***  Statements identifying

21   YieldPlus as a cash-alternative or cash-equivalent investment and asserting that

22   YieldPlus was only slightly or marginally riskier than cash or cash-like products, such

23   as CDs or money market funds,  were false and misleading because YieldPlus in fact

24

1   was substantially riskier than those products, and the greater risks were not fully or

2   accurately disclosed;

3           (e)   **Comparison to Money Markets and CDs.**  Characterizing YieldPlus as a

4   "money market alternative" or comparing YieldPlus to money market funds or CDs

5   was false and misleading because YieldPlus in fact was substantially different and

6   riskier than those products, and the significant differences and greater risks were not

7   fully or accurately disclosed.  For example, the large majority of YieldPlus's assets

8   were securities that money market funds were not permitted to own because of their

9   maturities or credit quality.

10          (f)   **Risk.**  Asserting that YieldPlus posed "minimal" risk, or only "slightly"

11  or "marginally" higher risk than money market funds was false and misleading

12  because YieldPlus posed high risk of a drop in value and was much riskier than money

13  market funds or other cash investments.

14          (g)   **Lehman Bros. U.S. Treasury 9-12 Month Index.**  The use of the

15  Lehman Brothers U.S. Treasury 9-12 Month Index was misleading because it

16  suggested that the Fund invested regularly and substantially in bonds issued by the

17  U.S. Treasury, and that YieldPlus's performance and risk profile would be similar to

18  that of Treasury bonds, neither of which were true.  Daifotis participated in selecting

19  the benchmark, and he and Merk knew, or were reckless in not knowing, that use of a

20  9-12 month Treasury benchmark for the Fund would be misleading for the reasons

21  described above.

22          92.   The foregoing sales and marketing materials were reviewed and/or prepared

23  by CS&Co.'s product development and management group, CSIM portfolio managers, and

24

other personnel within the Schwab Entities.

93.     At or about the time periods of the sales and marketing materials identified above, Daifotis and Merk knew, or were reckless in not knowing, that the Schwab Entities were disseminating either those particular marketing and advertising materials or materials containing the substance thereof, and that such materials were materially false and misleading in the ways described above.

94.     Daifotis and Merk caused, substantially participated in, or provided substantial assistance in the making of the misleading statements identified above.  As described more fully in Sections A.2.a and A.2.b., above, this included but is not necessarily limited to (a) Merk's role in the Cash Council and his involvement in deciding to highlight YieldPlus as a cash alternative; (b) the fact that, as Daifotis and Merk knew, or were reckless in not knowing, they were relied upon by personnel within the Schwab Entities to make sure that statements about YieldPlus were accurate, complete, and not misleading, but they failed to do so; (c) Merk and Daifotis provided information that made the statements false and misleading, or controlled or directed the providing of such information; or (d) Merk and Daifotis reviewed, edited, or approved the misleading statements.

### 6.     Misleading Statements and Omissions Regarding YieldPlus's Weighted Average Maturity

95.     With regard to mutual funds such as YieldPlus, facts pertaining to the term of investments held by the Fund, i.e., the time until maturity of the investments, are material facts.

96.     Investors can use weighted average maturity ("WAM") – a measurement of the average length of time until the underlying bonds in a portfolio mature – to evaluate the riskiness of a product.  Among similar funds, those with longer WAMs generally involve

1   more risk.

2       97.     For eighteen months, from February 2006 to September 2007, the Schwab

3   Entities, with Daifotis's substantial participation and assistance, misstated YieldPlus's WAM

4   in communications designed for investors, including but not limited to marketing materials on

5   the public website (as explained more fully below) and one Commission filing, a Form N-

6   CSR Annual Report dated August 31, 2007.

7       98.     In early 2006, the YieldPlus Fund's WAM tripled to over one to two years in

8   length because of a change in the calculation method used by Schwab Investment's new fund

9   accountant.  Investors complained about the increase, some even telling the Schwab Entities

10  that they might invest in CDs instead of YieldPlus as a result of the longer WAM.

11      99.     Because of the response of investors and representatives to the longer WAM,

12  between at least November 2005 and February 2006, Daifotis suggested to others at CSIM

13  and CS&Co. that "duration" be included instead of or in addition to WAM.

14      100.    "Duration" is a ratio that measures interest-rate sensitivity affected by hedging

15  techniques, but is not a measure of maturity or any other unit of time.

16      101.    Despite owning many long-maturity bonds, YieldPlus was classified as an

17  ultra-short fund because of its relatively low duration.  To keep YieldPlus's duration low,

18  YieldPlus "shorted" Treasury futures.  By selling Treasury futures short (which means selling

19  the futures contracts without owning them, and profiting if the value of the securities

20  declines), the Schwab Entities hedged the interest rate risk of the securities in YieldPlus's

21  portfolio.  This may have reduced YieldPlus's exposure to interest rate risk, but it did not

22  mitigate the liquidity risk and other risks posed by the bonds held by YieldPlus, especially

23  those with longer maturities.

24

1   102.   The numerals reflecting YieldPlus's duration (which generally ranged from 0.4

2   to 0.6) were significantly lower than the numerals reflecting the Fund's WAM (i.e., 1.2 to

3   over 4.2  by some calculations).

4   103.   Based on Daifotis's suggestion in or about January 2006, the Schwab Entities

5   then began listing YieldPlus's "duration" in place of its WAM in various sales materials, such

6   as tables on its public website listing Schwab funds and their attributes.  Daifotis also

7   discussed with CS&Co. and CSIM officials how to make that change.

8   104.   The Schwab Entities replaced WAM with duration only for YieldPlus, not for

9   any other fund.  In some communications, the Schwab Entities noted the replacement with a

10  footnote indicating that duration, not WAM, was listed, while in other communications, the

11  Schwab Entities failed even to disclose that they had made such a substitution.

12  105.   The duration number that the Schwab Entities listed was false and misleading

13  in another way because the figure itself was false.  Although YieldPlus's duration fluctuated,

14  during the period from at least February 2006 through September 2007, the Schwab Entities

15  hard-coded a "plug" duration figure of 0.5 in place of WAM, on Schwab's external website

16  available to the public, Schwab.com.  This misleadingly suggested to investors that

17  YieldPlus's duration (or WAM, when the footnote was omitted) was absolutely constant,

18  implying a stability that did not exist.

19  106.   The duration figure was included in tables of multiple Schwab investments,

20  allowing comparisons of the products and quick review of their attributes (including WAM

21  and performance data).  The tables listed the investment products by categories and included

22  columns for yield or performance data as well as the WAM for each product.  But the website

23  did not disclose that YieldPlus's duration had replaced WAM figures, or that a hard-coded

24

1   plug figure was being used.

2   107.   Because duration figures had replaced WAM figures for YieldPlus but that

3   change was not disclosed, the website and tables deceptively appeared to still be listing WAM

4   figures for the Fund.  The mere fact that the Schwab Entities were listing a duration figure

5   instead of WAM for YieldPlus was a material fact.  Their failure to disclose that fact, and to

6   explain the differences between "duration" and WAM, caused these communications with

7   investors to be deceptive and misleading.

8   108.   Because the numerals reflecting duration (i.e., 0.4 to 0.6) were significantly

9   lower than the numerals that would have reflected WAM (i.e., 1.2 to 4.2 years), this made the

10   materials appear to indicate that YieldPlus held investments with maturities of a few months

11   to six months, when in fact the maturities were at least three times that.

12   109.   ***Form N-CSR Signed by Merk.***  Further, Schwab Investments and Merk also

13   misleadingly used a false WAM figure in a Form N-CSR for the year ending August 31,

14   2007, which Merk signed and certified as to his review and the accuracy of the disclosure

15   contained therein on or about October 16, 2007.   The document was filed with the

16   Commission on November 2, 2007.  That document falsely listed a figure of 0.5 as the

17   "WAM" figure, when in fact, the true WAM figure would have been much higher.   Merk

18   knew, or was reckless in not knowing, that the document included a materially false WAM

19   figure of 0.5.

20   110.   The Schwab Entities also listed a duration figure of 0.5 in place of WAM,

21   without any notation of the replacement in Schwab's publicly distributed magazine, entitled

22   "*On Investing,*" including at least the Summer 2006 issue.

23   111.   Also for the period of at least February 2006 to at least September 2007, on

24

1   the Schwab Mutual Fund Center website, the Schwab Entities replaced WAM with duration

2   in tables listing data for Schwab products.  Again, they made the replacement only for

3   YieldPlus, not other products.  Although they included a footnote noting the change, they

4   failed to make the change obvious or to explain its import.

5        112.    Thus, even when the Schwab Entities included a footnote indicating that

6   duration was listed for YieldPlus instead of WAM, their failure to explain the difference

7   between the two measures was materially misleading.

8        113.    The difference between duration and WAM greatly confused many investors

9   and even CS&Co. representatives, who erroneously believed that YieldPlus's short duration

10  meant that it held only short-maturity bonds.

11       114.    Having been a lead decision-maker in deciding to replace WAM with duration,

12  Daifotis knew, or was reckless in not knowing, that that the materials described above,

13  including the Schwab.com website, the November 2, 2007 Form N-CSR, and the issues of the

14  *On Investing* publication listed duration figures in place of WAM but did not disclose that

15  change.

16       115.    Daifotis also knew, or was reckless in not knowing, that replacement of a 0.5

17  WAM with duration figures without disclosing the change and fully explaining the duration

18  figures in the above-described materials was false and misleading because, as discussed

19  above, the Fund's WAM was substantially longer than that.

20       116.    Daifotis knew, or was reckless in not knowing, that the Schwab Entities listed

21  a hard-coded duration figure of 0.5 on the Schwab Mutual Fund Center website, without

22  explaining the nature of duration or how it differed from WAM figures, as described above,

23  and that it was misleading to fail to fully explain those things and to list a hard-coded figure

24

1   that actually fluctuated.

2        117.   Daifotis caused, substantially participated or provided substantial assistance in

3   the making of the misleading statements and omissions described above.  Daifotis failed to

4   correct the misrepresentations or omissions regarding the listing of duration figures, as

5   described above, despite his obligation to do so as a result of his senior executive position and

6   his position as lead Portfolio Manager, his involvement in causing the change to be made, his

7   responsibilities and the fact that, as he knew, or was reckless in not knowing, he was relied

8   upon within the Schwab Entities to make sure that information about the Fund that was

9   disseminated to the public was accurate, complete, and not misleading.

10       118.   As a result of the foregoing, CS&Co. employees, including, but not limited to

11  registered representatives and regional bond specialists, communicated incorrect information

12  to investors.  For example, during one telephone call, on or about July 24, 2007, a CS&Co.

13  representative told a Schwab customer that the Fund invested in bonds with maturities of 180

14  days or less.  This was false because many of the Fund's holdings had maturities much longer

15  than 180 days.

16  **B.**    **Fraudulent Conduct In Connection With**
           **<u>Unlawful Deviation From Concentration Policy</u>**

17

18          **1.**    **<u>Background</u>**

         119.   As shown below, Daifotis engaged in a scheme to cause YieldPlus to deviate

19

20  from its concentration policy that it would not invest more than 25% of its assets in non-

    agency MBS, and took steps to mask the deviation.  Daifotis and Merk misleadingly failed to

21

22  disclose the deviation in reports filed with the Commission or issued to the public.

         120.   Section 8 of the Investment Company Act [15 U.S.C. § 80a-8] requires that a

23

24  fund's registration statement contain a recital of certain investment policies, including its

1   policy regarding concentration of investments in particular industries, fundamental investment

2   policies, or any investment policy that is only changeable if authorized by a shareholder vote.

3   Section 13(a)(3) of the Investment Company Act [15 U.S.C. § 80a-13(a)(3)] states that a fund

4   may not "deviate from" these investment policies unless authorized by a shareholder vote.

5          121.    To comply with Section 8, Schwab Investments recited a single concentration

6   policy for its taxable bond funds, including YieldPlus, the Total Bond Fund, and the Short-

7   Term Bond Fund, in a registration statement shared by all of the funds.  The registration

8   statement was filed with the Commission when the funds were created, which was 1999 for

9   YieldPlus, 1997 for the Total Bond Fund, and 1991 for the Short-Term Bond Fund, and

10   updated registration statements were filed at least annually.  They were available to the

11   public.

12          122.    All registration statements filed for the above-mentioned funds from each of

13   their inceptions stated that the funds would not concentrate more than 25 percent of their

14   assets in any industry.

15          123.    For five years prior to August 2006, the registration statements also stated that,

16   "for the purpose of its concentration policy," each fund would treat non-agency MBS as an

17   industry.  As a result, the bond funds, including YieldPlus, the Total Bond Fund, and the

18   Short-Term Bond Fund, could not invest more than 25 percent of portfolio assets in non-

19   agency MBS.

20          124.    The concentration policy and treatment of non-agency MBS as an industry

21   were material facts that impacted the riskiness, desirability and performance potential of the

22   funds.

23

24

## 2.   YieldPlus Invested More Than
## 25 Percent of Assets in Non-Agency MBS

125.    Schwab Investments, in violation of Section 13(a)(3) of the Investment Company Act [15 U.S.C. § 80a-13(a)(3)], deviated from YieldPlus's concentration policy by at least early 2006 when it invested more than 25 percent of its assets in non-agency MBS. Contemporaneous documents, including quarterly review power point presentations for YieldPlus dated March 31, 2006, and June 30, 2006, created by Fund portfolio managers, and that Daifotis reviewed, or was reckless if he did not review, reflected the deviation in charts summarizing the Fund's holdings, which conflicted with holding percentages reported in documents that Schwab Investments filed with the Commission.

126.    By at least March 2006, Daifotis directed YieldPlus's investments that caused it to deviate from its concentration policy and violate Section 13(a)(3) of the Investment Company Act [15 U.S.C. § 80a-13(a)(3)], and he knew, or was reckless in not knowing, that this was the result of his actions.

127.    Moreover, YieldPlus deviated from its concentration policy partly because Daifotis and the portfolio managers that he supervised failed to classify some securities as non-agency MBS for purposes of YieldPlus's concentration policy.  For example, from at least 2005 through mid-2008, Daifotis and the portfolio managers he supervised excluded two entire categories of securities, commercial MBS and subprime MBS, when calculating the percentage of assets invested in non-agency MBS, even though those categories should have been included as non-agency MBS.  If these categories of MBS were included in the calculation of non-agency MBS, YieldPlus's total non-agency MBS holdings significantly exceeded 25 percent by early 2006, as Daifotis knew, or was reckless in not knowing.

128.    In addition, some securities were moved among classifications in filings with

1   the Commission, thus masking the improper concentration, as Daifotis knew, or was reckless

2   in not knowing.  Consistently classifying the securities as MBS would have disclosed that

3   YieldPlus had exceeded its concentration limit.

4         129.    As a result of the foregoing, the Schwab Entities filed reports with the

5   Commission that substantially understated the actual percentage of YieldPlus's total non-

6   agency MBS holdings, making those reports materially false and misleading because they

7   falsely made it appear that non-agency MBS did not make up more than 25 percent of

8   YieldPlus's holdings.

9         130.    In particular, from at least late 2005 through mid-November 2006, the annual

10  registration statement amendments filed each November on Form N-1A and supplemented as

11  necessary, the annual and semi-annual Certified Shareholder Reports filed on Form N-CSR as

12  of February 28 and August 31 of each year, and the annual and semi-annual Quarterly

13  Schedule of Portfolio Holdings filed on Form N-Q as of May 31 and November 31 of each

14  year, were false and misleading in indicating that YieldPlus's non-agency MBS holdings did

15  not exceed 25 percent, when in fact YieldPlus's non-agency MBS holdings substantially

16  exceeded 25 percent.

17        131.    During the time period that the above-referenced reports were being filed with

18  the Commission, Daifotis knew, or was reckless in not knowing, that YieldPlus investments

19  that he directed, the improper classification of assets that he and his portfolio managers

20  directed, and the improper shifting of classification of assets, as described above, were

21  causing such false reports to be filed with the Commission.  Daifotis thereby caused,

22  substantially participated or provided substantial assistance in the creation of the false reports

23  described above.

24

132.    From at least March 2006, Schwab Investments, CSIM, CS&Co. and Daifotis knew, or were reckless in not knowing, that YieldPlus had deviated from its recited concentration policy without shareholder approval.  CSIM, CS&Co., and Daifotis knew, or were reckless in not knowing, that YieldPlus's filings with the Commission, including but not necessarily limited to those discussed above, contained material misstatements and omissions about YieldPlus's concentration in non-agency MBS.

### 3.    Schwab Investments' Invalid Change of the Concentration Policy Without Shareholder Approval

133.    After exceeding the 25 percent limit, the board of trustees of Schwab Investments, including Merk, voted in August 2006 to stop treating non-agency MBS as an industry and allow the funds to invest more than 25 percent of assets in non-agency MBS for funds including YieldPlus, the Total Bond Fund and the Short Term Bond Fund.

134.    By at least August 2006, Daifotis and another CSIM portfolio manager recommended the change and Daifotis presented the recommendation to the board.  Daifotis did not inform the board that, as Daifotis knew, or was reckless in not knowing, YieldPlus already had deviated from the concentration policy.

135.    The board voted in August 2006 to approve the change, but did not seek shareholder approval to allow the funds to invest over 25 percent of their assets in non-agency MBS as required by Section 13(a) of the Investment Company Act.

136.    This vote was improper and invalid because, under Section 13(a) of the Investment Company Act [15 U.S.C. §80a-13(a)], any such change in concentration policy had to be approved by a shareholder vote.

137.    YieldPlus's investment in non-agency MBS ballooned after the purported change, approaching 50 percent within a year.

138.    By at least November 2006, the Total Bond Fund and the Short Term Bond Fund, which were governed by the same prospectus, also exceeded 25 percent of assets invested in non-agency MBS in violation of the concentration policy.

**4.      Failure to Properly Disclose the Change of Concentration Policy**

139.    Following the board's vote to stop treating non-agency MBS as an industry, Daifotis and Merk caused, substantially participated, or provided substantial assistance in the making of misleading statements in one or more documents filed with the Commission or issued to investors, regarding the deviation from the concentration policy, including but not necessarily limited to those set forth below.  Merk signed at least one such document.

140.    ***Form 485B Signed by Merk.***  As a trustee, Merk, among others, signed or authorized his signature on and the filing of one or more documents that contained material misstatements or omissions concerning the concentration policy, including the filing on Form 485B on November 15, 2006.  The filing was misleading because it failed to properly and adequately disclose to the Commission or the public the material facts that Merk and the other trustees had voted to materially change the funds' concentration policies, and that the funds had not obtained the required shareholder approval for the change and had taken on the additional risk, and that YieldPlus already had deviated from the concentration policy.

141.    Moreover, Merk knew, or was reckless in not knowing, that the Form 485B filing contained a false certification that the filing did not contain any material changes.  Merk's signature appears on the same page as the certification that the document contained no material changes.  Merk allowed his signature to be affixed to the document even though he knew that the trustees had voted to change the funds' concentration policy and knew, or was reckless in not knowing, that it was a material change and that, therefore, the certification in

1   the Form 485B was false.

2       142.    Daifotis reviewed the November 2006 Form 485B before it was filed and was

3   specifically asked to review and comment on the language concerning the change to the

4   concentration policy and the related additional risk disclosure.  Although Daifotis knew, or

5   was reckless in not knowing, that the document was false and misleading for the reasons

6   stated above, and that it was to be filed with the Commission, Daifotis failed to make the

7   changes that would have been necessary to prevent the document from being false and

8   misleading, such as disclosing that the Form 485B contained a material change to the funds'

9   concentration policy, and that YieldPlus already had deviated from the policy.

10      143.    The Schwab entities filed the following forms with the SEC, that purported to

11  show by percentage the composition of YieldPlus's holdings, but misleadingly failed to

12  disclose that YieldPlus's holdings in non-agency MBS exceeded 25%, in violation of the

13  concentration limits described above:

14          (a)     Form N-CSR for the period ending August 31, 2006, filed November 6,

15      2006;

16          (b)     Form N-Q for the period ending May 31, 2006, filed July 19, 2006;

17          (c)     Form N-CSR for the period ending February 28, 2006, filed April 27,

18      2006.

19      144.    In light of Merk's and Daifotis's executive-level positions and responsibilities,

20  as described above, and the fact that they knew, or were reckless in not knowing, that others

21  within the Schwab Entities who prepared such documents relied on them to make sure that

22  statements that they reviewed or that they were asked or able to review were factually

23  accurate, complete, and not misleading, Daifotis and Merk were obligated to see to it that the

24

filings described above did not contain misrepresentations or omissions of material fact.

145.    Moreover, by having directed the investments that caused YieldPlus to hold more than 25% of its assets in non-agency MBS and by providing or causing to be provided information that masked the deviation, Daifotis caused the filings described above to be false.

**C.    Fraudulent Statements and Conduct Regarding YieldPlus During its Decline**

**1.    The Decline**

146.    Due in part to the misrepresentations and omissions described above, such as the misleading comparisons of YieldPlus to cash investments, the false descriptions of YieldPlus as only marginally riskier than a money market fund, the false statements that its NAV was unlikely to fluctuate by more than a few pennies, the understatement of YieldPlus's WAM, and the failure to properly disclose and seek shareholder approval for YieldPlus's concentration in non-agency MBS, and YieldPlus's historical performance, many YieldPlus investors expected that YieldPlus would experience minimal NAV fluctuations.

147.    When YieldPlus's NAV began to decline in the summer of 2007, many investors redeemed their holdings.

148.    Daifotis and Merk believed that they needed investor redemptions to diminish. For example, early in the crisis, a senior portfolio manager for YieldPlus sent an email to Daifotis, Merk and others stating that, "we need flows to stabiliz[e]."  Shortly after, Daifotis sent an email to Merk stating that, "[i]f the Advisor community starts to bail out, who [sic] has been stable to this point, we will be in trouble."

149.    In response, as detailed below, the Schwab Entities held a series of conference calls, spoke with individual customers and advisers, issued written materials, and circulated internal talking points regarding the Fund's decline.

1    150.   As described more fully below, Daifotis and Merk played key roles in this

2    communication effort and knew, or were reckless in not knowing, that statements that they

3    made, or misleading statements that they caused or in which they substantially participated or

4    for which they provided substantial assistance, contained misrepresentations and omissions of

5    material fact.

6    151.   Daifotis was the primary face of the Schwab Entities' statements.  He led

7    conference calls discussing YieldPlus's status, personally made misrepresentations and

8    omissions of material fact (detailed below), received daily updates about YieldPlus's level of

9    redemptions and cash status, and authored or reviewed most of the documents circulated to

10   investors, advisers and CS&Co. representatives.

11   152.   During the decline of YieldPlus beginning in or about the summer of 2007,

12   Merk became increasingly involved in making, reviewing, and approving communications

13   concerning the Fund and its performance, including but not limited to the misrepresentations

14   and omissions of material fact specified below.  Merk authored several of the public

15   statements that contained misrepresentations and omissions of material fact.  He received

16   daily updates concerning the Fund, monitored the Fund's performance and participated in

17   crafting the public response.  He also supervised Daifotis, the other portfolio managers, and

18   the CS&Co. marketing group during the relevant period.

19   153.   The defendants made, caused, substantially participated, or provided

20   substantial assistance in the making of misrepresentations or omissions of material fact during

21   the period of the Fund's decline, including but not necessarily limited to those set forth in

22   Sections C.2. and C.3. below.

23          **2.    <u>False Statements and Omissions About the Level of Redemptions</u>**

24

1      154.    Prominent among the false statements early in the crisis were two false

2 statements by Daifotis about YieldPlus's level of redemptions in two prescheduled conference

3 calls on August 14 and 16, 2007, with large groups of registered representatives and

4 independent investment advisers. The calls were intended to respond to investors' questions

5 and concerns about YieldPlus.

6      155.    From August 1 through 14, 2007, investors redeemed almost $1.2 billion in

7 assets, or approximately 10 percent of Fund assets. Because YieldPlus had a negative cash

8 position as of July 31, 2007, it had to sell assets to meet the redemptions and prepare for more

9 redemptions. During that two-week period, YieldPlus sold over $2.1 billion in portfolio

10 securities, representing 16 percent of assets. YieldPlus's portfolio managers had never before

11 sold a significant percentage of Fund assets.

12      156.    Because redemptions were a growing concern, Daifotis monitored redemption

13 levels multiple times per day in August 2007, and thus was well aware of the high level of

14 redemptions.

15      157.    Six days before the August 14, 2007 conference call, Daifotis and Merk

16 received the email from a portfolio manager stating that, "we need flows to stabiliz[e]."

17      158.    Three days before the August 14, 2007 conference call, Daifotis sent an email

18 to Merk in which he said that, "[i]f the Advisor community starts to bail out, who has been

19 stable to this point, we will be in trouble."

20      159.    On August 12, 2007, two days before the first conference call, Daifotis sent an

21 email editing a set of questions and answers ("Q&A") to be posted on the Schwab.com

22 website and thus available to the public. The edits removed redemption information from the

23 Q&A and, in the email, Daifotis explained, "***I don't want anyone to sense that we are having***

24

1   *outflows.*" (Emphasis added).

2       160.   ***Daifotis's August 14, 2007 Conference Call.***   On August 14, 2007, Daifotis

3   held a prescheduled conference call with a large number of independent registered investment

4   advisers to discuss YieldPlus.  During the call, an adviser asked Daifotis, "how expensive

5   [sic] have your redemptions been since the decline?"  During his answer, Daifotis responded

6   that some advisers had purchased more shares, and that "we've got ***very, very, very slight***

7   negative flows over the course of the last week or two." (Emphasis added).

8       161.   ***Daifotis's August 16, 2007 Conference Call.***   Two days later, on August 16,

9   2007, Daifotis held a similar conference call with a large number of CS&Co. registered

10  representatives.  In that call, a representative asked "what are the net outflows of the Schwab

11  Yield Plus fund to date?"  During his answer, Daifotis stated, "[i]t's not that much. . . .  So

12  ***outflows have been minimal.***" (Emphasis added).  He also referred to YieldPlus's assets as

13  being "very, very short  . . . instruments for the most part."

14      162.   Daifotis knew, or was reckless in not knowing, that his statements were

15  materially false and misleading because YieldPlus was experiencing tremendous,

16  unprecedented outflows, which required over $2 billion in asset sales in only two weeks, and

17  therefore could not fairly be described as "very, very, very slight" or "minimal."  Also,

18  YieldPlus's assets at that time had very long maturities, for the most part.

19      163.   Daifotis's false statements were communicated to YieldPlus investors, and

20  Daifotis knew, or was reckless in not knowing, that this would occur.  For example, in the

21  week after the conference calls, a CS&Co. representative told a YieldPlus investor during a

22  telephone call:  "And what we really have to be concerned about, is what have the outflows

23  been on the fund.  And surprisingly – and this – Kim Daifotis, who is the head of Schwab

24

Investment Management said that he was very surprised, and he said the redemptions were negligible on the fund."

### 3.   Other False Statements and Misleading Omissions During the Fund's Decline

164.   ***Merk's August 2007 Q&A on the Website.***   In early August 2007, CS&Co. published on the Schwab website a Q&A, which was available to the public, that listed Merk as the author.  Merk reviewed and edited the document before it was published.  Among other false and misleading statements and omissions, the Q&A stated that the "fund's short maturity structure has mitigated much of the price erosion that some other ultrashort bond funds have experienced."  This remained on the Schwab website through at least March 2008.

165.   When he made the statement described above, Merk knew, or was reckless in not knowing, that his statement was false and misleading because YieldPlus did not have a short maturity structure, especially compared to money market funds.  Rather, as described above, it held many long-term bonds with stated maturities of twenty years or more, and used interest rate hedging strategies to limit YieldPlus's duration.

166.   Merk's statement also was false and misleading because YieldPlus was performing worse than most of its peers.  For example, the day after the Q&A piece was posted, Merk received statistics showing that YieldPlus was ranked in the bottom 15 percent percentile of its peers.  In light of Merk's statement about YieldPlus's performance in relation to other funds, it was a material omission to not disclose the fact that the large majority of peer funds had performed better, and this made Merk's statement on that point materially misleading.  Merk, however, did not remove his misleading statement from Schwab's website, and the false statement remained on the website through at least March 2008.

167.   In addition to being on the Schwab website, the false statements were

1    communicated to YieldPlus investors, as Merk knew, or was reckless in not knowing, would

2    result from his having posted the statements.  For example, on August 21, 2007, a CS&Co.

3    representative told a YieldPlus investor during a telephone call:  "And if we take a look at the

4    peer group of ultrashort term bond funds, this has actually performed much better than all the

5    other ultrashort term bond funds, because it does have a very quality portfolio."

6         168.   ***Daifotis's September 2007 Webcast***.  On or about September 18, 2007,

7    Daifotis spoke in a webcast broadcast to investors as part of "Schwab's Straight Talk Series."

8    Daifotis stated, "We continue to maintain higher-than-normal cash positions in an effort to

9    capitalize on investment opportunities in the current market environment and to effectively

10   manage the timing of any redemption requests."  That statement was false, misleading, and

11   omitted material facts.  As Daifotis knew, or was reckless in not knowing, during August

12   2007, Merk had instructed the portfolio management team to focus on selling assets to raise

13   cash, and to stop buying bonds.  Thus, YieldPlus was not looking for buying opportunities in

14   the then-"current" market.

15        169.   ***Daifotis's November 2007 Manager's Discussion***.  Schwab distributed a

16   November 2007 "Manager's Discussion" to the public under Daifotis's title, "Manager," thus

17   attributing the statements therein to Daifotis.  The Manager's Discussion was made available

18   to the public and posted on Schwab's external website.  The document contained the same

19   false and misleading statement identified in the preceding paragraph.

20        170.   ***Merk's November 2007 Talking Points.***  In late November 2007, CS&Co. and

21   CSIM circulated a set of internal talking points that were used by Schwab employees when

22   discussing YieldPlus with investors.  Merk exercised the ultimate authority over the

23   statements therein.  Before circulation, Merk and Daifotis reviewed the talking points, which

24

covered half of the one-page document, the rest of which mainly contained standard

disclosure language and a chart entitled "Average Annualized Total Returns."  Merk

suggested an edit.  Staff incorporated Merk's edit and asked him to approve the document.

Merk approved the document, and directed the staff to issue the talking points, by stating,

"Great job.  Book it, Dano!"  By reason of the foregoing, Merk controlled not only the content

of the communication, but also whether and how to communicate it.

171.    The November 2007 Talking Points stated that:

- "The portfolio management team has confidence in the Fund's strategy given
  our outlook for the fixed-income markets."

- "Despite the recent spike in bond market volatility, history suggests this is a
  temporary condition."

- YieldPlus's unrealized loss, which made up 75 percent of YieldPlus's losses,
  was a "paper loss."

- "Since last summer, the Fund has maintained a higher than normal cash
  position, in an effort to capitalize on investment opportunities and to
  effectively manage potential redemption requests."

- "The portfolio is highly diversified with approximately 400 securities across a
  wide range of sectors and industries."

172.    The talking points contained a number of false and misleading statements and

omissions of material fact, including but not necessarily limited to the following:

(a)      The statement that the portfolio management team had "confidence" in

YieldPlus was, at best, misleading because it omitted the material fact that the

portfolio management team's contemporaneous internal discussions stated the

1    opposite.  For example, in one email sent days before Merk approved the talking

2    points, the portfolio manager assigned to give daily updates on the Fund reported to

3    Daifotis, Merk, and other senior executives that raising cash "was like pulling teeth"

4    and that "[l]iquidity is AWFUL ….period."  In a second email sent that week, the

5    same portfolio manager reported to Daifotis that "it[']s not better today and likely

6    won't be for some time."  In a third email that he sent shortly before the talking points

7    were finalized, he reported to Daifotis, Merk, and others that "we are hostage to the

8    market at this point and can't improve the NAV."  The statement also was misleading

9    because it omitted material facts concerning the high level of redemptions and the fact

10   that many of the Fund's best assets were being sold at depressed prices in order to

11   meet redemptions.

12          (b)     The statements that YieldPlus's losses to date were "paper loss[es]"

13   and were "unrealized" were at best misleading because they omitted the material fact

14   that, by that time, YieldPlus had sold its safest, most liquid assets, which made the

15   portfolio more vulnerable to further declines.  YieldPlus had sold its safest assets

16   because it needed to raise cash to meet redemptions and the safest assets were easiest

17   to sell.

18          (c)     The statement that YieldPlus was raising cash "since last summer" to

19   take advantage of buying opportunities was false, misleading, and omitted material

20   facts.  During August 2007, Merk had instructed the portfolio management team to

21   focus on selling assets to raise cash, and to stop buying bonds.  The false statement

22   was repeated in the September 2007 webcast described above and in a November 2007

23   document labeled a "Manager's Discussion," which stated that "[w]e continue to

24

FIRST AMENDED COMPLAINT                    -66-                    CASE NO. 11cv0137

1    maintain higher-than-normal cash positions in an effort to capitalize on purchasing

2    opportunities in the current market environment and to effectively manage the timing

3    of any redemption requests."  YieldPlus was not looking for "current" buying

4    opportunities.

5              (d)      The statement that YieldPlus was "highly diversified" was misleading

6    and omitted material facts.  For example, combining YieldPlus's MBS and its

7    ownership of corporate bonds issued by financial institutions, over 75 percent of

8    YieldPlus's assets were tied to the real estate and financial sectors.

9         173.    As Daifotis and Merk knew, or were reckless in not knowing, would occur,

10   CS&Co.'s representatives repeated the substance of the talking points and other misleading

11   communications in at least November 2007 when communicating with investors about

12   YieldPlus in telephone calls regarding concern over YieldPlus's performance and general

13   reviews of portfolios that held YieldPlus.

14        174.    In light of their senior executive positions and responsibilities, and the fact that

15   they knew, or were reckless in not knowing, that they were relied upon within the Schwab

16   Entities to convey accurate, complete, and not misleading information about the Fund, as

17   described above, Daifotis and Merk were obligated to make sure that the documents described

18   above that they reviewed, approved, signed or that were attributed to them were accurate,

19   complete, and not misleading in the ways described above.  Daifotis and Merk failed to carry

20   out that obligation because they allowed the talking points to be issued without correcting the

21   above-described misrepresentations and omissions.

22        175.    ***Omission of Facts Regarding Alt-A MBS Investments***.  Also misleading was

23   frequent emphasis of YieldPlus's "minimal" subprime holdings, which constituted

24

1    approximately 6 percent of Fund assets, but omitting to state that, although YieldPlus

2    arguably had modest subprime holdings, approximately one-third of YieldPlus's assets were

3    invested in Alt-A securities, another type of security backed by lower quality residential

4    mortgages that were suffering price declines, which were similar to subprime mortgages and

5    which posed risks similar to those of subprime mortgages.

6         176.    ***Merk's August 2007 Q&A.***  The early-August 2007 Q&A, discussed above,

7    which identified Merk as the author, included a discussion of YieldPlus's subprime holdings

8    without references to the related substantial Alt-A MBS investment.  As Merk knew, or was

9    reckless in not knowing, because this communication stressed the "minimal" exposure to

10   "subprime" holdings, the Q&A was misleading and deceptive because it omitted the material

11   fact that the Fund had a large percentage of Alt-A MBS securities, which exposed the Fund to

12   risks similar to those of subprime assets.

13        177.    Also in early August 2007, Merk approved another set of Q&As that were

14   submitted to Schwab's Fixed Income Sales & Service Management Team, for use in

15   providing information to investors.  Merk knew that such information likely would be

16   provided to investors.  The Q&A stated:

17            (a)  "Subprime mortgages are loans to borrowers with blemished credit

18        histories" and stated that "default rates for subprime mortgages are increasing."

19            (b)  "[A]s the value offered by the [subprime] sector became less apparent, we

20        both stopped additional purchases and sold securities with lower perceived value."

21        178.    ***Daifotis's August 2007 Manager's Discussion.***  In August 2007, Daifotis

22   presented a written "Manager's Discussion" to Schwab Financial Consultants and

23   independent Registered Investment Advisors regarding "Subprime Securities," among other

24

FIRST AMENDED COMPLAINT              -68-              CASE NO. 11cv0137

1   topics.  By its title, the Manager's Discussion was attributed to Daifotis.  The document also

2   was posted on Schwab's internal website, for Financial Consultants and Registered

3   Investment Advisors to use in obtaining information for dissemination to investors.  Daifotis's

4   presentation included – in bold type – the statement that YieldPlus "does not own any

5   subprime CDOs in its portfolio.  Currently, the fund holds less than 5% of its total portfolio

6   assets in subprime securities . . . ."

7          179.   ***Daifotis's November 2007 Manager's Discussion.***  Daifotis's November 2007

8   "Manager's Discussion," which was attributed to Daifotis as discussed above, also

9   emphasized the Fund's minimal subprime holdings, stating that they were approximately 5

10   percent of the Fund's holdings.

11          180.   The documents described above were materially false and misleading in

12   omitting disclosure of the material fact that that the Fund had a large percentage of Alt-A

13   MBS securities, which exposed the Fund to risks similar to those of subprime assets.  It was

14   misleading to state that the Fund held only 5 percent in subprime assets without also

15   disclosing the Fund's large holdings of Alt-A MBS securities.

16          181.   Daifotis and Merk knew, or were reckless in not knowing, the contents of the

17   August and November documents described above, as well as other documents that contained

18   similar material omissions regarding the Fund's Alt-A holdings.  In light of their senior-level

19   executive positions and responsibilities, as described above, and the fact that they knew, or

20   were reckless in not knowing, that they were relied upon within the Schwab Entities to ensure

21   that such materials were accurate, complete, and not misleading, they were obligated to make

22   sure that the documents cited above did not contain false or misleading statements or

23   omissions, but they failed to do so.   In particular, in connection with the documents'

24

1   statements about the Fund's minimal subprime holdings, they should have made sure that the

2   documents disclosed the Fund's substantial Alt-A holdings.

3   **D.**      **Redemptions by Schwab-Related Funds**

4          182.    While Daifotis and Merk were telling investors that they had confidence in

5   YieldPlus and to maintain a patient, long-term perspective on their investments, and while

6   Merk and Daifotis knew that CSIM and CS&Co. were making those statements to investors, a

7   number of Schwab-related Funds with material nonpublic information about the adverse

8   condition of YieldPlus redeemed their investments in YieldPlus.

9          183.    For example, Schwab's five target date and retirement funds ("Target Date

10  Funds") redeemed investments in YieldPlus in March 2008, after its senior portfolio manager

11  received material, nonpublic information about YieldPlus.  The Target Date Funds' senior

12  portfolio manager was the Chief Investment Officer for Equities ("CIO-Equities") at the time.

13         184.    Both the CIO-Equities and Daifotis reported directly to Merk during

14  YieldPlus's decline, and the CIO-Equities learned material nonpublic information about

15  YieldPlus from Daifotis in regular meetings with Merk and his direct reports in at least

16  February and March 2008.

17         185.    During these meetings, Daifotis discussed YieldPlus, its NAV decline, high

18  redemption levels, and plans to satisfy redemptions by selling assets.

19         186.    While in possession of this information, the CIO-Equities approved the

20  recommendation of another portfolio manager to redeem the Target Date Funds' investments

21  in YieldPlus and personally arranged to expedite the redemptions.  This material information

22  was not disclosed to the public at that time.

23         187.    The CIO-Equities informed Merk of his intention to redeem.

24

188.    CSIM and CS&Co. served as investment advisers to YieldPlus and thus owed a fiduciary duty to YieldPlus, as did Merk because of his position as a trustee of YieldPlus and as a senior officer of CSIM and CS&Co.

189.    Despite Merk's awareness of the foregoing, and his knowledge that the CIO-Equities learned material, nonpublic information about YieldPlus during the meetings of the Merk reports, Merk approved the Target Date Funds' redemptions of investments in YieldPlus.

190.    Merk failed to disclose to YieldPlus's board of trustees and to the investors in YieldPlus the material fact that the Target Date Funds were redeeming investments in YieldPlus after their senior portfolio manager had learned material nonpublic information about YieldPlus.

191.    The material nonpublic information that was shared during the meetings with Merk and Merk's direct reports belonged to YieldPlus and should not have been shared with other investors — such as the CIO-Equities, who managed funds that invested in YieldPlus — without the permission of YieldPlus's trustees.  The trustees had not been informed of the disclosure of the Fund's information and had not approved such disclosure.

192.     This unauthorized disclosure harmed YieldPlus because it contributed to the Target Date Funds' decision to redeem their YieldPlus investments.  These redemptions harmed YieldPlus because they came at a time when YieldPlus was struggling to raise cash to meet redemptions by selling bonds in a declining market.

193.    Through the actions of Merk, who was a senior officer of each of  the Schwab Entities, in permitting the unauthorized disclosure of material nonpublic information and in approving the Target Date Fund's redemptions in YieldPlus when he possessed material

1    nonpublic information and was aware of the unauthorized disclosures of material nonpublic

2    information, CSIM and CS&Co. breached the fiduciary duties that they owed to YieldPlus in

3    their roles as the Fund's investment advisers, and they violated Section 206(1) and (2) of the

4    Investment Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

5    **E.**      **Defendants Received Higher Compensation As a Result of Their Misconduct**

6            194.    Daifotis received significant bonuses in addition to salary and long-term

7    incentive compensation for the period January 1, 2005, through June 30, 2008.  The

8    performance of the YieldPlus, the Total Bond Fund, and the Short-Term Bond Fund was a

9    substantial factor in the calculation of Daifotis's bonuses.  Daifotis's misconduct relating to

10   the management and marketing of the funds and the misrepresentations and misleading

11   omissions of material fact regarding the funds that he made, caused, substantially participated,

12   or provided substantial assistance in making, as described herein, resulted in his receiving

13   higher compensation, including but not necessarily limited to higher bonuses.

14           195.    Merk received significant bonuses in addition to salary and long-term incentive

15   compensation for the period January 1, 2005, through December 2008.  Merk's bonus was

16   based on the revenues and profits of Charles Schwab Corporation, including CSIM, and

17   CS&Co., which in turn reflected the performance of bond funds including but not necessarily

18   limited to YieldPlus, the Total Bond Fund and the Short-Term Bond Fund.  Thus, the

19   performance of those funds impacted the amount of Merk's bonuses.  Merk's misconduct

20   relating to the management and marketing of the funds and the misrepresentations and

21   misleading omissions of material fact regarding the funds that he made, caused, substantially

22   participated, or provided substantial assistance in making, as described herein, resulted in his

23   receiving higher compensation, including but not necessarily limited to higher bonuses.

24

## FIRST CLAIM FOR RELIEF

(Against Daifotis and Merk)

Violations of Section 10(b) of the Exchange Act
[15 U.S.C. §78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

196.    The Commission realleges and incorporates by reference paragraphs 1 through 195 above.

197.    By reason of the foregoing, Daifotis, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], including but not necessarily limited to his making the statements or omissions described in paragraphs 76-77, 82 through 87, 160-162, 168-69, and 178-80, above.

198.    By reason of the foregoing, Merk directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], including but not necessarily limited to his making of the statements or omissions described in paragraphs 88-89, 109, 140-141, 164-166, 170-172, and 176, above.

199.    By reason of the foregoing, Daifotis directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly, employed devices, schemes, or artifices to

1  defraud, or  engaged in acts, practices, or courses of business which operated or would

2  operate as a fraud or deceit upon other persons, including purchasers and sellers of securities,

3  in violation of  Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rules 10b-5(a) and

4  (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], through, but not necessarily limited to, his

5  actions described in paragraphs 119 through 145, above, by which he caused YieldPlus and

6  other bond funds to deviate from their concentration policy and took steps to mask the

7  deviations by YieldPlus.

8        200.    By reason of the foregoing, Merk directly or indirectly, in connection with the

9  purchase or sale of securities, by the use of means or instrumentalities of interstate commerce,

10  or the mails, knowingly or recklessly, employed devices, schemes, or artifices to defraud, or

11  engaged in acts, practices, or courses of business which operated or would operate as a fraud

12  or deceit upon other persons, including purchasers and sellers of securities, in violation of

13  Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) thereunder

14  [17 C.F.R. § 240.10b-5(a) and (c)], through, but not necessarily limited to, his actions

15  described in Section A.2.a. (i.e., paragraphs 38 through 68), above, regarding his actions and

16  involvement in the presentation, promotion and highlighting of YieldPlus as a cash

17  alternative.[1]

18        201.    By reason of the foregoing, Daifotis and Merk violated Section 10(b) of the

19  Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

20

21

-----

22       [1] The Court's Order dated June 6, 2011 order dismissed "scheme liability" allegations
against Merk, but did not indicate that those claims were dismissed with prejudice.  Therefore,

23  in order to avoid any argument that the SEC has waived appellate review of that dismissal, the
claims are repeated here.

24

FIRST AMENDED COMPLAINT          -74-         CASE NO. 11cv0137

## SECOND CLAIM FOR RELIEF
(Against Daifotis and Merk)

Aiding and Abetting Violations of Section 10(b) of the Exchange Act
[15 U.S.C. §78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

202.    The Commission realleges and incorporates by reference paragraphs 1 through 201 above.

203.    Schwab Investments, CSIM, CS&Co., Daifotis and Merk, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

204.    Accordingly, Schwab Investments, CSIM, CS&Co., Daifotis and Merk violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

205.    By reason of the conduct described above, Daifotis and Merk knowingly provided substantial assistance to each other's violations, and to Schwab Investments', CSIM's and CS&Co.'s violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thus aided and abetted such violations.

206.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Daifotis and Merk are liable for such violations.

**THIRD CLAIM FOR RELIEF**
(Against Merk)

Control Person Liability Under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)]
for Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

207.    The Commission realleges and incorporates by reference Paragraphs 1 through 206 above.

208.    By reason of the foregoing, Schwab Investments, CSIM, CS&Co., and Daifotis, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

209.    By reason of the foregoing, Schwab Investments, CSIM, CS&Co., and Daifotis violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

210.    As set forth above, particularly in Section A.2.a., above, Merk participated in the day-to-day affairs of CSIM, CS&Co. and Schwab Investments, and had power to control corporate actions.  Merk was involved in the formulation of many of the improper actions, misrepresentations and omissions by Schwab Investments, CSIM, CS&Co. and Daifotis, described above, including but not necessarily limited to the improper presentation and marketing of YieldPlus as a cash alternative, the improper decision to change the funds' concentration policy without shareholder approval, and Merk particularly exercised day-to-

1   day control over statements made about YieldPlus during the period of its decline beginning

2   in or about August 2007.  Merk thereby exercised actual authority over such matters.  Merk

3   personally participated in the making of misrepresentations and misleading omissions of

4   material fact regarding YieldPlus, as described above.

5   211.   By reason of the foregoing, Merk directly or indirectly controlled Schwab

6   Investments, CSIM, CS&Co. and Daifotis, within the meaning of Section 20(a) of the

7   Exchange Act [15 U.S.C. § 78t(a)].

8   212.   As described above, Merk, knowingly or recklessly, directly or indirectly

9   induced acts constituting violations of Section 10(b) of the Exchange Act and Rule 10b-5

10  thereunder, including, but not limited to, through his actions to promote the presentation of

11  YieldPlus as a cash alternative, his substantial participation in or authorization of misleading

12  statements and omissions and his approval of the change in the funds' fundamental

13  investment policy.

14  213.   By reason of the foregoing, Merk is liable as a control person for Schwab

15  Investments', CSIM's, CS&Co.'s, and Daifotis's violations of Section 10(b) of the Exchange

16  Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

17  214.   Accordingly, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §

18  78t(a)], Merk is liable jointly and severally with and to the same extent as Schwab

19  Investments, CSIM, CS&Co., and Daifotis.

20

## FOURTH CLAIM FOR RELIEF
(Against Daifotis and Merk)

21

22  Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

23  215.   The Commission realleges and incorporates by reference Paragraphs 1 through

24  214 above.

216.     Daifotis and Merk directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite degree of knowledge or state of mind, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], by the untrue statements and misleading omissions that they made or substantially participated in making, including but not necessarily limited to those set forth above.

217.     By reason of the foregoing, Daifotis directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite degree of knowledge or state of mind, employed devices, schemes, or artifices to defraud, or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], through, but not necessarily limited to, his actions described in paragraphs 119 through 145, above, by which Daifotis caused YieldPlus and other bond funds to deviate from their concentration policy and took steps to mask the deviations by YieldPlus,

218.     By reason of the foregoing, Merk directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite degree of knowledge or state of mind, employed devices, schemes, or artifices to defraud, or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon

1   the purchasers, in violation of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §

2   77q(a)(1) and (3)], through, but not necessarily limited to, his actions described in Section

3   A.2.a. (i.e., paragraphs 38 through 68), above, regarding his actions and involvement in the

4   presentation, promotion and highlighting of YieldPlus as a cash alternative.[2]

5       219.    By reason of the foregoing, Daifotis and Merk violated Section 17(a) of the

6   Securities Act [15 U.S.C. § 77q(a)].

7                          **FIFTH CLAIM FOR RELIEF**
                              (Against Merk)
8
                          Aiding and Abetting Violations of
9           Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)]

10      220.    The Commission realleges and incorporates by reference Paragraphs 1 through

11  219 above.

12      221.    CSIM and CS&Co., while acting as investment advisers, directly or indirectly,

13  by use of the mails or means or instrumentality of interstate commerce:  (a) employed

14  devices, schemes, or artifices to defraud a client or clients or prospective clients; and/or (b)

15  engaged in transactions, practices or courses of business which operated as a fraud or deceit

16  upon a client or clients or prospective clients.

17      222.    By reason of the foregoing, and in particular, Merk's conduct as described in

18  Section D, above, CSIM and CS&Co. violated Sections 206(1) and 206(2) of the Advisers

19  Act [15 U.S.C. § 80b-6(1) and (2)].

20      223.    By reason of the conduct described above, Merk, with the requisite degree of

21  knowledge or state of mind, aided, abetted, counseled, commanded, induced, or procured said

22  violation by CSIM and CS&Co.

23  ───────────────────────

24      [2] *See* Note 1, above.

224.    Accordingly, pursuant to Section 209 of the Advisers Act [15 U.S.C. 80b-9],

Merk is liable for such violations.

### SIXTH CLAIM FOR RELIEF
(Against Daifotis and Merk)

Aiding and Abetting Violations of
Section 206(4) [15 U.S.C. § 80b-6(4)] of the Advisers Act
and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] Thereunder

225.    The Commission realleges and incorporates by reference Paragraphs 1 through

224 above.

226.    CSIM and CS&Co., while acting as investment advisers, directly or indirectly,

by use of the mails or means or instrumentality of interstate commerce, engaged in acts,

practices, or courses of business that were fraudulent, deceptive or manipulative.

227.    CSIM and CS&Co., while acting as investment advisers to pooled

investment vehicles:  (a) made untrue statements of material facts or omitted to state material

facts necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading, to investors or prospective investors in the pooled

investment vehicle; or (b) engaged in acts, practices, or courses of business that were

fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the

pooled investment vehicle.  CSIM and CS&Co. thereby violated Section 206(4) [15 U.S.C. §

80b-6(4)] of the Advisers Act and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8 (eff. Sept. 10,

2007)] thereunder.

228.    By reason of the conduct described above that occurred after September 10,

2007, Daifotis and Merk, acting with the requisite degree of knowledge or state of mind,

aided, abetted, counseled, commanded, induced, or procured said violations by CSIM and

CS&Co., and thus aided and abetted such violations.

1       229.     Accordingly, pursuant to Section 209 of the Advisers Act [15 U.S.C. 80b-9],

2 Daifotis and Merk are liable for such violations.

3 **SEVENTH CLAIM FOR RELIEF**
(Against Daifotis and Merk)

4

5 <u>Violations of Section 34(b) of the Investment Company Act [15 U.S.C. §80a-33(b)]</u>

6       230.     The Commission realleges and incorporates by reference Paragraphs 1 through

7 229 above.

8       231.     In registration statements, applications, reports, accounts, records, or other

9 documents filed or transmitted pursuant to the Investment Company Act, Daifotis and Merk

10 made untrue statements of material fact, and/or omitted facts necessary in order to prevent

11 statements made, in the light of the circumstances under which they were made, from being

12 materially misleading.

      232.     By reason of the foregoing, Daifotis and Merk violated Section 34(b) of the

13 Investment Company Act [15 U.S.C. § 80a-33(b)].

14 **EIGHTH CLAIM FOR RELIEF**
(Against Daifotis and Merk)

15

16 <u>Violation of Section 48(a) of the Investment Company Act [15 U.S.C. §80a-47(a)]</u>

17       233.     The Commission realleges and incorporates by reference Paragraphs 1 through

18 232 above.

19       234.     By reason of the foregoing, in registration statements, applications, reports,

20 accounts, records, or other documents filed or transmitted pursuant to the Investment

21 Company Act, Schwab Investments, CSIM, and CS&Co., made untrue statements of material

22 fact, and/or omitted facts necessary in order to prevent statements made, in the light of the

23 circumstances under which they were made, from being materially misleading.

24       235.     By reason of the foregoing, Schwab Investments, CSIM, and CS&Co. violated

1    Section 34(b) of the Investment Company Act [15 U.S.C. §80a-33(b)].

2           236.    As set forth above, Daifotis and Merk, acting with the requisite degree of

3    knowledge or state of mind, directly or indirectly, caused to be done acts or things through or

4    by means of Schwab Investments, CSIM, and CS&Co., which it would have been unlawful

5    for Daifotis and Merk to do under the provisions of Section 34(b) of the Investment Company

6    Act [15 U.S.C. § 80a-33(b)].

7           237.    Accordingly, Daifotis and Merk violated Section 48(a) of the Investment

8    Company Act [15 U.S.C. § 80a-47(a)].

9                                  **PRAYER FOR RELIEF**

10          WHEREFORE, the Commission respectfully requests that this Court:

11                                            I.

12          Find that defendants Daifotis and Merk committed the violations alleged;

13                                            II.

14          Permanently enjoin Daifotis from directly or indirectly violating Section 17(a) of the

15   Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act  [15 U.S.C. §§ 78j(b)],

16   and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 34(b) of the Investment

17   Company Act [15 U.S.C. § 80a-33(b)], Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-

18   6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

19                                           III.

20          Permanently enjoin Merk from directly or indirectly violating Section 17(a) of the

21   Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act  [15 U.S.C. §§ 78j(b)],

22   and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 34(b) of the Investment

23   Company Act [15 U.S.C. § 80a-33(b)], Sections 206(1), (2) and (4) of the Advisers Act [15

24

1   U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

2                                                IV.

3          Order Daifotis and Merk to pay civil penalties pursuant to Section 20(d) of the

4   Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)],

5   Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 42(e) of the Investment

6   Company Act [15 U.S.C. § 80a-41(e)];

7                                                V.

8          Order Daifotis and Merk to disgorge any ill-gotten gains, including prejudgment

9   interest;

10                                               VI.

11         Retain jurisdiction of this action in accordance with the principles of equity and the

12  Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

13  and decrees that may be entered, or to entertain any suitable application or motion for

14  additional relief within the jurisdiction of this Court; and

15                                               VII.

16         Grant such other and further relief as this Court may determine to be just and

17  necessary.

18                                   **<u>JURY DEMAND</u>**

19         Plaintiff respectfully demands trial by jury on all issues in this case triable by a jury.

20     DATED:   October 13, 2011                    Respectfully Submitted,

21

22                                                 ____/s/ David J. Gottesman____
                                                   David J. Gottesman
23                                                 Frederick L. Block
                                                   Robert A. Cohen
24                                                 Melissa R. Hodgman

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, DC 20549-4030
Telephone:  (202) 551-4470 (Gottesman)
Facsimile:  (202) 772-9245 (Gottesman)