DAVID B. BAYLESS (SBN 189235)
Email:  dbayless@cov.com
TAMMY ALBARRÁN (SBN 215605)
Email:  talbarran@cov.com
AILEEN WHEELER (SBN 223705)
Email:  awheeler@cov.com
JOSHUA D. HURWIT (SBN 263108)
Email:  jhurwit@cov.com
SAMANTHA J. CHOE (SBN 252002)
Email:  schoe@cov.com
JOHN D. FREED (SBN 261518)
Email:  jfreed@cov.com
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111
Telephone:     415-591-6000
Facsimile:     415-591-6091

Attorneys for Defendant Kimon P. Daifotis

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> KIMON P. DAIFOTIS and RANDALL MERK, <br><br> Defendants. | Civil Case No.: 11-cv-00137-WHA <br><br> **DEFENDANT KIMON P. DAIFOTIS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Date:          June 7, 2012 <br> Time:          2:00 p.m. <br> Judge:        Hon. William H. Alsup <br> Courtroom:  8 |

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE that on June 7, 2012, at 2:00 p.m. in the courtroom of the

4   Honorable William H. Alsup, United States District Court for the Northern District of

5   California, San Francisco Division, 450 Golden Gate Ave., Courtroom 8, 19th Floor, San

6   Francisco, California, or at such date and time as the Court may otherwise direct, defendant

7   Kimon P. Daifotis ("Kim") will and hereby does move, pursuant to Rule 56 of the Federal Rules

8   of Civil Procedure, for an order granting Kim summary judgment on: various alleged

9   misstatements for which the undisputed evidence shows that Kim was not involved in drafting,

10  reviewing or publishing the statements or that the statements were true and not misleading;

11  statements that were only communicated within the Charles Schwab corporate entities;

12  statements for which there is failure of proof of statements made; and Counts II, VI – VIII in its

13  entirety.

14          This motion is based on this Notice, the Memorandum of Points and Authorities set forth

15  below, the accompanying Declaration of David B. Bayless in Support of Kimon P. Daifotis'

16  Motion for Summary Judgment ("Bayless Decl.") and exhibits attached thereto ("Ex. __");

17  Declaration of Sarah Bulgatz and exhibits attached thereto; Declaration of Mila Dunn and

18  exhibits thereto; Declaration of Gregory Hand and exhibits attached thereto; Declaration of Eric

19  Carlson and exhibits attached thereto; Declaration of Matthew Hastings and exhibits attached

20  thereto; Declaration of Maureen M. Chakraborty and exhibits attached thereto; the Proposed

21  Order; the pleadings and papers filed in this action; and such further argument and evidence as

22  the Court shall permit.

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

(Local Rule 7-4)

1.   Whether defendant Kimon P. Daifotis ("Kim") is liable under Count I (primary liability under Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934 ("Exchange Act")), Count III (primary violation of Section 17(a) of the Securities Act of 1933 ("Securities Act")), and Count VII (primary violation of Section 34(b) of the Investment Company Act of 1940 ("ICA")) for statements that Kim did not make.

2.   Whether Kim is liable for securities law violations for alleged misstatements at twenty six events where the SEC has failed to provide any evidence to support its allegations about those events.

3.   Whether Kim is liable for securities law violations based on purely internal statements made solely to company insiders.

4.   Whether Kim is liable for aiding and abetting under Counts II and VI where no one is alleged to have had scienter for the primary violation beside Kim.

5.   Whether the SEC can maintain its Count VI (aiding and abetting Section 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940 ("IAA")) against Kim where there are no allegations of a primary violation under the IAA.

6.   Whether Kim is primarily liable for violating Section 34(b) of the ICA (Count VII) where the undisputed evidence shows that Kim did not meet the threshold requirement of this provision because he did not file, transmit or maintain documents pursuant to the ICA.

7.   Whether Kim is liable for purportedly violating Section 48(a) of the ICA (an anti-circumvention provision) where the undisputed evidence shows that Kim is not subject to liability under the predicate primary liability statute, Section 34(b) of the ICA.

8.   Whether Kim is liable for securities law violations for statements disclosing the YieldPlus Fund's ("YP") subprime holdings without also disclosing its Alt-A holdings where the undisputed evidence shows that the subprime disclosures were true and that there was no duty to disclose YP's Alt-A holdings.

9.   Whether Kim is liable for securities law violations for statements representing that YP was an ultra-short bond fund, without disclosing that it was different from other ultra-short bond funds, where the undisputed evidence shows that the statements were true and the differences between and among ultra-short bond funds were publicly disclosed.

10. Whether Kim is liable for securities law violations for statements comparing YP to money market funds where the undisputed evidence shows that it was clearly and repeatedly disclosed that YP was not a money market fund and that it was riskier than a money market fund.

11. Whether Kim is liable for securities law violations for a statement representing that one of the purposes for maintaining a higher cash balance in YP was to capitalize on investment opportunities where the undisputed evidence shows that the statement was subjectively and objectively true.

12. Whether Kim is liable for securities law violations for a March 10, 2008 statement representing that YP was a diversified fund where the undisputed evidence shows that YP met the statutory definition in the ICA for a diversified fund.

13. Whether scheme liability claims under Counts I, II, IV and VI are still viable when the Court stated in its October 7, 2011 Order that the SEC's scheme liability claims have been dismissed.

# TABLE OF CONTENTS

**STATEMENT OF ISSUES TO BE DECIDED** ..................................................................... iii

**INTRODUCTION** ...................................................................................................................... 1

**STATEMENT OF UNDISPUTED FACTS** ............................................................................... 2

**ARGUMENT** ............................................................................................................................... 3

I.  The Undisputed Facts Demonstrate that Kim Is Not Liable for Many of the
    SEC's Alleged Misstatements Under the Supreme Court's Decision in *Janus* .................. 4

    A.  Kim Cannot Be Liable for Statements in Documents He Had No Role in
        Drafting, Reviewing, or Publishing. ..................................................................... 4

        1.  June 30, 2007 Schwab Internal Website ..................................................... 4

        2.  December 23, 2005 Schwab Internal Website ............................................ 5

        3.  September 2005 Advertisement ................................................................... 6

        4.  May 2005 Advertisement ........................................................................... 7

    B.  Summary Judgment Should Be Granted on the SEC's Catch-all
        Allegation that Kim Made Misstatements at Twenty-Six Events Because
        the SEC Has Failed To Offer Any Proof. ............................................................. 7

    C.  Kim Cannot Be Liable for Internal Statements to Schwab Employees. ................. 8

II. Kim Cannot Be Held Liable for Aiding and Abetting (Counts II and VI) Because
    the SEC Does Not Allege that Any Other Schwab Employee Possessed the
    Requisite Scienter. ...................................................................................................... 10

III. Summary Judgment Should Be Granted on Aiding and Abetting Liability under
     IAA Because No Primary Violation Under IAA Remains (Count VI). .......................... 11

IV. Summary Judgment Should Be Granted on Alleged Violations of the ICA
    (Counts VII and VIII). ................................................................................................ 12

    A.  Kim Is Not Liable Under Section 34(b) of the ICA (Count VII). ........................ 12

    B.  Kim Cannot be Liable under Section 48(a) of the ICA (Count VIII) ................... 14

V.  Accurate Disclosures Regarding YP's Subprime Holdings Did Not Create A
    Duty to Disclose YP's Alt-A Holdings. ......................................................................... 15

A.      Subprime and Alt-A Are Different Types of Securities. ...................................... 16

B.      Schwab's Truthful Disclosures In Response to Specific Questions About YP's Subprime Holdings Did Not Trigger a Duty To Disclose Its Alt-A Holdings. ................................................................................................ 17

VI.     Statements Representing YP as An Ultra-Short Bond Fund Were Not Misleading. ............................................................................................. 18

VI.     YP's Comparisons to Money Market Funds Were Not Misleading. ............................... 20

VII.    Schwab Accurately Disclosed in 2007 that One Purpose in YP Maintaining a Higher than Normal Cash Balance Was to Capitalize on Investment Opportunities. ................................................................................. 22

VIII.   YP Was a Highly Diversified Fund in March 2008. ........................................................ 23

IX.     The SEC's Scheme Liability Claims Have Been Dismissed. ........................................... 25

**CONCLUSION** .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Berson v. Applied Signal Tech.,*
  527 F.3d 982 (9th Cir. 2008) ...................................................................16

*Brody v. Transitional Hosps. Corp.*
  280 F.3d 997 (9th Cir. 2002) ..............................................................16, 19

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).................................................................................3

*Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994)...............................................................................10

*Clemente Global Growth Fund, Inc. v. Pickens,*
  729 F. Supp. 1439 (S.D.N.Y. 1990) .........................................................15

*Fulton County Employee Ret. Sys. v. MGIC Inv. Corp.,*
  No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010) ...........................17

*Goodworth Holdings, Inc. v. Suh,*
  239 F. Supp. 2d 947 (N.D. Cal. 2002) (WHA).............................................3

*Hawaii Ironworkers Annuity Trust Fund v. Cole,*
  No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ...........................9

*In re Apple Computer, Inc. Sec. Litig.,*
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) .....................................................17

*In re Barclay's Bank PLC Sec. Litig.,*
  No. 09 Civ. 1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5. 2011) ...................17

*In re Time Warner, Inc. Sec. Litig.,*
  9 F.3d 259 (2d Cir. 1993) .......................................................................23

*Janus Capital Group v. First Derivative Traders,*
  131 S. Ct. 2296 (2011).................................................................1, 4, 5, 9

*Lessler v. Little,*
  857 F.2d 866 (1st Cir. 1988)....................................................................15

*Nelson v. Pima Cmty. Coll.,*
  83 F.3d 1075 (9th Cir. 1996) ..................................................................6, 7

*Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,*
  210 F.3d 1099 (9th Cir. 2000) ..................................................................3

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ........................................................................10

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ......................................................................23

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011) ...........................................................4

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*
   365 F.3d 353 (5th Cir. 2004) ..................................................................10, 11

*United States v. Menasche*,
   348 U. S. 528 (1955).....................................................................................14

*United States v. Skilling*,
   638 F.3d 480 (5th Cir. Apr. 6, 2011) ..............................................................9

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991).....................................................................................23

*Williams v. Taylor*,
   529 U.S. 362 (2000).......................................................................................14

**FEDERAL STATUTES**

15 U.S.C. 80a-5(b).................................................................................................24

15 U.S.C. § 80a-33(b)............................................................................................12

15 U.S.C. § 80a-48(a) ...........................................................................................14

15 U.S.C. § 80a-48(b)............................................................................................15

15 U.S.C. § 80b-9 ..................................................................................................12

**OTHER AUTHORITIES**

*Am. Bar Ass'n*,
   S.E.C. No-Action Letter, 1999 WL 235450 (April 22, 1999) .....................15

*Axe Houghton*,
   S.E.C. No-Action Letter 1973 WL 11345 (Dec. 16, 1973) .........................15

*Cornish & Carey Commercial, Inc.*,
   S.E.C. No-Action Letter, 1996 WL 422641 (June 21, 1996) ......................15

Frank J. Fabozzi,
   *Fixed Income Analysis* (2d ed. 2007) ..........................................................17

Frank J. Fabozzi,
  *Fixed Income Securities* (2d ed. 2002) ..........................................................................16, 17

*The Handbook of Fixed Income Securities,*
  (Frank J. Fabozzi ed., 7th ed. McGraw-Hill 2005)..........................................................16, 17

*The Handbook of Mortgage Backed Securities,*
  (Frank J. Fabozzi ed., 6th ed. McGraw-Hill 2006)..................................................................16

*In re John P. Flannery and James D. Hopkins,*
  Initial Decision Release No. 438, Admin. Proc., File No. 3-14081
  (SEC Administrative Decision, Oct. 28, 2011) .......................................................................15

*Investment Company Mergers,*
  S.E.C. Investment Company Act Release No. 25259,
  2001 WL 1398720 (Nov. 8, 2001)............................................................................................4

*SEC v. M-Wesley Groshans & Brokers Cap. Mgmt, Inc.,*
  47 S.E.C. Docket 712, Litig. Release No. 12,677, 1990 WL 322073 (Oct. 19, 1990)  ..........15

# INTRODUCTION[1]

The SEC has sued Kim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act (**Counts I** and **II**), Section 17 of the Securities Act (**Count IV**), Section 206(4) and Rule 206(4)-8 of the IAA (**Count VI**) and Section 34 and 48 of the ICA (**Counts VII** and **VIII**).  The SEC alleges over sixty alleged misstatements about YP in over thirty distinct documents.  Fact discovery involved millions of documents and nearly twenty depositions.

First, undisputed evidence shows that Kim had no involvement in drafting, reviewing and publishing four documents.  Similarly, the undisputed evidence shows that numerous statements were communicated only within Schwab.  Such statements are not actionable under *Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296 (2011).

Second, the SEC's aiding and abetting claims under Counts II and VI allege aiding and abetting against Kim for the same misstatements for which it seeks to hold him primarily liable.  To prove aiding and abetting liability, the SEC must prove that Kim aided and abetted a primary violation.  But Kim is the only person alleged to have had the requisite scienter for a primary violation.  So, the SEC must use Kim's alleged scienter to prove both his primary ***and*** secondary liability.  In other words, the SEC must prove that Kim aided and abetted himself.  The law bars this circuitous litigation strategy.

Third, the SEC's aiding and abetting claim under IAA (Count VI) fails because an essential element of the claim, a primary violation under the IAA, is not alleged.

Fourth, summary judgment should be granted on Counts VII and VIII – alleged violations of the ICA – because the undisputed evidence shows that Kim did not file, transmit or maintain documents pursuant to the ICA.  The statutory language makes it plain that Section 34 only reaches persons who so file, transmit or maintain such documents.

---

[1] Unless otherwise noted, capitalized terms and abbreviations have the meaning given in the Statement of Issues.

Fifth, the undisputed evidence establishes that five statements that the SEC alleges were false and misleading were in fact true and not misleading: 1) statements disclosing YP's subprime holdings; 2) statements representing YP as an ultra-short bond fund; 3) statements comparing YP to money market funds; 4) statements about the purpose of YP maintaining higher than normal cash balances; and 5) a statement representing YP as a diversified fund.

And finally, as the Court stated in its October 7, 2011 Order, the SEC's scheme liability claims have been dismissed and so are no longer part of this case.

## STATEMENT OF UNDISPUTED FACTS

Kim was Chief Investment Officer ("CIO") of fixed income at Charles Schwab Investment Management, Inc. ("CSIM"). CSIM is the investment adviser for the Schwab family of mutual funds, including YP. The funds were distributed by Charles Schwab & Co., Inc. ("CS&Co."). Both CSIM and CS&Co. are wholly owned subsidiaries of Charles Schwab Corporation (collectively "Schwab").

The SEC first filed its complaint against Kim and Randall Merk, Kim's boss and the President of CSIM, in January 2011, alleging securities law violations based on alleged statements and omissions regarding YP. After motions to dismiss were granted in part, the SEC filed a first amended complaint ("FAC") in October 2011. Defendant Merk settled with the SEC in late 2011.

In discovery, Kim served interrogatories asking the SEC to identify each alleged misstatement or material omission for which it contended Kim was liable. The SEC did so initially on November 23, 2011 by producing two tables: one that identified statements for which Kim was alleged to be primarily liable ("Schedule 1") and another that identified statements for which Kim was alleged to be liable as an aider and abettor ("Schedule 2"). After substantial discovery, on March 14, 2012, the SEC amended Schedule 1 and withdrew Schedule

DEFENDANT KIMON P. DAIFOTIS'
MOTION FOR SUMMARY JUDGMENT
Civil Case No.: 11-cv-00137-WHA

- 2 -

2 in its entirety.  (Bayless Decl. Ex. 7 (pp. 133-91) at No. 2.)[2]

In its current form, Schedule 1 alleges that Kim is primarily liable for over 60 misstatements or material omissions.[3]  (*Id.* Ex. 1 (pp. 10-29).)  It also states that "if and to the extent that [Kim] is not liable as a primary violator for the misrepresentations and misleading omissions identified in Schedule 1 (revised 3/14/2012), then the SEC alleges that [Kim] is liable as an aider and abettor with regard to those misrepresentations and misleading omissions."  (*Id.* Ex. 7 (pp. 133-91) at No. 2.)[4]

Kim also served an interrogatory asking the SEC to identify all natural persons at Schwab who had scienter for the primary violation that the SEC alleged Kim to have aided and abetted.  (*Id.* Ex. 60 (pp. 802-19).)  The SEC responded that Kim was the only individual at Schwab who possessed such scienter.  (*Id.* Ex. 8 at No. 15 (pp. 194-95).)

## ARGUMENT

Summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Goodworth Holdings, Inc. v. Suh*, 239 F. Supp. 2d 947, 955 (N.D. Cal. 2002) (WHA).  The party without the burden of proof at trial may either produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its burden at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *Goodworth Holdings, Inc.*, 239 F. Supp. 2d at 956.

---

[2] For ease of reference, page numbers in parentheses in the fact citations refer to the page numbers at which the cited exhibit appears in the continuously paginated Bayless Declaration and exhibits attached thereto.

[3] At its peak, the SEC's Schedule 1, twice amended, included over forty documents, with some documents containing as many as eight misstatements or material omissions.  (Bayless Decl., Ex. 2 (pp. 30-49).)

[4] The SEC's Fourth Amended and Supplemental Response, served after the close of discovery, did not change this response.  (Bayless Decl., Ex. 6 at No. 2 (pp. 97-98).)

**I.      The Undisputed Facts Demonstrate that Kim Is Not Liable for Many of the SEC's Alleged Misstatements Under the Supreme Court's Decision in *Janus*.**

Many of the alleged misstatements in the FAC supporting primary liability (Counts I, IV, and VII) are the same as those in the SEC's initial complaint.  But the Supreme Court's decision in *Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296 (2011) fundamentally transformed the framework for primary liability under federal securities laws.[5] *Janus* draws a bright line between individuals who can be primarily liable and others who can be liable as aiders and abetters.  *Id.* at 2304.  Only the individual with ultimate authority over the content of the statement, and whether and how to communicate it, may be held primarily liable for securities fraud.  *See id.* at 2303.  Mere participation, regardless of how substantial, in the drafting or dissemination of a statement is no longer sufficient for primary liability.

Despite this sea change, the SEC has pursued this action as if *Janus* never happened. Kim cannot be held primarily liable under *Janus* for many alleged misstatements in the FAC.

**A.      Kim Cannot Be Liable for Statements in Documents He Had No Role in Drafting, Reviewing, or Publishing.**

In discovery, the parties examined millions of documents and took nearly 20 depositions concerning the drafting, review, and publication of YP communications.  The undisputed evidence from that voluminous discovery shows that Kim made no contribution to, or even knew of, four documents containing the alleged misstatements listed in Schedule 1.  Kim is entitled to summary judgment on these documents.

**1.      June 30, 2007 Schwab Internal Website (Schedule 1, Row 9)**

---

[5] The Court has ruled previously that *Janus* only applies to Section 10(b) and Rule 10b-5.  For the reasons stated in Mr. Daifotis' motion for reconsideration (Doc. No. 67) and motion for certification for interlocutory appeal (Doc. No. 75), Mr. Daifotis maintains that the ultimate authority standard set forth by *Janus* also applies to primary liability under Section 17(a) of the Securities Act (Count III) and Section 34(b) of the ICA (VII).  *SEC v. Kelly*, 817 F. Supp. 2d 340, 341-42 (S.D.N.Y. 2011); *In re John P. Flannery and James D. Hopkins*, Initial Decision Release No. 438, Admin. Proc., File No. 3-14081 (SEC Administrative Decision, Oct. 28, 2011).

The SEC seeks to hold Kim primarily liable for statements contained in an internal "Schwab Mutual Fund Commentary" written by Keith Parker and Justin Holt.  (Schedule 1, Row 9 (Bayless Decl., Ex. 1).)  But the SEC did not take the deposition of either author, and no deposition testimony or exhibits show that Kim saw the commentary before it was published. The only testimony about this commentary came at Kim's deposition, where he testified that he had: (1) "a very, very vague recollection" of an interview with Mr. Parker and (2) that he does not recall seeing the commentary during his employment at Schwab; and (3) that he "would never make that statement."  (*See* Bayless Decl. Ex. 10 (pp. 198-202) at 543:3-545:19.)

The SEC appears to rely solely on the fact that statements purportedly attributed to Kim (without quotation marks) wound up in the commentary.  (*Id.* Ex. 9 (p. 197).)  But, under *Janus*, attribution is not sufficient.  *Janus*, 131 S. Ct. at 2302.  Rather, "ultimate authority" over the statement, with or without attribution, can only be established by control.  *See id.*  The analogy the Court draws to the "relationship between a speechwriter and a speaker" is instructive on this point—"[e]ven when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  It is the speaker who takes credit—or blame—for what is ultimately said."  *Id.*

Here, the commentary was written by Messrs. Parker and Holt, not Kim.  They had the control over its content, including the decision to include a supposedly paraphrased statement by Kim.  There is no evidence that Kim saw or reviewed the document.  Indeed, according to CSIM product management, Schwab employees would "probably not" get the opportunity to review paraphrased statements attributed to them.  (Bayless Decl. Ex. 11 (pp. 203-8) at 137:1-17.)  Obviously, Kim did not exercise ultimate authority over a statement he never saw.

### 2.     December 23, 2005 Schwab Internal Website (Schedule 1, Row 11)

The SEC alleges primary liability against Kim for statements in a Schwab internal website.  (Schedule 1, Row 11.)  But there is no evidence that Kim saw the contents of this webpage before it was published.  Exhibit 101, which the SEC represents is the compliance folder for this website article, (*see* Bayless Decl. Ex. 13 (pp. 211-16) at 118:9-119:24), does not

1    mention Kim among its reviewers.  (*See* Bayless Decl. Ex. 14 (pp. 217-40).)  In his deposition,

2    Kim testified that he did not recall the website article or whether he gave the quote that appears

3    therein.  (*See Id.* Ex. 10 (pp. 198-202) at 542:6-543:2.)

4            Again, the SEC appears to rely solely on the fact that the article attributes a quote to

5    Kim.  (*Id.* Ex. 12 (pp. 209-10).)  But it is undisputed that the practice at Schwab was for an

6    employee in the Product Management or Client Experience divisions to write the quotes used in

7    advertisements.  (*See Id.* Ex. 11 (pp. 203-8) at 135:24-136:8.)  In other words, the "quotes" that

8    appeared in Schwab communications during the relevant time period did not come from the

9    executive to whom they were attributed.  While product managers at Schwab indicated that they

10   would "try" to get the individual to whom the "quote" was attributed to review the made-up

11   quotation, (*id.* at 136:9-19; *see also* Bayless Decl. Ex. 15 (pp. 241-45) at 72:24-74:9 (explaining

12   Schwab's "routine practice")), there is no evidence of that happening ***in this instance***.  At most,

13   this testimony shows that it is possible that Kim saw this statement before it was published.  But

14   speculation is not evidence and cannot create a material dispute of fact.  *See Nelson v. Pima*

15   *Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not

16   create a factual dispute for purposes of summary judgment.").  Kim was not the speaker of these

17   website statements attributed to him because he never saw them.

18                   **3.      September 2005 Advertisement (Schedule 1, Row 13)**

19           The SEC seeks to hold Kim primarily liable for statements in a September 2005 YP

20   advertisement bearing his picture and a quote attributed to him.  (Schedule 1, Row 13; Ex. 2.)

21   But no deposition testimony or contemporaneous documents or emails reflect that Kim saw this

22   advertisement before it was published.  At his deposition, Kim testified that he did not give the

23   quote and did not recall seeing the advertisement.  (*See* Bayless Decl. Ex. 10 (pp. 198-202) at

24   528:17-529:1.)  No other witness knew whether Kim reviewed this advertisement prior to its

25   use.  (*See Id.* Ex. 11 (pp. 203-8) at 315:11-316:10; Ex. 15 (pp. 241-45) at 74:19-75:3; Ex. 13,

26   (pp. 211-16) at 163:10-164:18.)  Given that other Schwab employees made up these quotes, (*see*

27   *Id.* Ex. 11 (pp. 203-8) at 135:24-136:8), and that there is no evidence that Kim actually reviewed

28

1   them, Kim had no role (much less ultimate authority) with respect to this advertisement.

2   **4.     May 2005 Advertisement (Schedule 1, Row 34)**

3       The SEC seeks to hold Kim primarily liable for statements in a May 2005 YP

4   advertisement bearing his picture.  (Schedule 1, Row 34.)  As with the preceding documents,

5   however, no contemporaneous documents or emails suggest that Kim reviewed, or even knew

6   of, this advertisement before it was published.  Nor is Kim quoted or paraphrased.  (Bayless

7   Decl. Ex. 17 (p. 248).)

8       The only evidence connecting Kim to this advertisement in any way is product manager,

9   Jennifer Hafner's belief that Kim and a product manager named Liz Evans "would have worked

10  together" to determine the accuracy of the statement.  (*See Id.* Ex. 15 (pp. 241-45) at 335:1-

11  336:15.)  But Ms. Hafner's statement was not based on personal knowledge.  Rather, it was

12  based on her assumption that Ms. Evans was one of the few business partners that would work

13  with Kim directly and that "when they worked together . . . they worked directly together."  (*Id.*

14  at 336:8-15.)  Ms. Hafner's speculation about what might or could have happened is not

15  admissible evidence sufficient to create a material issue of fact.  *Nelson*, 83 F.3d at 1081-82.

16      In sum, the undisputed evidence demonstrates that Kim had no role in drafting,

17  reviewing or publishing, nor did he exercise ultimate authority over, these four documents.

18  Accordingly, the Court should grant summary judgment on the alleged misstatements listed in

19  Rows 9, 11, 13 and 34 in Schedule 1.

20      **B.     Summary Judgment Should Be Granted on the SEC's Catch-all Allegation
             that Kim Made Misstatements at Twenty-Six Events Because the SEC Has

21           Failed To Offer Any Proof.**

22      The SEC alleges that Kim made misstatements at speaking events around the country

23  from 2005 to 2008.  (Schedule 1, Row 5.)  But the SEC has failed to produce any evidence to

24  support this sweeping allegation.

25      When asked to identify the facts supporting its allegation, the SEC referred Kim to

26  paragraph 83 in the FAC (Doc. No. 98) —which lists 26 events at which Kim allegedly made

27  false and misleading statements—but cited only four power point presentations.  (Schedule 1,

28  DEFENDANT KIMON P. DAIFOTIS'          - 7 -
    MOTION FOR SUMMARY JUDGMENT
    Civil Case No.: 11-cv-00137-WHA

Row 5.)  And the SEC has not identified which of the four presentations were given at which of the 26 events.

To make matters worse, two of the presentations could not possibly have been presented at the 2005-2008 events listed in Paragraph 83 of the FAC.  For example, one of the presentations dates from 2004 and includes "Economic Outlook for the Remainder of 2004" as an agenda item, indicating that the presentation was used sometime in 2004.  (Bayless Decl. Ex. 18 (pp. 249-65).)  Similarly, one presentation is dated September 20, 2006, (*Id.* Ex. 19 (pp. 266-96)), but paragraph 83 does not list an event occurring on that date.  (FAC ¶ 83.)

The remaining two presentations also offer no support for the alleged misstatements. The third presentation cited dates from early 2005.  (Bayless Decl. Ex. 20 (pp. 297-314).)  But there is no evidence that indicates that this presentation was used at any of the 26 events or whether Kim presented it.  The SEC did not examine a single witness about this presentation, not even Kim.  Finally, the last presentation is for an event that No. 6 in Schedule 1 also describes, thereby being duplicative.  *Compare* SEC-FINRA_AD-0000107-151 cited in Rows 5 *and* 6 of Schedule 1.  (Bayless Decl., Ex. 1 (pp. 14 & 16).)

In short, there is an utter failure of proof as to the allegations in paragraph 83, as reflected in Row 5 of Schedule 1.  Accordingly, the Court should grant summary judgment as to these presentations.

**C.    Kim Cannot Be Liable for Internal Statements to Schwab Employees.**

The SEC alleges that Kim is liable for purported misstatements he made internally to Schwab employees, including statements made during a conference call on August 16, 2007 (Schedule 1, Row 4, 15, and 15.a), various presentations to Schwab Registered Representatives and Regional Bond Specialists (Schedule 1, Row 5)[6], and mutual fund commentaries posted on

---

[6] As addressed in section B, the allegations in Schedule 1, Row 5 fail because the SEC has failed to adduce any evidence to show that Kim made any misstatements at twenty six events. They fail for the additional reason, addressed in this section, that the SEC has failed to allege,

(continued…)

Schwab's internal website (Schedule 1, Row 9 and 11 ).

But these *internal* statements cannot violate the federal securities laws because the SEC has not alleged that Kim made them to the investing public. *See Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) (holding that managers who sent false statements within the company did not possess ultimate authority over the statements eventually released to the public); *see also United States v. Skilling*, 638 F.3d 480, 484 n.4 (5th Cir. Apr. 6, 2011) (noting that a statement only communicated within the company would not provide a basis for securities fraud).

The SEC had ample opportunity to establish the audiences of these alleged misstatements during discovery. Its investigation produced no evidence that the conference call on August 16, 2007 or the internal presentations were attended by anyone other than Schwab employees. Nor is there evidence that the mutual fund commentary posted on Schwab's internal website was ever made available to the public. In fact, one of the mutual fund commentaries bears a prominent warning, "FOR SCHWAB INTERNAL USE ONLY." (Bayless Decl. Ex. 9 (p. 197).) It is undisputed that these statements were heard or read only by Schwab employees.

And Kim cannot be liable for subsequent statements made by Schwab employees who attended his presentations or read the mutual fund commentary. *Janus* requires the SEC to show that Kim held "ultimate authority" over the specific statement actually communicated to the investing public, "including its contents and whether and how to communicate it." 131 S. Ct. at 2302. But Kim did not control whether or how Schwab employees would convey information to investors. As in *Janus*, a speechwriter may prepare a script, but he cannot control whether or how the speaker delivers it. *See id.* The speaker may improvise, forget key lines, or mangle the message completely. *See also id.* at 2303 (stating that absent ultimate

let alone provide any evidence, which of the presentations were attended by people outside of Schwab. (FAC ¶¶ 82-83.)

1    authority, "it is not 'necessary or inevitable' that any falsehood will be contained in the

2    statement.").

3        Thus, Kim did not have "ultimate authority" over statements that CS&Co.

4    representatives made to investors, even if the subject-matter was based on his internal

5    communications.  The SEC's attempt to hold Kim liable for Rows 4, 5, 9, 11, 15 and 15.a. fails.

6    **II.    Kim Cannot Be Held Liable for Aiding and Abetting (Counts II and VI) Because
         the SEC Does Not Allege that Any Other Schwab Employee Possessed the Requisite
7         Scienter.**

8        In an extreme display of belt and suspenders litigation, the SEC alleges that Kim may be

9    secondarily liable for each alleged misstatement in Schedule 1 even if he is found not primarily

10   liable for it.  (Bayless Decl. Exs. 6-7 at No. 2 (pp. 97-98, 136-37).)  This even includes his own

11   oral statements.  (*See, e.g.,* Schedule 1, No. 2.)  But this makes no sense.

12       Kim can be held liable for aiding and abetting under the federal securities laws if and

13   only if the SEC first proves that a primary violation occurred.  *Cent. Bank of Denver N.A. v.*

14   *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 168 (1994).  This means that the SEC must

15   prove that there was a primary violation by someone else that Kim aided and abetted.  However,

16   the SEC has alleged that Kim—and only Kim—had the scienter for primary liability.  (Bayless

17   Decl. Ex. 8 at No. 15 (pp. 194-95).)  So, for Kim to be found secondarily liable, the SEC must

18   use his alleged scienter to satisfy the requirements for both the primary violation he aided and

19   abetted *and* his secondary liability for this primary violation.  In other words, the SEC must

20   prove the Kim aided and abetted himself.

21       The SEC attempts to overcome this obvious problem by attributing the primary violation

22   to one of Schwab's corporate entities. (Bayless Decl. Exs. 7-8 at No. 6 (pp. 123-24, 162-63).)

23   But a corporation may only be held liable if the natural person who made the false or misleading

24   statement possessed the requisite scienter.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,

25   365 F.3d 353, 366 (5th Cir. 2004) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424,

26   1435-36 (9th Cir. 1995); *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023

27   (N.D. Cal. 2002)).  The *Southland* Court explained that,

28

> [t]his is consistent with the general common law rule that where,
> as in fraud, an essentially subjective state of mind is an element of
> a cause of action also involving some sort of conduct, such as a
> misrepresentation, the required state of mind must actually exist in
> the individual making (or being a cause of the making of) the
> misrepresentation, and may not simply be imputed to that
> individual on general principles of agency.

*Southland*, 365 F.3d at 366 (internal citations omitted).  Thus, for Schwab's corporate entities to be primarily liable, the SEC must prove that the individual who made the alleged misstatement possessed the scienter required for a primary violation.

However, Kim is the only natural person alleged to have had scienter.  (Bayless Decl. Ex. 8 at No. 15 (pp. 194-95).)  So the SEC is back at square one—it must prove that Kim is primarily liable before it can prove that he is secondarily liable.  But, the secondary liability claims proceed if and only if Kim is found not to have made the alleged misstatement in the first place.  Thus, the secondary liability inquiry is over before it begins.  Summary judgment must be granted on the secondary liability claims--Counts II and VI.

**III.    Summary Judgment Should Be Granted on Aiding and Abetting Liability under IAA Because No Primary Violation Under IAA Remains (Count VI).**

Count VI alleges aiding and abetting liability against Kim under Section 206(4) and Rule 206(4)-8(b)) of the IAA.  For the reasons set forth in section II above, summary judgment on this claim is warranted.  But a separate defect in Count VI also warrants summary judgment.

In discovery, Kim asked the SEC to identify all misrepresentations or misleading omissions of material fact for which Kim is alleged to be secondarily liable.  (Bayless Decl. Ex. 62 (pp. 872-81) at No. 2.)  In response, the SEC initially produced a table setting forth the misstatements, the statutes violated and the person/entity alleged to be primarily liable.  (*Id.*, Ex. 4 (pp. 65-78) (Schedule 2).)  This table included misstatements for which the SEC alleged aiding and abetting liability under the IAA against Kim.  And it identified the Schwab entities, Mr. Merk, and George Pereira as the persons or entities primarily liable under the IAA.  (*Id.*)

In its Third Amended and Supplemental Response to the same interrogatory, however, the SEC withdrew Schedule 2, the table of misstatements supporting the aiding and abetting

claims.  Instead, it stated that it was pursuing aiding and abetting liability based <u>only</u> on those misstatements or misleading omissions for which the SEC is also alleging primary liability against Kim "if and to the extent that Daifotis is not liable as a primary violator."  (Bayless Decl. Exs. 6-7 at No. 2 (pp. 97-98, 136-37).)  But, significantly, none of these are IAA claims.

Thus, the SEC is no longer alleging primary liability under the IAA against anyone.[7] And proof of primary liability under the IAA is an essential element of an aiding and abetting claim under the IAA.  15 U.S.C. § 80b-9.  Without a primary liability claim, there cannot be a secondary liability claim.  Thus, summary judgment must be granted on Count VI.

## IV.      Summary Judgment Should Be Granted on Alleged Violations of the ICA (Counts VII and VIII).

Counts VII and VIII allege that Kim violated Section 34(b) and Section 48(a) of the ICA.  But the undisputed facts show that there is no basis for these claims.

### A.      Kim Is Not Liable Under Section 34(b) of the ICA (Count VII).

Section 34(b) provides that any person who files, transmits or keeps a document pursuant to the ICA cannot misstate or omit material facts from such documents:

> It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted *pursuant to this . . . title* . . . .  It shall be unlawful for any person *so filing, transmitting, or keeping* any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.  For the purposes of this sub-Section, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.

15 U.S.C. § 80a-33(b) (emphasis added).

The undisputed facts show that Kim did not file or certify any documents with the SEC

---

[7] The SEC has never alleged primary liability under the IAA against Kim.

or any document filed with the NASD which is "deemed to be filed" with the SEC under section 24 and Rule 24b-3 of the ICA.  Koji Felton, Schwab's Deputy General Counsel, testified that documents filed directly with the SEC, such as registration statements, prospectuses, statements of additional information, certified shareholder reports (Forms N-CSR, N-SCRS, N-CSRS) and quarterly schedules of portfolio holdings (Form N-Q), were filed by CSIM Legal or Fund Administration.  (Bayless Decl. Ex. 22 (pp. 360-63) at 103:16-104:12.)  Kim was not involved. (*Id.* at 104:17-20.)

With respect to advertising materials filed with the NASD (and so "deemed" filed with the SEC), no admissible evidence shows that Kim was responsible or involved in making such filings.  Instead, Schwab's internal policies provided that compliance personnel had the responsibility to file marketing materials with the NASD.  (*Id.* Ex. 23 (pp. 369).)  And these policies were followed with respect to marketing materials regarding YP.  (*Id.* Ex. 24 (pp. 375-82) at 48:12-22, 72:5-73:8, 105:19-106:2; Ex. 13 (pp. 211-16) at 100:17-101:18.)

Further, no admissible evidence shows that Kim transmitted or kept documents pursuant to the ICA.  Rather, the departments or personnel responsible for making the filings with the SEC and the NASD were responsible for transmitting and keeping the files of the regulatory filings.  (*Id.* Ex. 24 (pp.375-82) at 38:15-40:9, 43:7-46:20; Ex. 25 (pp.383-438), Ex. 26 (p.439)).

Recognizing this problem, the SEC has previously urged a different reading of the first sentence in Section 34, arguing that any person can be held liable if that person makes an untrue statement in documents filed, transmitted or kept pursuant to the ICA, even if that person did not actually file, transmit or keep the documents.  (SEC's Reply Br. ISO Mot. for Leave to Amend, Doc. No. 86, at 6.)

But this interpretation cannot be squared with the plain statutory language in the second sentence that "it shall be unlawful for any person *so filing, transmitting, or keeping* any such document to *omit* to state therein any fact necessary in order to prevent the states made . . . from being materially misleading."  This language is clear that the prohibition on misleading *omissions* reaches only persons who file, transmit or keep documents pursuant to the ICA.  The

SEC cannot seriously argue otherwise.

So, accepting the SEC's reading of the first sentence of section 34(b), combined with the plain meaning of the second sentence, would mean that the scope of the statutory prohibition drastically expands or contracts simply on the basis of whether liability arises from a misstatement or an omission.  Congress could not have intended such an absurd result.  And no case so holds.

The SEC's reading would also render the final sentence of Section 34(b) superfluous.  If Section 34 reached persons who did not file, transmit or keep a document required to be filed with the SEC, as the SEC urges, the final sentence of the provision—which states that "any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document"—would be entirely unnecessary as "any person" would have included them without that provision.

That Congress carefully provided for auditors or accountants who sign or certify a part of the document to be "deemed" to have made, filed, transmitted or kept a document demonstrates that the SEC's contorted reading is incorrect.  It violates a "cardinal principle of statutory construction" to "'give effect, if possible, to every clause and word of a statute.'"  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U. S. 528, 538-539 (1955) (further internal citations omitted).

Thus, Section 34, properly read as a whole, imposes liability only on persons who file, transmit or keep documents filed with the SEC pursuant to the ICA.  No evidence shows that Kim did this.  Thus, summary judgment is warranted on Count VII.

**B.     Kim Cannot be Liable under Section 48(a) of the ICA (Count VIII).**

Section 48(a) is an anti-circumvention provision.  It prohibits "any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person ***which it would be unlawful for such person to do under the provisions of [the ICA]***."  15 U.S.C. § 80a-48(a) (emphasis added).  The SEC has recognized that Section 48(a) prohibits Person A from

causing Person B to do something that the ICA prohibits Person A from doing himself. *Investment Company Mergers*, S.E.C. Investment Company Act Release No. 25259, 2001 WL 1398720, at *8 (Nov. 8, 2001) (stating Section 48(a) "prohibits a person from doing indirectly through another person what the person is prohibited from doing directly").[8]  Congress recently recognized that Section 48(a) was limited in this way when, through the enactment of the Dodd-Frank Act in 2010, it added an aiding and abetting provision in Section 48(b).[9]

So, Section 48(a) is limited.  It is not an aiding and abetting provision.  Rather, it only prohibits Kim from "causing" Schwab to do something that he himself is prohibited from doing himself.  But the SEC has not identified conduct for which Kim *himself* could be liable under the ICA (because, as discussed above, its section 34(b) claims are invalid).  Thus, summary judgment on Count VII is warranted.

## V.   Accurate Disclosures Regarding YP's Subprime Holdings Did Not Create A Duty to Disclose YP's Alt-A Holdings.

The SEC faults Schwab for the failure to disclose the Fund's Alt-A holdings when Schwab disclosed the Fund's holdings in subprime securities in the Fall 2007.  (Schedule 1, Rows 14.c., 18, and 19.)  But this has no support in Ninth Circuit law or the evidence.

There is no duty to disclose all material information in a fund's or company's

---

[8] *See also Am. Bar Ass'n*, S.E.C. No-Action Letter, 1999 WL 235450, at *17 (April 22, 1999) (same); *Cornish & Carey Commercial, Inc.*, S.E.C. No-Action Letter, 1996 WL 422641, at *2 n.5 (June 21, 1996) (same); *SEC v. M-Wesley Groshans & Brokers Cap. Mgmt, Inc.*, 47 S.E.C. Docket 712, Litig. Release No. 12,677, 1990 WL 322073, at *2 (Oct. 19, 1990) (same); *Axe Houghton*, S.E.C. No-Action Letter 1973 WL 11345, at *2 (Dec. 16, 1973) (same); *see also Lessler v. Little*, 857 F.2d 866, 873 (1st Cir. 1988) (stating that Section 48(a) "makes it unlawful to do indirectly that which one could not do directly"); *Clemente Global Growth Fund, Inc. v. Pickens*, 729 F. Supp. 1439, 1443 (S.D.N.Y. 1990) (Section 48(a) "bars an entity from making an acquisition indirectly that it could not make directly").

[9] Enacted through Section 929M(b) of the Dodd-Frank Act and titled "Aiding and Abetting Authority Under the [ICA,]" Section 48(b) provides:  "[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this Act, or of any rule or regulation issued under this Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 80a-48(b).

possession.  *See Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008) (holding that absent a duty to disclose, the securities laws do not require disclosure of all information). Moreover, an omission is not actionable unless it is misleading.  *See Brody v. Transitional Hosps. Corp.* 280 F.3d 997, 1006 (9th Cir. 2002) (refusing to impose a duty that all statements be complete so long as any omission is not misleading).  As the *Brody* Court stated, "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts. . . . To be actionable under the securities laws, an omission must be misleading; in other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

The SEC does not dispute that Schwab accurately disclosed the percentage of YP's subprime securities in three different disclosures during Fall of 2007.  The SEC contends, though, that YP's disclosure of its subprime holdings triggered an affirmative duty to also disclose its  Alt-A holdings.  But this hinges on the assumption that Alt-A securities are so similar to subprime securities that a failure to discuss them together was, by definition, misleading.  *Id.*  This is not so.  The disclosure of YP's subprime holdings did not convey any impression, let alone a false or misleading one, about its Alt-A holdings.

### A.      Subprime and Alt-A Are Different Types of Securities.

Alt-A loans are extended to borrowers who have "slightly below top-credit" but are "missing a standard credit history, documented source of income, or some other standard input used in credit scoring models." *The Handbook of Fixed Income Securities* 567 (Frank J. Fabozzi ed., 7th ed. McGraw-Hill 2005)(Bayless Decl. Ex. 27 (pp. 440-44)).  "The typical Alt-A borrower will have an excellent credit rating—referred to as an 'A' rating, and hence the loan is referred to as an Alt-A loan—which is especially important to the originator as the credit quality of the borrower must compensate for the lack of other necessary documentation."  Frank J. Fabozzi, *Fixed Income Securities* 286 (2d ed. 2002)(Bayless Decl. Ex. 28 (pp. 445-47)); *see also The Handbook of Mortgage Backed Securities* 188 (Frank J. Fabozzi ed., 6th ed. McGraw-Hill 2006)(Bayless Decl. Ex. 29 (pp. 448-51)) ("Typically, alt-A borrowers have strong credit

histories.").  In contrast, subprime borrowers have low credit scores and "have had some mortgage delinquencies, as well as some serious delinquencies on other consumer debt."  *The Handbook of Fixed Income Securities* 594 (Bayless Decl. Ex. 27 (pp. 440-44)).  The Federal Reserve Bank of San Francisco observed in its 2007 Annual Report entitled "The Subprime Mortgage Market," that "[o]n balance, alt-A loans are viewed as having lower risk and, thus, carry lower interest rates than subprime loans."  (Bayless Decl. Ex. 30 (pp. 452-56) at 7.) [10]

Moreover, subprime and Alt-A securities are located in different sectors of the fixed income market—the former in the ABS sector and the latter in the MBS sector.  According to Fabozzi, a typical subprime borrower "used a home equity loan to consolidate consumer debt using the current home as collateral rather than to obtain funds to purchase a new home." Frank J. Fabozzi, *Fixed Income Analysis* 313 (2d ed. 2007)(Bayless Decl. Ex. 31 (pp. 457-59).)  "For this reason, subprime securities traded on ABS desks.  Conversely, prime and Alt-A loans traded through the RMBS, or 'Resi,' desks at the large investment banks." (Bayless Decl. Ex. 32 (pp. 460-63).)  Consistent with industry practice, Schwab classified subprime securities as ABS but Alt-A securities as MBS.  (*See, e.g., Id.* Ex. 33 (pp. 487-494).)  Because of these basic and well-recognized differences, it was not misleading to discuss subprime without discussing Alt-A.

      **B.**    **Schwab's Truthful Disclosures In Response to Specific Questions About YP's Subprime Holdings Did Not Trigger a Duty To Disclose Its Alt-A Holdings.**

Moreover, the statements about YP's subprime holdings were made in response to specific inquiries about its subprime holdings.  Schwab answered those inquiries directly and truthfully:

---

[10] A number of courts have also recognized that subprime and Alt-A securities are distinct types of securities.  *See In re Barclay's Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2011 WL 31548 (S.D.N.Y. Jan. 5. 2011); *Fulton County Employee Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010).

> Q: What is the direct exposure to subprime securities in the Schwab YieldPlus Fund?
>
> A: The Fund currently holds approximately 4.7% [5.8%] in subprime securities. . . . .

(Bayless Decl. Ex. 34 (p. 557); Ex. 35 (p. 562).)

> Q: And then I am curious to know more specifically what you have in it, and did you have any subprime mortgage CDO exposure?  Were you forced to mark those to market, and is that the reason the fund's NAV is down?
>
> A: Okay.  So the – as far as what that decline related to subprime?  Let me lay out exactly what's happened with our subprime holding share on the YieldPlus Fund.
>
> So, first of all, the YieldPlus Fund holding does have some exposure to the subprime market, but . . . what really hasn't been talked about enough in the marketplace is that subprime is being painted with a broad brush.  . . . .
>
> . . . . Now we have roughly about 4.7% in the fund in subprime securities. . . . .

(Bayless Decl. Ex. 63 (pp. 882-884) at 36:15-19, 37:12-38:5.)

Schwab's disclosure of YP's subprime holdings in response to specific inquiries about its subprime holdings did not convey any misimpression about its Alt-A holdings.  Therefore, the subprime disclosures did not trigger any duty to disclose Alt-A holdings.  Accordingly, summary judgment is warranted on Rows 14c, 18, and 19 in Schedule 1.

**VI.     Statements Representing YP as An Ultra-Short Bond Fund Were Not Misleading.**

In various public communications, Schwab characterized YP as an ultra-short bond fund. (Schedule 1, Rows 8, 9, 11, 13, 18, 34.)  The SEC alleges that such statements were misleading because they were not accompanied by disclosures of the ways YP "differed significantly from ultra-short bond funds and the ways in which it was significantly riskier."  (Schedule 1, Rows 8, 9, 11, 13, 18, 34.)  This claim appears to have two parts, neither of which present a genuine issue of material fact.

First, the SEC says that it was misleading to call YP an ultra-short bond fund.  But the undisputed evidence shows that YP was an ultra-short bond fund.  Both Morningstar and

Lipper, the two independent third-party research firms that categorized mutual funds, placed YP in the ultra-short bond fund category.  (*See, e.g.,* Bayless Decl. Ex. 37 (pp. 601-04); Ex. 17 (p. 248); Ex. 38 (pp. 605-09) at 71:11-72:10.)  That classification was based on their own independent analysis of the fund's holdings.  (*See, e.g., Id.* Ex. 39 (pp. 610) ("While the investment objective stated in a fund's prospectus may or may not reflect how the fund actually invests, the Morningstar category is assigned based on the underlying securities in each portfolio."))  Further, the SEC branch chief who led the SEC's examination of the Schwab's fixed-income bond funds in 2006 conceded that YP was an ultra-short bond fund.  (*See id.* Ex. 40 (pp. 615-21) at 186:15-18.)  Thus, it is undisputed that YP *was* an ultra-short bond fund.

Second, the SEC claims that YP was riskier than other ultra-short bond funds and these risks were not adequately disclosed.  But Schwab only had a legal obligation to make additional disclosures if they were necessary to make its affirmative statements about YP being an ultra-short bond fund not misleading.  *Brody*, 280 F.3d at 1006.  The SEC, therefore, must show that, by characterizing YieldPlus as an ultra-short bond fund, Schwab conveyed a false impression that YieldPlus was not significantly different and riskier than other ultra-short bond funds.  But, the term "ultra-short bond fund" conveyed no impression other than Lipper's and Morningstar's classification.

In fact, the ***SEC's own disclosures to investors*** squarely contradict its current litigation position.  From at least early 2006, the SEC has maintained a webpage titled "Ultra-Short Bond Funds: Know Where You're Parking Your Money."[11]  (Bayless Decl. Ex. 41 (pp. 622-23); *see also id.* Ex. 42 at No. 180 (pp. 717).)  There, the SEC informed investors that ultra-short bond funds "may invest in a wide range of securities, including corporate debt, government securities, mortgage-backed securities, and other asset-backed securities.  The SEC also told investors that ultra-short bond funds vary significantly from each other in terms of their risks, credit quality,

---

[11] http://www.sec.gov/investor/pubs/ultra-short_bond_funds.htm.

maturities, and sensitivity to interest rates:

> If you are considering investing in an ultra-short bond fund, **keep in mind that ultra-short bond funds can vary significantly in their risks and rewards**. **The level of risk associated with a particular ultra-short bond fund may depend on a variety of factors,** including: Credit Quality of Fund's Investments . . . [,] Maturity Dates of the Fund's Investments . . . [, and] Sensitivity to Interest Rate Changes."

(Bayless Decl. Ex. 41 (pp. 622-23) (emphasis added).)  So even as the SEC describes ultra-short bond funds, even if YP significantly differed from other ultra-short bond funds in terms of its investments, risks and rewards, that fact does not oust YP from the "ultra-short bond fund" category.

Moreover, the undisputed evidence confirms the SEC's statements that ultra-short bond funds were not homogeneous in terms of their investment composition.  Some ultra-short bond funds invested almost exclusively in mortgage-backed securities or corporate bonds, while others invested purely in government securities.  ( *Id.* Ex 43 (p. 725).)  Other ultra-short bond funds' investment compositions, including YP's, placed somewhere between these two extremes.  (*Id.*)

Finally, YP disclosed every single security it held every three months and the percentages of the Fund's holdings by type, range of maturities and credit quality.  (*See, e.g.*, *id.* Ex. 44 (pp. 726-27), Ex. 33 (pp. 464-549); Ex. 42 at Nos. 21-86 (pp. 634-71).)  So, any investment differences from other ultra-short bond funds were fully and repeatedly disclosed.

In short, the only impression conveyed by the term "ultra-short bond fund" is Lipper's and Morningstar's classification.  Both categorized YP as an ultra-short bond fund.  So, characterizing YP as an ultra-short bond fund did not create a duty to disclose how YP differed from other ultra-short bond funds, and regardless, differences were fully disclosed.

Accordingly, the Court should enter summary judgment on the ultra-short bond fund statements in Rows 8, 9, 11, 13, 18, 34 in Schedule 1.

## VI.   YP's Comparisons to Money Market Funds Were Not Misleading.

The SEC alleges that statements comparing YP to money market funds were misleading

DEFENDANT KIMON P. DAIFOTIS'
MOTION FOR SUMMARY JUDGMENT
Civil Case No.: 11-cv-00137-WHA

1  because YP was riskier than money market funds and did not disclose such risks.  (Schedule 1,

2  Rows 2, 3, 4, 5.a, 34.)  The SEC is mistaken.  Schwab disclosed those risks, unequivocally and

3  repeatedly.

4        Schwab's public communications about YP uniformly disclosed, in no uncertain terms,

5  that YP was ***not*** a money market fund.  But it did not stop there; they included extensive

6  disclosures to make plain that YP was riskier than a money market fund.  The prospectus for

7  YP, the fund's offering document, stated this point in clear and specific terms:

8          The fund's investment strategy is designed to offer higher yields
        than a money market fund while seeking minimal changes in

9          share price. The fund is an ultra-short bond fund and ***is not a***

10          ***money market fund. The fund has a higher risk profile than a***
        ***money market fund (please see the Principal risks section) and,***

11          ***unlike a money market fund, its share price will fluctuate. As an***
        ***ultrashort bond fund, the fund is not subject to the maturity,***

12          ***credit or diversification limitations of a money market fund and***
        ***may invest in financial instruments that a money market fund***

13          ***may not purchase.***

14  (Bayless Decl. Ex. 45 (p. 733) (emphasis added).  *See also id*. Ex. 46 (p. 739) ("The fund's

15  investment strategy is designed to offer the potential for somewhat higher yields than a money

16  market fund, although unlike a money market fund, its share price will fluctuate."); Ex. 42 at

17  Nos. 91-93, 102-104, 113-115, 124-126 (pp. 673-88).)

18        YP's prospectus then set forth three pages of "Principal Risks" associated with the Fund,

19  including but not limited to, interest rate risk, investment risk, market risk, credit risk,

20  prepayment risk, investment style risk, and management risk.  (*See. e.g., id.* Ex. 45 (pp. 728-

21  36).)  And every other public communication about YP that compared the Fund to money

22  market funds either disclosed, again, that it was not a money market fund and that it was riskier,

23  and/or referred the investor to the prospectus which contained the extensive disclosures noted

24  above.  (*See, e.g.*, Bayless Decl. Exs. 17 (p. 248), 47 (pp. 740-42), 48 (pp. 743-50), 49 (pp. 751-

25  57), 50 (pp. 758-74).)

26        In the face of such unambiguous, consistent and repeated disclosures, no reasonable

27  investor could have been misled to believe that YP was no more risky than a money market

28  DEFENDANT KIMON P. DAIFOTIS'
MOTION FOR SUMMARY JUDGMENT
Civil Case No.: 11-cv-00137-WHA

     - 21 -

1    fund.  And no reasonable jury could so find.  The Court should, therefore, grant summary

2    judgment on the money market fund comparisons in Rows 2, 3, 4, 5.a, and 34 in Schedule 1.

3    **VII.     Schwab Accurately Disclosed in 2007 that One Purpose in YP Maintaining a
              Higher than Normal Cash Balance Was to Capitalize on Investment Opportunities.**
4

5                  Twice in 2007, once in September and again in November, Schwab represented that YP

6    maintained higher than normal cash balances for two purposes: to capitalize on investment

7    opportunities and to meet redemption requests.  (Schedule 1, Row 16 and 17.)  The SEC alleges

8    that these statements were fraudulent because, it claims, the only purpose for maintaining higher

9    than normal cash balances was to meet redemption requests.  (*See* FAC at ¶¶ 168-69.)

10                 The SEC's claim rests solely on a strained reading of the testimony of Mr. Merk (taken

11   during the SEC's investigation, not during this case), which the SEC interprets to mean that

12   Mr. Merk ordered the portfolio management team to stop buying bonds.  (*See id*.)  But

13   Mr. Merk's testimony, read as a whole, makes clear that purchasing opportunities were indeed

14   on his and YP's radar screen:

15                        Q: Did there come a time in the summer of 2007 when you
                         instructed the YP portfolio management team to stop buying
16                        securities, and only sell?

17                        A: I believe that's true.  ***I can't exactly recall a specific instance.***
                         But I know that the message I tried to continue to give to the team
18                        was, ***yes, we could have cash build up, and that could put us in a
                         position where at some point, if the market did turn around, we
19                        could go back on the offensive and start buying, because there
                         were going to be some real big bargains out there.***
20
     (Bayless Decl. Ex. 51 (pp. 775-77) at 311:7-16 (emphasis added).)  Mr. Merk's testimony
21
     demonstrates the truth, not the falsity, of the statements.  He is clear that he could not recall a
22
     specific instance of giving an order to stop purchasing bonds.  And he confirms that YP was
23
     building its cash position both to meet redemption requests and to take advantage of the "real
24
     big bargains out there."  (*Id.* )
25
                   It is also undisputed that Kim considered buying bonds to take advantage of the
26
     dislocation in the marketplace in 2007.  In an email dated August 6, 2007, Kim wrote Mr. Merk,
27

28   DEFENDANT KIMON P. DAIFOTIS'                        - 22 -
     MOTION FOR SUMMARY JUDGMENT
     Civil Case No.: 11-cv-00137-WHA

his boss, that while "[t]here is an understanding on the trading desk that long cash positions should be avoided . . . until the dust settles on future fund liquidity concerns. *At the same time when the PM's believe they have identified a dislocation in certain credits we believe it to be prudent by selectively adding certain risks to the fund.*" (*Id.* Ex. 52 (pp. 778-79) (emphasis added).)

And, significantly, it is undisputed that YP actually purchased securities in the Fall of 2007. (*See* Hastings Decl. ¶¶ 1-3.) None of the SEC's experts dispute this fact. Thus, YP did, in fact, use some of its accumulated cash to purchase new bonds for the portfolio.

Finally, the representations that YP was maintaining higher than normal cash balances to capitalize on investment opportunities and to meet redemption requests is a statement of intent or opinion, not assertions of fact. Such statements are not actionable unless they are shown to be "*both* objectively *and* subjectively false or misleading." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)); *see also In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) ("[S]tatements reflect[ing] merely that talks [about strategic alliances] are ongoing, and that Time Warner hopes that the talks will be successful" do not "constitute[] . . . affirmative misrepresentation[s].")

As shown above, the statements were objectively and subjectively true. Summary judgment should be granted on Rows 16 and 17 of Schedule 1.

**VIII.   YP Was a Highly Diversified Fund in March 2008.**

The SEC alleges that one statement in a March 10, 2008 letter to investors that Kim and Mr. Merk signed was false. (Schedule 1, Row 8.) The statement in its entirety says: "Even though YP is a highly diversified fund, it reflects the declines we have seen in non-Treasury securities, including mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations. The average credit rating of the YP holdings continues to be AA." (Bayless Decl. Ex. 54 (p. 783).) The SEC's only complaint about this statement is its labeling of YP as a "highly diversified" fund.

But the undisputed facts show that YP *was* a highly diversified fund.  Under Section 5(b) of the ICA, mutual funds are ***diversified*** if they invest—with respect to 75% of their total assets—not more than 5% of their total assets in the securities of any one company and in securities representing not more than 10% of the outstanding voting securities of any one company.  15 U.S.C. 80a-5(b).  The SAI for YP informed investors that "diversification" has a specific meaning under the ICA and recited the definition as set forth in Section 5(b).  (*See, e.g.*, Bayless Decl. Ex. 55 (pp. 784-85); Ex. 56 (pp. 786-87).)

CSIM also maintained a written internal policy regarding diversification, called "CSIM Operational Guidelines for Diversification," which conformed to this statutory requirement for diversified funds.  (*Id.* Ex. 22 (pp. 360-63) at 34:1-19; Ex. 57 (pp. 788-93).)  Indeed the SEC branch chief who led the SEC's 2006 examination of the Schwab Funds, including YP, testified that the definition of "diversified" fund in CSIM Operational Guidelines for Diversification conformed to her understanding of what it means for a mutual fund to be diversified, and that, when SEC examiners test for diversification, they would use this statutory definition.  (Bayless Decl. Ex. 40 (pp. 615-21) at 136:8-20, 138:7-139:9.)

When Schwab described YP as "diversified" in the March 10, 2008 letter, it was using the ICA's definition of that term.  Steven Schantz, an in-house lawyer assigned to Schwab's mutual funds, and a former SEC enforcement attorney, reviewed a draft of the March 10, 2008 letter and the specific disputed statement therein.  He testified that when Schwab publicly disclosed that YP is a diversified fund, it meant "that it was diversified in accordance with SEC requirements."  (Bayless Decl. Ex. 58 (pp. 794-97) at 78:2-7.)  Koji Felton, Schwab's Deputy General Counsel, and also a former SEC enforcement attorney, testified consistently with Mr. Schantz.  (Bayless Decl. Ex. 22 (pp. 360-63) at 34:1-36:6.)

Finally, it is undisputed that YP met this statutory definition of diversification as of March 10, 2008.  Mr. Schantz confirmed that YP met the legal test for "diversified" until at least the end of 2008.  (Bayless Decl. Ex. 58 (pp. 794-97) at 78:12-80:25.)  The SEC has never alleged otherwise.

DEFENDANT KIMON P. DAIFOTIS'
MOTION FOR SUMMARY JUDGMENT
Civil Case No.: 11-cv-00137-WHA

- 24 -

1        Accordingly, summary judgment should be granted on Row 8 in Schedule 1.

2    **IX.    The SEC's Scheme Liability Claims Have Been Dismissed.**

3        Counts I, II, IV and VI of the FAC allege primary and secondary liability against Kim

4    based on alleged fraudulent and deceptive "schemes."  However, this Court's Order of

5    October 7, 2011 noted that the SEC's scheme liability claims were dismissed by Order dated

6    June 6, 2011 and that the SEC "does not attempt to cure those claims in the FAC but, rather,

7    seeks to preserve them for appellate review."  *SEC v. Daifotis*, No. C 11-00137 WHA, Doc. No.

8    94 at 4 n.2 (N.D. Cal. Oct. 7, 2011).  Thus, the scheme liability claims are no longer in the

9    case.[12]

10                                    **CONCLUSION**

11        For these reasons, the Court should grant summary judgment as requested in this motion.

12

13                                            Respectfully submitted,

14    DATED:  May 3, 2012                     COVINGTON & BURLING LLP

15                                            By:    */s/ David B. Bayless*
                                                   _____
16                                                    DAVID B. BAYLESS

17                                            Attorneys for Defendant KIMON P. DAIFOTIS

18

19

20

21

22
     _____

23    [12] Because the SEC never confirmed whether it was or was not pursuing the scheme allegations
     despite the Court's order, Kim requests confirmation from the Court that the scheme allegations
24    have been dismissed.  In fact, the SEC has impliedly conceded that the scheme allegations are
     not part of the case by characterizing this suit as one that alleges misrepresentations and
25    misleading omissions only.  (SEC's Mot. for Summary Judgment, Doc. No. 117 at 1.)  If the
     Court were to reconsider and change its order and hold that scheme liability is still a part of the
26    case, Kim requests leave to file summary judgment on this claim.

27

28    DEFENDANT KIMON P. DAIFOTIS'                       - 25 -
     MOTION FOR SUMMARY JUDGMENT
     Civil Case No.: 11-cv-00137-WHA