1  David J. Gottesman (Trial Counsel) (Illinois Bar No. 6182719)
   (gottesmand@sec.gov)
2  Frederick L. Block (blockf@sec.gov)
   David Mendel
3  Robert A. Cohen (cohenr@sec.gov)
   Melissa R. Hodgman (hodgmanm@sec.gov)
4
   Attorneys for Plaintiff
5  SECURITIES AND EXCHANGE COMMISSION
   100 F Street, N.E.
6  Washington, DC 20549-4030
   Telephone:  (202) 551-4470 (Gottesman)
7  Facsimile:  (202) 772-9245 (Gottesman)

8                  UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
9                    SAN FRANCISCO DIVISION

10

11 SECURITIES AND EXCHANGE              Case No. CV-11-0137 WHA
   COMMISSION,
12
                                       PLAINTIFF SEC'S MEMORANDUM IN
13           Plaintiff,                 OPPOSITION TO DEFENDANT'S
                                       MOTION FOR SUMMARY
14      vs.                            JUDGMENT

15 KIMON P. DAIFOTIS and RANDALL MERK,  Date:       June 7, 2012
                                       Time:       2:00 p.m.
16           Defendants.               Judge:      Hon. William H. Alsup
                                       Courtroom:  8
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... v

INTRODUCTION ........................................................................................................................ 1

BACKGROUND FACTS ............................................................................................................ 1

ARGUMENT ................................................................................................................................. 3

I.      Summary Judgment Should Not Be Granted Where There Are
Genuine Issues of Material Fact ........................................................................... 3

II.     Daifotis Is Liable As a Primary Violator Under Rule 10b-5 as
Interpreted Under *Janus* ...................................................................................... 3

        A.      Daifotis Is Liable as the "Maker" of Statement Attributed to Him ....... 4

              1.      December 23, 2005 Website (Schedule 1, Row 11) ................................... 4

              2.      September 2005 Advertisement (Schedule 1, Row 13) ........................... 5

        B.      A Genuine Issue of Material Fact Exists Regarding Daifotis's
Presentations at Marketing Events ........................................................... 6

        C.      Daifotis Is Liable for Misrepresentations and Misleading Statements
He Communicated Through Other Schwab Personnel ........................... 7

              1.      The August 16, 2007 Conference Call (Schedule 1, Rows 4,
15 and 15.a) ................................................................................................... 8

              2.      Other Statements ........................................................................................ 11

III.    Daifotis Supplied Any Necessary Scienter for Violations That He
Aided and Abetted ................................................................................................... 12

IV.    Daifotis Remains Subject to Liability for Aiding and Abetting
Violations of the IAA ............................................................................................. 14

V.    Daifotis Properly Faces Liability for Violations of
      Sections 34(b) and 48(a) of the ICA (Counts VII and VIII)............................................. 15

      A.    Daifotis Properly Faces Liability Under Section 34(b) For Making
            False Statements......................................................................... 15

      B.    Daifotis Properly Faces Liability Under Section 48(a) For Causing
            Others to Make False Statements.................................................. 16

VI.   In Touting YP's Minimal Subprime Holdings, It Was Misleading To Not
      Disclose That YP Held a Significant Amount of Similarly Risky Alt-A
      Securities.................................................................................................... 16

      A.    Subprime and Alt-A Were Similarly Risky ........................................ 17

      B.    By Undertaking to Tout Low Subprime Levels, Daifotis and YP
            Were Under a Duty to Disclose YP's Substantial Alt-A Holdings,
            In Order to Avoid Misleading By Omission..................................... 18

VII.  Statements Representing YP as an Ultra-Short Bond Fund Were Misleading ................ 19

VIII. Daifotis Misled by Characterizing YP as Being Almost Like a Money
      Market Fund .................................................................................................. 22

IX.   Daifotis Mischaracterized the Reasons Why YP Was Holding Cash ............................. 23

X.    Daifotis Misled By His Representations That YP Was "Highly Diversified".................. 24

XI.   The Scheme Liability Claims Are Asserted to Preserve Them for Possible Appeal........ 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 3

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) ........................ 21, 22, 23

*In re Apple Computer, Inc. Sec. Litig.,* 243 F. Supp. 2d 1012 (N.D. Cal. 2002) .............. 13

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ........................................ 3, 7

*Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955 (7th Cir. 1995) .............................. 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 3

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997)............................................................. 8, 9

*Glazer Capital Mgt, LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008)................................... 14

*Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL
   3862206 (N.D. Ohio Sept. 1, 2011) ............................................................................ 10

*Janus Capital Group v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) ............................................... 3, 4, 5, 9, 10, 11, 12, 13

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008) .................................... 18, 21, 22

*In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947 (D. Minn. 2009) .............. 19

*Nordstrom Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424 (9th Cir. 1995) ........................ 13, 14

*In re Peoplesoft, Inc.*, No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal.
   May 25, 2000)............................................................................................................ 8, 9

*SEC v. C.R. Richmond & Co.*, 565 F.2d 1101 (9th Cir. 1977)......................................... 18

*SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822-WHA, 2011 WL
   5871020 (N.D. Cal. Nov. 22, 2011)............................................................................. 3

*SEC v. Pentagon Capital Mgt. PLC*, No. 08 Civ. 3324, 2012 WL 479576
   (S.D.N.Y. Feb. 14, 2012) ........................................................................................... 3

*SEC v. Sentinel Mgt. Group, Inc.*, No. 07 C 4684, 2012 WL 1079961 (N.D. Ill.
   Mar. 30, 2012)............................................................................................................ 3

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) .......................................................... 12

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir.
   2004) ..................................................................................................................... 13, 14

*United States v. Skilling*, 638 F.3d 480 (5th Cir. 2011) .................................................. 10

*Van Asdale v. Int'l Game Technology*, 577 F.3d 989 (9th Cir. 2009)............................... 17

*Vissuet v. Indymac Mortg. Services*, No. 09-cv-2321-IEG (CAB), 2010 WL 2612153 (S.D. Cal. Jun. 29, 2010) ............................................................... 17

*Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996) ..................................... 7, 9

*Webster v. Omnitrition Intern., Inc.*, 79 F.3d 776 (9th Cir. 1996) ............................ 23, 24

*In re Worldcom, Inc. Secs. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ........................ 13

**STATUTES**

Federal Rules of Civil Procedure

    Rule 56(c) ........................................................................................................ 3

Investment Company Act of 1940

    Section 5(b) [15 U.S.C. § 80a-5(b)] ............................................................. 24

    Section 34(b) [15 U.S.C. § 80a-33(b)] ........................................................ 15

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether a genuine issue of material fact exists over whether Defendant Kimon P. Daifotis ("Daifotis") may be liable under Count I (primary liability under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act")), Count III (primary violations of Section 17(a) of the Securities Act of 1933 ("Securities Act")), and Count VII (primary violation of Section 34(b) of the Investment Company Act of 1940 ("ICA")) where substantial evidence shows that Daifotis committed actions triggering liability under the respective legal requirements for liability under each of those securities laws.

2.     Whether a genuine issue of material fact exists over whether Daifotis may be liable for misstatements at events at which, according to substantial evidence in the case, Daifotis made presentations which included statements that were misrepresentations or omissions of material fact.

3.     Whether a genuine issue of material fact exists over whether Daifotis may be liable for statements that Daifotis knowingly and purposely communicated to investors through lower-level Schwab personnel, including but not necessarily limited to statements that such personnel attributed to Daifotis by name when relaying the information.

4.     Whether a genuine issue of material fact exists over whether Daifotis could be held liable for aiding and abetting primary violations by Schwab, where Daifotis supplied the requisite scienter.

5.     Whether the SEC may maintain its Count VI (aiding and abetting violation of Section 206(4) and Rule 206(4)-8 under the Investment Advisers Act of 1940 ("IAA")) against Daifotis, where the SEC alleges primary violations by Schwab, and alleges that Daifotis aided and abetted those violations.

6.     Whether a genuine issue of material fact exists over whether Daifotis violated Section 34(b) of the ICA where substantial evidence shows that Daifotis made misrepresentations or misleading omissions of material fact in materials that were filed, transmitted or kept under the ICA.

7.      Whether a genuine issue of material fact exists over whether Daifotis violated Section 48(a) of the ICA where substantial evidence shows that Daifotis caused to be done, through Schwab or its personnel, the filing, transmission or keeping of documents that contained untrue or misleading statements of material fact.

8.      Whether a genuine issue of material fact exists over whether Daifotis may be liable for non-disclosure of the YieldPlus Fund's holdings of risky securities backed by "Alt-A" mortgages, where substantial evidence indicates that such information was a material fact, the omission of which made Daifotis's other statements misleading, and that therefore, his failure to disclose such information violated the anti-fraud provisions of the federal securities laws.

9.      Whether a genuine issue of material fact exists over whether Daifotis is liable for securities law violations for statements representing that YP was an ultra-short bond fund and had minimal risks, when his statements were materially false and misleading because in fact YP did not have certain key characteristics of an ultrashort bond fund and was significantly riskier, in material ways that were not disclosed.

10.      Whether a genuine issue of material fact exists over whether Daifotis is liable for securities law violations for representing that YP was only slightly riskier than a money market fund, or otherwise was comparable to a money-market fund in its risks and characteristics, when his statements were materially false and misleading because YP was significantly riskier than a money market fund and was not comparable to a money market fund in crucial ways.

11.      Whether a genuine issue of material fact exists over whether Daifotis is liable for securities law violations for a statement that one of two reasons why YP was maintaining a higher cash balance was to capitalize on investment opportunities, when substantial evidence shows that at the time of the statement, YP was maintaining its cash to meet redemption requests, rather than to capitalize on buying opportunities.

12.      Whether a genuine issue of material fact exists over whether Daifotis is liable for securities law violations for a March 10, 2008 statement representing that YP was

"highly diversified," where substantial evidence shows that YP was concentrated in certain types of high-risk securities, and was not "diversified" in any way that would address those risks.

Plaintiff United States Securities and Exchange Commission ("SEC") states the following in opposition to the Motion for Summary Judgment and Memorandum in Support ("Motion" or "Mo.") filed by Defendant Kimon P. Daifotis ("Daifotis").

## INTRODUCTION

Daifotis's Motion challenges only some of the SEC's allegations in this case. But, as the exhibits[1] and authorities cited below show, the evidence in the record establishes that there are genuine issues of material fact and Daifotis is not entitled to judgment as a matter of law.

## BACKGROUND FACTS

Daifotis was a Senior Vice President and the Chief Investment Officer of Fixed Income at Charles Schwab Investment Management, Inc. ("CSIM"), a subsidiary of Charles Schwab Corporation. YP was a mutual fund distributed by Charles Schwab & Co. ("CS & Co."), another Schwab entity. CSIM was the investment advisor for YP, and CS&Co. also provided advisory services. CS&Co. and CSIM are referred to herein collectively as "Schwab."

In discovery, the SEC identified Daifotis's misrepresentations and omissions of material fact. Those are included primarily on a "Schedule 1 (revised 3/14/2012)"[2] and a few additional specific statements or misleading omissions are identified in the March 30, 2012 report of Gifford Fong ("Fong Report") (S/J Ex. 1),[3] the SEC's expert witness on, among other things, investment management and risk analysis of fixed income investments.[4] The SEC alleges primary liability of Daifotis for those misrepresentations and misleading

---

[1] The SEC has filed herewith applicable declarations and relevant exhibits, marked as "S/J Ex. __." Where those exhibits have been given exhibit numbers that were used in depositions and/or which may be used at trial, the additional designation "Trial Ex. __" also is included.

[2] Schedule 1 is at the back of S/J Ex. 2.

[3] *See* Declaration of H. Gifford Fong and Fong's report dated March 30, 2012) (S/J Ex. 1).

[4] See S/J Ex. 2 (SEC's Fourth Amended and Supplemental Responses to Defendant Daifotis's First Set of Interrogatories).

statements. Alternatively, if and to the extent that Daifotis is found not to have primary liability, then the SEC alleges that Schwab committed the primary violations and Daifotis is secondarily liable under aiding-and-abetting or other secondary liability provisions of the securities laws.

Some of the secondary liability claims require scienter, but others do not. With regard to those secondary liability provisions that require scienter, the SEC alleges that Daifotis had the requisite scienter to establish a primary violation on the part of Schwab.

As discussed below, the evidence reveals that Daifotis personally made numerous misrepresentations and misleading omissions of material fact about YP in a variety of settings from 2005 to 2008. For example, as discussed below, Daifotis characterized YP as a safe, stable investment, with minimal risk, similar to traditional cash investments such as money market funds. In fact, his statements were false and misleading because YP held a portfolio of securities that bore substantial risks in certain key respects, far beyond any risks disclosed. *See* Section VII below. Daifotis indicated that, as an ultrashort bond fund, YP was an "alternative" to money market funds and held assets "just outside the approved limits of money funds." Those statements also were false and misleading. *See* Section VIII below.

When YP's value began to decline in the summer of 2007, and investors began withdrawing their funds (i.e., "redemptions"), Daifotis continued his dissembling. Within the first two weeks of August 2007, redemptions approached and then topped ***$1 billion*** (over 10% of the fund) – which was unprecedented for YP. Daifotis wrote an email to another Schwab employee, stating, "I don't want anyone to sense that we are having outflows." S/J Ex. 30 (Trial Ex. 429); S/J Ex. 4 (Daifotis Dep. at 412 & 414-415). When asked in conference calls on August 14 and 16, 2007 how high redemptions were, Daifotis falsely stated that they were "very, very, very slight" or "minimal." S/J Exs. 19, 21 (Trial Exs. 22 & 26).[5] These are

---

[5] Daifotis's Motion does not seek judgment regarding the statements made in the August 14 call, only the August 16 call, and even then only on the limited basis described in Section II.C.1. below.

just examples.  Daifotis made false and misleading statements about many other aspects of
YP.  *See* Schedule 1 and S/J Ex. 1 (Fong Report).

## ARGUMENT

**I.      Summary Judgment Should Not Be Granted
         Where There Are Genuine Issues of Material Fact**

Summary judgment should not be granted unless there "is no genuine issue as to any
material fact" and the moving party is "entitled to a judgment as a matter of law." Fed. Rule
Civ. Proc. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Credibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences from the facts are jury functions, not those
of a judge."  *Blankenhorn v. City of Orange,* 485 F.3d 463, 470 (9th Cir. 2007) (quoting
*Anderson,* 477 U.S. at 255).  All justifiable inferences must be drawn in the non-movant's
favor, and summary judgment must be denied if any rational trier of fact could resolve an
issue in the non-movant's favor.  *Id.*

**II.     Daifotis Is Liable As a Primary Violator Under
         Rule 10b-5(b) as Interpreted Under *Janus***

This Court previously held that the rule of *Janus Capital Group v. First Derivative
Traders,* 131 S. Ct. 2296 (2011), applies only to claims under Exchange Act Section 10(b)
and Rule 10b-5(b) (collectively, "Rule 10b-5(b)"), i.e., Count I, but not to any of the other
claims.[6]  *See* Order entered Aug. 1, 2011 (Dkt. No. 74) at 7-9.  In *Janus,* the Court held that
for purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate
authority over the statement, including its content and whether and how to communicate it."
*Janus*, 131 S. Ct. at 2302.  The Court further stated that, "in the ordinary case, ***attribution
within a statement*** or implicit from surrounding circumstances is strong evidence that a

---

[6]  Most courts that have addressed the issue agreed with this Court's ruling.  *See, e.g.,
SEC v. Sentinel Mgt. Group, Inc.,* No. 07 C 4684, 2012 WL 1079961, at *15 (N.D. Ill. Mar.
30, 2012); *SEC v. Pentagon Capital Mgt. PLC,* No. 08 Civ. 3324, 2012 WL 479576, at *42
(S.D.N.Y. Feb. 14, 2012); *SEC v. Mercury Interactive, LLC,* No. 5:07-cv-02822-WHA, 2011
WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) (Fogel, J.).

statement was made by – and only by – the party to whom it is attributed." *Id.* at 2302 (emphasis added). Those principles support holding Daifotis primarily liable under Rule 10b-5(b) for the misrepresentations and misleading omissions alleged.

### A.   Daifotis Is Liable as the "Maker" of Statements Attributed to Him

Of the numerous misleading statements that the SEC alleges, Daifotis identifies only four (three specific statements and one group of statements) with regard to which he contends that the evidence is insufficient to show his making or involvement. In the interest of streamlining the case further, the SEC agrees that it will not contend that Daifotis is liable for two of those particular items, i.e., the June 30, 2007 internal website item (Schedule 1, Row 9) and a May 2005 ad (Schedule 1, Row 34). With regard to the remaining items identified in Daifotis's Motion, substantial evidence shows that Daifotis was the maker and otherwise participated in making those statements, including the December 23, 2005 Website (Schedule 1, Row 11) and the September 2005 Advertisement (Schedule 1, Row 13)).

### 1.   December 23, 2005 Website (Schedule 1, Row 11)

S/J Ex. 25 (Trial Ex. 31) is a page from the Schwab internal website that, as discussed below, was available not just to Schwab personnel, but also to outside institutional investors and investment advisors. The page directly quotes Daifotis, stating,

> "With exceptional performance, the Schwab YieldPlus Fund may be a smart cash alternative for our clients in the current rising-rate environment, providing enhanced yield potential over money market funds," ***said Kim Daifotis,*** senior vice president and chief investment officer for fixed income with Schwab Funds.

(Emphasis added). The statement thus attributes itself to Daifotis by name. Under *Janus,* "***attribution within [this] statement … is strong evidence*** that [the] statement was made by" Daifotis. 131 S. Ct. at 2302 (emphasis added). That "strong evidence" by itself is enough to defeat summary judgment.

Daifotis argues that "there is no evidence that [he] saw the contents of this webpage before it was published" and that a certain file folder at Schwab lacked documents showing his involvement. Mo. at 6-7. But those are not the standards. First, as discussed above, the

statement's attribution to Daifotis (quoting him verbatim) is "strong evidence" under *Janus* that Daifotis made the statement.  On that basis alone, Daifotis's motion for summary judgment should be denied as to this item.  Second, the quoted statement is just a re-publication of the quotation appearing in the September 2005 advertisement discussed below. Substantial evidence shows Daifotis's involvement in that ad, so he is liable as well for the re-publication of his quote in the December 23, 2005 website.

## 2.   September 2005 Advertisement (Schedule 1, Row 13)

S/J Ex. 13 (Trial Ex. 2) is a September 2005 advertisement, which also directly quotes Daifotis, placing his statement within quotation marks, next to his picture and above his name and title:

> "With consistent, exceptional performance, [YP] is a smart cash alternative for your clients in the current rising-rate market, providing enhanced yield potential over money market funds."   *Kim Daifotis, Senior Vice President and Chief Investment Officer, Schwab Funds, Fixed Income.*

Daifotis's only alleged basis for summary judgment is his generalized assertion that he did not give the quote and "did not recall" seeing the ad.   Mo. at 6.  But ample evidence establishes at least a genuine issue of material fact about his making the statement.  First, because the quote is attributed to Daifotis by name, it is "strong evidence" (*Janus,* 131 S. Ct. at 2302) that Daifotis made it.

Second, product management employee Keith Maddock wrote a December 1, 2006 email attaching a copy of the ad, and stating that it was an ad that "Kim [Daifotis] liked and was very involved with in creating." S/J Ex. 31 (Trial Ex. 440).  In his deposition, Maddock stated that he no longer recalled what had occurred, but he confirmed that he wrote that email, when the events were fresher in his mind.  S/J Ex. 9 (Maddock Dep. at 316-320).

Third, when Daifotis was confronted with that email in his deposition, Daifotis stated, "I'm sure that I discussed this ad with him [Maddock]." S/J Ex. 4 (Daifotis Dep. at 531 & 529-530). Because the ad quotes Daifotis, and Daifotis admitted having discussed it with

1   other Schwab personnel, Daifotis cannot now deny that the quote is his.   Accordingly,

2   Daifotis cannot obtain summary judgment on that point.

3

4

5

6   **B.   A Genuine Issue of Material Fact Exists Regarding
        Daifotis's Presentations at Marketing Events**

7   The record contains ample evidence that Daifotis travelled around the country making

8   presentations about YP, including making misrepresentations and omissions of material fact.

9   Daifotis admits that he made oral presentations to independent investment advisors and

10  others, that he showed slides, and he spoke "off the slides."[7]  Daifotis had a standard form of

11  presentation (slides) he would make.  *See* S/J Ex. 6 (Jen Hafner Dep. at 166-167 (identifying

12  Trial Ex. 290 as similar in type and format to other presentations that Daifotis made)).

13  Daifotis also admitted that he travelled to the locations listed in paragraph 83 of the FAC.

14  *See* paragraph 83 of Daifotis's Answer (Dkt. No. 99).

15  At least several of Daifotis's presentations have been documented specifically, and

16  Daifotis's Motion does not challenge those.  For example, Schedule 1, Row 5.a. (not

17  challenged in Daifotis's Motion) lists a presentation by Daifotis on September 13 or 14, 2006

18  at a symposium of the Colorado Financial Planning Association ("FPA") in Denver,

19  Colorado.[8]  *See* Daifotis Dep. at 288-289 (admitting that Trial Ex. 278-A (S/J Ex. 26)

20  includes what appears to be the presentation he made).  The presentation materials included a

21  discussion about ultrashort bond funds (on Bates Nos. SCH1758739 – 8741), asserting (on

22  _____

23      [7] S/J Ex. 4 (Daifotis Dep. at 237 (recalls making presentations), 238 (presentations
    primarily were to registered investment advisors, or sometimes small retail gatherings, and to

24  retail bond specialists; his presentations included showing slides), 239 (he was involved in
    making some of the slides), 303 (spoke off of the slides in presentations)).

25
        [8] S/J Ex. 4 (Daifotis Dep.) at 278 (admitting it is "highly likely" that he spoke there),

26  282-283 (admitting emails indicate that he made a presentation); *see also* pages 273-274
    (identifying Trial Exs. 271 & 272, which includes an email chain in which Daifotis accepts

27  the invitation to speak at the event), 276-277 (identifying Trial Ex. 274, which includes a
    brochure regarding the FPA event); Daifotis Dep. at 283 identifying Trial Ex. 277 (9/11/06

28  email indicates that up to 125 financial advisors may attend)).

SCH1758739) that they have an average maturity of 91-365 days, and then (on the next page, SCH1758740) describing YP as an ultrashort bond fund, thus indicating that YP had that characteristic, which as discussed below, was false.

Similarly, Schedule 1, Row 6 lists a Daifotis presentation about topics including YP in Denver in March 2007.  See S/J Ex. 4 (Daifotis Dep.) at 255 (identifying the slides in Trial Ex. 19 as the March 21, 2007 presentation he made), S/J Ex. 28 (Trial Ex. 293) (3/23/07 email to Daifotis enclosing his presentation entitled "Denver FI Presentation"), S/J Ex. 27 (Trial Ex. 291 (3/22/07 email from Andrea Halko to attendees, thanking them for their "participation today at Kim Daifotis's presentation on the Fixed Income Outlook")). Daifotis's presentation included a section on YP (S/J Ex. 27 (Trial Ex. 291) at Bates No. SCHP15333907 *et seq*.), and misleadingly referred to YP as among "long-term cash alternatives, such as a money-market fund."  Daifotis made multiple presentations in his trip to Denver, some to financial consultants, and some to clients.  S/J Ex. 7 (Halko Dep.) at 56-57).  Daifotis also made a presentation in Seattle on May 22, 2007.  *See* S/J Ex. 29 (Trial Ex. 297 (4/2/07 emails with Daifotis, documenting his presentation in Seattle on May 22, 2007)).

Daifotis argues that the four sets of slides identified in Schedule 1, Row 5 do not necessarily match the dates of presentations listed in paragraph 83 of the First Amended Complaint.  But those slides are just examples of Daifotis's presentations at various times.

Because the evidence described above establishes that Daifotis routinely made presentations about YP – with specific presentations documented and proven – the jury could reasonably infer that Daifotis made similar presentations at other times.  *See Blankenhorn,* 485 F.3d at 470 ("weighing of the evidence, and the drawing of "legitimate inferences from the facts are jury functions").

### C.   Daifotis Is Liable for Misrepresentations and Misleading Statements He Communicated Through Other Schwab Personnel

Section I.C. of Daifotis's Motion asserts that Daifotis made certain statements only to Schwab employees, and that no liability can attach because, he asserts, they were not "made to the investing public."  But the Ninth Circuit has held that a defendant "cannot escape

liability simply because it carried out its alleged fraud through the public statements of third parties." *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir. 1996) (defendant liable for statements by existing investors where the defendant had supplied them with the false information); *see also Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir. 1997) (defendant liable when he "made false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market"). As this Court stated in *In re Peoplesoft, Inc.,* No. C 99-00472 WHA, 2000 WL 1737936, at *4 (N.D. Cal. May 25, 2000), it is sufficient that "defendants made the statements *to analysts* with the intent, as here, that analysts communicate them to the market. Analysts have such clear and immediate influence on the stock market that, under the fraud-on-the-market theory approved by the Supreme Court, misleading the analysts is tantamount to misleading the market." (internal citation omitted). If statements to analysts are sufficient, then statements by a senior corporate officer such as Daifotis to lower-level employees, made with the intent that they would communicate these to the public, is sufficient.

### 1.    The August 16, 2007 Conference Call
### (Schedule 1, Rows 4, 15 and 15.a.)

Daifotis argues that his August 16, 2007 conference call was solely with Schwab employees, so any statements he made were not made to the investing public and, therefore, are not actionable. The August 16 call was a pre-arranged conference call in which Daifotis spoke to approximately 350 Schwab financial consultants or other personnel.[9] S/J Ex. 21 (Trial Ex. 26) is a transcript of the call. S/J Ex. 4 (Daifotis Dep.) at 458. Daifotis began the call by stating:

> I will try to make this call as efficient as possible so everybody can get back to their clients and respond to them with any questions that they might have. ***So today's call is essentially meant to provide you with some sounding points to provide your clients*** with regards to what's going on in the fixed income market, ***and also what's going on in particular with the yield plus fund.***

---

[9] Daifotis Dep. at 459-460 (the call included financial consultants, sales personnel and traders). Decl. of Jennifer Ordelt, para. 3.

S/J Ex. 21 (Trial Ex. 26) at 1-2 (emphasis added.)

During the August 16 call, a participant asked Daifotis about the level of net outflows (i.e., redemptions), to which Daifotis responded, "[i]t's not that much. . . . ***So outflows have been minimal***." *Id.* (Trial Ex. 26) at 10; S/J Ex. 4 (Daifotis Dep.) at 464 (emphasis added). This was false because redemptions topped $1 billion by that time.

Daifotis's Motion argues that because this statement was made to Schwab employees, it was not made to the "public," and therefore is not actionable. He is mistaken for several reasons. First, Daifotis is liable for making the statement to more junior employees because Daifotis intended and directed that they communicate the statements to the public. *See, e.g., Cooper v. Pickett,* 137 F.3d 616 at 624; *Warshaw v. Xoma Corp.,* 74 F.3d 955 at 959; *In re Peoplesoft, Inc.,* 2000 WL 1737936, at *4.

Daifotis's statement during the call, quoted above, proves that he intended and directed that his statements would be communicated to the investing public, i.e., the Schwab financial consultants' clients. Moreover, Daifotis conceded that his conference calls in August 2007 were for the purpose of giving investment advisors and financial consultants information to disseminate to their respective clients. S/J Ex. 4 (Daifotis Dep.) at 339-340.

Daifotis relies on *Janus,* (Mo. at 9), but the *Janus* Court specifically declined to rule on the question of what constitutes making statements to the public. " 131 S. Ct. at 2304 n.9. ("We do not address whether and in what circumstances statements would qualify as 'public.'"). Indeed, the Court cited, but did not overrule or criticize, caselaw holding officials liable for statements made to third parties such as analysts, including *Cooper v. Pickett,* 137 F.3d at 623-24 (discussed *supra*). *See Janus,* 131 S.Ct. at 2304 n.9.

Moreover, Daifotis incorrectly cites *Janus,* 131 S. Ct. at 2302, as support for the argument that only the Schwab representatives had ultimate authority over what they said, akin to the example in *Janus* of a speechmaker having control over his speech. But a mere speechwriter does not purport to be the person with authority to deliver the content of the speech, and does not write the speech expressly or implicitly for attribution to himself. Thus the speechwriter is not the maker. Daifotis, in contrast, delivered the content of his comments

as his own words that he attributed to no one but himself – he thus was the maker when he spoke those words in the August 16 call.

Also, a speechwriter is not senior to the speechmaker, and does not purport to direct the speechmaker over what he is allowed to say.  Daifotis, however, was a senior Schwab official, holding a formal conference call with lower-level employees.  He instructed them that the call was to provide them with "points to provide your clients."  Daifotis thus exercised ultimate authority over the statements he made, with the intent and the direction that his comments be relayed by lower level employees to the investors.  In short, the facts and circumstances indicate that Daifotis was using the financial consultants on the call as mere conduits to transmit his statements to the public.

These facts make this case completely different from the cases Daifotis cites.  Motion at 9.  In *Hawaii Ironworkers Annuity Trust Fund v. Cole,* No. 3:10CV371, 2011 WL 3862206, at *5 & n.4 (N.D. Ohio Sept. 1, 2011), the defendants were subordinates, who merely provided information to the corporate office pursuant to a "mandatory directive" from top management officials regarding what the content would be, and those more senior officials made "necessary adjustments" to the information before it was used in statements to the public.  Thus, the defendants did not have authority over what was communicated.  *Id.* In *United States v. Skilling,* 638 F.3d 480, 484 n.4 (5th Cir. 2011), the defendant communicated information to the board of directors, with no indication that it was to be transmitted outside of the company.  That also is entirely different from Daifotis as a senior officer providing information to lower-level personnel with instructions that they pass the information to investors.

A second reason why Daifotis is liable under Rule 10b-5(b) for his comments in the August 16 call  is that, even if *Janus* were read to require attribution to Daifotis in order for him to be liable, such attribution occurred.  The particular financial consultant who asked Daifotis about redemptions in the August 16 call later called one of his clients and relayed Daifotis's false statement about redemptions, and ***expressly attributed the remark to Daifotis by name***.  S/J Ex. 32 (Trial Ex. 473) is a transcript of a recording of a subsequent phone call

between financial consultant Joe Minarik, who was the financial consultant on the August 16 call who asked Daifotis about redemptions, and one of Minariks' clients who was an investor in YP.  S/J Ex. 10 (Minarik Dep. at 113-115).  In that call, Minarik told the investor:

> "And what we really have to be concerned about, is what have the outflows been on the fund.  And surprisingly – **and this – Ken (sic) Daifotis,** who is the head of Schwab Investment Management, said he was very surprised, **and he said the redemptions were negligible on the fund."**

(Emphasis added.)  *Id.*. Minarik Dep. at 131-133.  Minarik testified that this was based on Daifotis's comment in the August 16 call.  *Id.* at 133-135.  This shows that Daifotis's misrepresentation was publicly communicated, with specific attribution to Daifotis.  This attribution to Daifotis is more "strong evidence" under *Janus* that Daifotis was the maker.

Third, ample evidence indicate that many of the Schwab financial consultants who were on the August 16 call were themselves investors in YieldPlus.  *See* Decl. of Jennifer Ordelt, paras. 5 & 7 (comparing attendee list to list of YP investors).   All of them had the option of investing in YP if they chose to do so.  Thus, Daifotis's statements to them **were** statements to investors.

### 2.   Other Statements

Daifotis erroneously argues that several other statements should not be deemed made to the public.[10]  Daifotis points to the December 23, 2005 material on the Schwab website (S/J Ex. 25 (Trial Ex. 31) (Schedule 1, Row 11)).  Schwab's Tina Ritko identified a copy of that item (*see* S/J Ex. 11 (Ritko Dep. at 98, identifying Trial Ex. 101-6)) as having been posted on the "Schwab Institutional" website.  Ritko Dep. at 103 & 98-102.  Ritko explained that the Schwab Institutional website was accessible to institutional investment advisors (*id.* at 145), which includes independent advisors who are not employees of Schwab (*id.* at 200-201).  Thus, the December 23, 2005 item was not only shown to Schwab employees but also to the public.

---

[10]  As indicated above, in the interest of streamlining the case, the SEC will not contend that the June 30, 2007 "commentary" (Schedule 1, Row 9) is a misrepresentation by Daifotis.

Daifotis argues over whether some of his oral presentations about YP were to Schwab employees, not outsiders.  But as shown above, Daifotis made presentations to outside investment advisors and clients.  *See, e.g.,* S/J Ex. 26 (Trial Ex. 278-A), discussed above. And even Daifotis's presentations to Schwab employees were for the purpose of having them transmit information to investors, just as he did in the August 16, 2007 call discussed above. One again, he was using Schwab personnel as conduits to the public.

### III.   Daifotis Supplied Any Necessary Scienter for Violations That He Aided and Abetted

The SEC alleges that, in the unlikely event that Daifotis is found not to have **primary** liability for violations under Rule 10b-5 (*e.g.,* if under *Janus,* Daifotis were not deemed the "maker" of a statement) then Schwab was the primary violator and Daifotis aided and abetted the violations.[11]  Daifotis argues that the SEC's aiding-and-abetting claim cannot stand unless someone at Schwab other than Daifotis possessed the scienter necessary for a primary violation.  Daifotis errs in several respects.

First, the only aiding-and-abetting claim that requires scienter (i.e., at least recklessness) for the underlying primary violation is Count II, involving Rule 10b-5.  Count VI involves aiding and abetting a primary violation of IAA Section 206(4) and Rule 206(4)-8, which do not have a scienter or state of mind element.  *SEC v. Steadman,* 967 F.2d 636, 647 (D.C. Cir. 1992).

Second, Daifotis misinterprets the nature of the SEC's claim.  Daifotis argues that, to maintain its aiding and abetting claim, "the SEC must prove that [Daifotis] aided and abetted himself."  That is not so.  The aiding and abetting claim would be in play *if* Daifotis were found not to have committed the primary violation of Rule 10b-5 because, for example, Schwab rather than Daifotis were found to have been the "maker" of a false statement.   If that occurs, then the Daifotis aided and abetted **Schwab's** violation, not his own.

---

[11]   As noted below, the aiding-and-abetting claim in Count VI (regarding the IAA) does not require scienter, so Daifotis's argument is not relevant to that claim.

Third, the law does not prevent Daifotis from having supplied the scienter necessary for Schwab's violation in that situation. Daifotis argues that "the SEC must prove that the individual who made the alleged misstatement possessed the scienter required for a primary violation." Daifotis cites an out-of-circuit case, *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir. 2004). Even if that case supplied the correct rule, Daifotis omits crucial language from that case that thoroughly undercuts his position. The *Southland* decision states:

> For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (*or order or approve it or its making or issuance, or who furnish information or language for inclusion therein or the like*).

*Id.* (emphasis added).

Thus, even if under *Janus,* one who only furnishes information for a statement is not its "maker," *Southland* would still permit that person to supply the necessary state of mind. In the present case, even if Daifotis were not deemed the "maker" of a statement because of the rule in *Janus,* he still would have been the person who, for example, approved it or furnished information for it "or the like," and thus his scienter would be sufficient to establish liability on the part of Schwab, even under the principle stated in *Southland*.

Moreover, *Southland* was addressing a different legal point than the principle at issue here. *Southland* was addressing whether the doctrine of "collective scienter" applies.[12] But "collective scienter" is not the operative principle in this case. It is not necessary to find that various Schwab personnel had separate pieces of information, the aggregate of which amounted to an organization's "collective" scienter.[13] Rather, the SEC has identified one

---

[12] "Collective scienter" is the combination of multiple individual's knowledge into a single corporate fraudulent intent. *See e.g., Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995). *See In re Worldcom, Inc. Secs. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("Proof of a corporation's collective knowledge and intent is sufficient.").

[13] Also, even if it were necessary to apply the doctrine of collective scienter, *Southland* erroneously suggested that the doctrine does not exist in the Ninth Circuit. *Southland* and Daifotis cite *Nordstrom Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424 (9th Cir. 1995), and *In re Apple Computer, Inc. Sec. Litig.,* 243 F. Supp. 1012, 1023 (N.D. Cal. 2002), for the proposition that a

official – Daifotis –  who had the scienter.

Under Daifotis's analysis, if a fraudster deliberately provided false information for another corporate official to report to the public, no one would be liable.  The reporting official and the company would be the "maker" but would lack scienter, and the person with scienter would not be a "maker."  Thus, there would be no primary or aiding-and-abetting liability under Rule 10b-5.  This would eviscerate the concept of aiding-and-abetting liability.

For purposes of the aiding-and-abetting claim in Count II, Daifotis supplies the necessary scienter for the predicate primary violation of Rule 10b-5 if Schwab, rather than Daifotis, were the "maker" of the misleading statements.  In sum, Daifotis has not shown that he is entitled to summary judgment with regard to the aiding-and-abetting claims.

## IV. Daifotis Remains Subject to Liability for <u>Aiding and Abetting Violations of the IAA</u>

Daifotis erroneously argues that the SEC no longer alleges primary violations of the IAA, and therefore, he cannot be liable for aiding and abetting such violations.  Daifotis misreads the SEC's discovery responses.  The SEC's answer to Interrogatory No. 2 (*see* David Bayless Declaration, Ex. 7 at No. 2 (pp. 137-138)) specifies that the SEC alleges that Daifotis is liable for "aiding and abetting . . . Section 206(4) [15 U.S.C. § 80b-6(4)] of the Advisers Act and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8 eff. Sept. 10, 2007]."  The SEC's response to Interrogatory No. 4 (*see* Bayless Decl., Ex. 7 at No. 4 (pp. 162-163)) states that "[i]f Daifotis were found not to be the primary violator with regard to any of the statements listed on Schedule 1 (revised 3/14/2012), ***then the primary violators were Schwab Investments and/or Charles Schwab & Co.*** ("CS&Co.")." (Emphasis added.)   Thus, contrary

---

corporation only has scienter if the individual corporate officer making the statement has scienter, and that there can be no "collective scienter." The Ninth Circuit later clarified that *Nordstrom* should not be interpreted the way that *Southland* read it.  In *Glazer Capital Mgt, LP v. Magistri,* 549 F.3d 736, 744 (9th Cir. 2008), the Ninth Circuit held that the *In re Apple* court had "overstated" Ninth Circuit law in interpreting *Nordstrom,* and the Ninth Circuit left open the possibility that "in some circumstances, it might be possible to plead scienter under a collective theory."  *Id.* at 475.

to Daifotis's argument, the SEC has indeed alleged primary liability on the part of Schwab with regard to the IAA, and Daifotis is liable for aiding and abetting Schwab's violations.

**V.     Daifotis Properly Faces Liability for Violations of
        Sections 34(b) and 48(a) of the ICA (Counts VII and VIII)**

      **A.     Daifotis Properly Faces Liability Under
                Section 34(b) For Making False Statements**

ICA Section 34(b) broadly prohibits making "any untrue statement of a material fact" in documents filed, transmitted or kept pursuant to the ICA.  Daifotis argues that he did not personally "file," "transmit" or "keep" documents.  Rather, he claims only various organizational components of Schwab actually did those tasks, so he cannot be liable for any falsities therein, no matter how involved he was in generating the false statements.  Mo. at 13.

Daifotis raised similar arguments before, and the Court rejected them.  In his motion for reconsideration of the motion to dismiss the SEC's complaint (Dkt. No. 67 at 8-9), and his opposition to the SEC's motion for leave to amend the complaint (Dkt. No. 80 at 9-11), Daifotis argued that only Schwab "files" documents.  In the latter brief, Daifotis argued that the SEC did not allege that Daifotis "had any obligation to (or in fact did) file, transmit, or keep any documents under the ICA."  Dkt. No. 80 at 11.  In its October 7, 2011 Order (Dkt. No. 94) at 8, the Court noted that it already had rejected Daifotis's argument in prior rulings. This Court stated Section 34(b) liability "is not limited 'only to entity defendants that bear the statutory obligation to *file* documents with the Commission.' Yet Daifotis attempts again to revive this very argument."

Daifotis now tries for at least the third time, but he has not moved the ball. Previously, Daifotis asserted that the SEC's complaint did not ***allege*** that Daifotis filed, transmitted or kept documents under the ICA.  The Court found that argument unpersuasive, and upheld the SEC's claim.  Now Daifotis alleges that the facts do not ***show*** that he filed, transmitted or kept the documents.  But the outcome should be the same because Daifotis did not need to do those things to be liable. Rather, it is sufficient to trigger liability that he ***made***

the false statements contained in documents that Schwab filed, transmitted or kept under the ICA.[14]

## B. Daifotis Properly Faces Liability Under Section 48(a) For Causing Others to Make False Statements

Daifotis argues that Section 48(a) only prohibits Daifotis from causing Schwab to do something that he would be prohibited from doing and, he argues, the SEC "has not identified conduct for which [Daifotis] *himself* could be liable under the ICA (because, as discussed above, its Section 34(b) claims are invalid)."  Motion at 15.  The argument makes no sense.  Even if Section 34(b) were interpreted as Daifotis suggests, such that it applied only to those who, for example, personally file or transmit documents to the SEC or FINRA for filing, there is no reason why Daifotis could not have done those very things.   Therefore, he faces liability under Section 48(a) for causing others (Schwab) to do those things.

## VI. In Touting YP's Minimal Subprime Holdings, It Was Misleading To Not Disclose That YP Held a Significant Amount of Similarly Risky Alt-A Securities

Daifotis made several statements, discussed below, touting how little YP held in securities backed by "subprime" mortgages.  Schedule I, Rows 14.c., 18 and 19.  Subprime mortgages are mortgages extended to borrowers with lower credit ratings.  S/J Ex. 1 (Fong Report) at 55.  But, as discussed below, another type of mortgage known as "Alt-A" shared a similar level of risk as subprime.  By August 2007, about one-third of YP was in Alt-A (S/J Ex. 33 (Trial Ex. 490)), and almost half of YP's mortgage-backed securities consisted of either subprime or Alt-A (S/J Ex. 1 (Fong Report) at 58, Fig. 18).  As one of the other YP portfolio managers conceded in testimony, Alt-A securities were one of the main causes of YP's decline.  S/J Ex. 8 (Hastings 8/27/09 Investig. Testimony) at 143.  It was misleading to tout YP's relatively low level of subprime securities without disclosing that it held a significant amount of similarly risky Alt-A securities.

---

[14] Daifotis's Motion does not point to any alleged absence of evidence that Daifotis *made* at least some false statements, so the SEC need not in this brief catalog the extensive evidence that Daifotis did so.

## A.   Subprime and Alt-A Were Similarly Risky

Daifotis cites investment literature discussing differences between subprime and Alt-A mortgages.  Mo. at 16-17.  But a party cannot obtain summary judgment by pointing to seemingly favorable evidence and ignoring the substantial contrary evidence that exists.  *Van Asdale v. Int'l Game Technology,* 577 F.3d 989, 998 (9th Cir. 2009) (summary judgment not appropriate if it requires court to weigh conflicting evidence).

Daifotis omits mention of the fact that investment literature and even popular financial press sources warned that differences between subprime and Alt-A were lessening, and despite any differences, the two types of mortgages shared risks and both posed significant risks of high levels of default.  The Fong Report (S/J Ex. 1) at 55-57 discusses the literature making that point.  Even popular financial press articles noted the riskiness of Alt-A.  *See*  S/J Ex. 34 (Trial Ex. 491) (Chris Isadore, *"Liar Loans":  Mortgage Woes Beyond Subprime* (Mar. 19, 2007, 5:01 pm EDT), http://cnn.money.printthis. clickability.com)) (noting that "some people in the industry call [Alt-A] 'stated income' loans, or worse, 'liar loans.'  And they were an important part of the record real estate boom of 2004 and 2005 that has recently shown signs of turning into a bust.").  Case law also has recognized the similarity between Alt-A and subprime.  *See Vissuet v. Indymac Mortg. Services*, No. 09-cv-2321-IEG (CAB), 2010 WL 2612153, at *1 n.1 (S.D. Cal. Jun. 29, 2010) ("An 'Alternative-A' loan ('Alt-A loan') refers to a type of subprime loan.").

Fong reviewed the relevant literature and opined that Alt-A and subprime were impacted by the housing market and shared the same types of risk.  S/J Ex. 1 (Fong Report) at 58.  In the present summary judgment motion, all reasonable inferences must be drawn in favor of the SEC.  The evidence cited above is sufficient to at least create a genuine issue of material fact over whether Alt-A and subprime were similarly risky.

1

2

3

**B.     By Undertaking to Tout Low Subprime Levels, Daifotis and
YP Were Under a Duty to Disclose YP's Substantial
Alt-A Holdings, In Order to Avoid Misleading By Omission**

4

5

6

7

8

9

10

The record includes several instances in which Daifotis made misleading statements by emphasizing YP's low level of subprime securities without disclosing its high levels of similarly risky Alt-A securities, i.e., the August 14, 2007 conference call,[15] and two "Manager's Discussion" publications in August and November 2007.[16]  *See* Schedule 1, Rows 14.c., 18 and 19.  Daifotis argues that in those instances he truthfully stated the amount of subprime securities held by YP, and cannot be held liable for not disclosing levels of Alt-A.

11

12

13

14

15

16

17

18

But liability can attach under Rule 10b-5 even for making a literally true statement, if it omits information necessary to make it not misleading under the circumstances.  *SEC v. C.R. Richmond & Co.,* 565 F.2d 1101, 1106-07 (9th Cir. 1977) (statements can be "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of a material fact was false."); *Miller v. Thane Int'l, Inc.,* 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers") (citation omitted).

19

20

Daifotis's statements about subprime were misleading under these standards.  In making statements that minimized YP's holdings of subprime, Daifotis was obliged to

21

22

23

[15] *See* David Bayless Decl., Ex. 63.

24

25

26

27

[16] The August and November 2007 Manager's Discussions (S/J Ex. 20 and 23 (Trial Ex. 25 and Ex. 28, respectively) contained the question "What is the direct exposure to subprime securities in the Schwab YieldPlus Fund?".  Those documents answered the question by stating, in the August document, that YP "holds approximately 4.7% in subprime securities," and stating in the November 2007 document that YP "holds approximately 5.8% in subprime securities."  In the August 14 call, Daifotis also emphasized YP's low holdings of subprime (4.7%).  *See* Motion at 18.

28

disclose that about one-third of YP's holdings were in similarly risky Alt-A (see above) by at least August.  *See* S/J Ex. 1 (Fong Report) at 92.

The present case is similar to *In re MoneyGram Int'l, Inc. Sec. Litig.,* 626 F. Supp. 2d 947, 976-77 (D. Minn. 2009), in which a defendant-officer made statements in a conference call addressing exposure "to the faltering subprime mortgage market," and stated that the downturn had very little impact on the portfolio's securities because they were rated "A or better" and downturns were temporary.  The court held that "a duty existed to disclose enough information related to the Portfolio's exposure to that market" to prevent misleading the public, including "detailed information about the Portfolio's content and exposure to the subprime *and Alt-A market* . . . ."  *Id.* at 976-77 (emphasis added).  Because Daifotis undertook to affirmatively minimize the threats posed by subprime mortgage holdings, he had the same duty as described in *Moneygram*.

## VII.    Statements Representing YP as an Ultra-Short Bond Fund Were Misleading

There is at least a genuine issue of material fact over whether Daifotis's characterization of YP as an "ultrashort bond fund" (hereafter "USB fund") was misleading because he did not disclose the ways in which YP differed greatly from, and was significantly riskier than, USB funds.[17]  First, it was misleading for Daifotis even to call YP an USB fund without disclosing that it did not meet the definition that Daifotis himself applied to USB funds.  For example, in his September 20, 2006 presentation, (S/J Ex. 17 (Trial Ex. 18) (9/20/06 transcript at SCH2001583)), Daifotis said, "[a]n ultra short bond fund has to maintain an average maturity between three months and one year."  *See also, e.g.,* S/J Ex. 26 (Trial Ex. 278-A) at SCH1758739 (listing, as one of three parts of his definition of a USB fund, that it has an "average maturity between 91 and 365 days").   Indeed, Daifotis testified that he personally edited a template for his presentations to use the phrase "average maturity between 91 and 365 days," rather than other wording, because he was purporting to make the

---

[17]   *See, e.g.,*  Schedule 1, Rows 5, 5.a., 6, 7, 9.a., 10, 18.

slide present what he understood was the Lipper definition of an ultrashort bond fund.  S/J Ex. 4 (Daifotis Dep. at 241 & 246-247).

In truth, however, YP's average maturity was greater than a year.  Schwab's own filings with the SEC showed the WAM to be well over a year in most periods.  *See* S/J Ex. 1 (Fong Report) at 29, Table 2.  And Schwab's reported numbers actually understated the average maturity.  If the WAM had been calculated correctly under the method that Schwab claimed to be using, the WAM would have ranged from 1.26 years to 8.81 years.  *See* S/J Ex. 1 (Fong Report) at 29, Table 3.

Daifotis argues that independent research firms Lipper and Morningstar classified YP as an USB fund.[18]  But that is beside the point.  As shown above, Daifotis personally established and publicly announced the definition that he and Schwab were using, which included having an average maturity of 91 to 365 days.  Having set that definition, Daifotis had to abide by it.  It therefore was misleading for him to call YP a USB fund without disclosing that it did not meet *his own* definition.

Daifotis argues that an SEC examiner who conducted an examination of YP in 2006 characterized YP as a USB fund.  Mo. at 19.  But the examiner, Erica Gould, also testified that she had not looked specifically into whether YP had characteristics inconsistent with a USB fund, and did not recall that issue being part of the examination.  S/J Ex. 5 (Gould Dep.) at 247-248).  Moreover, even if YP was a USB fund at some points in 2006, that does not mean it was so at later times.  In short, it was misleading for Daifotis to call YP a USB fund but not disclose that it did not actually meet the definition that he had promulgated, and not disclose how it thus suffered additional risks.  This presents a jury question.

Second, Daifotis misled by characterizing YP as having little risk.  Contrary to the arguments in his Motion at 19, Daifotis did not merely fail to *disclose* risks, he affirmatively mischaracterized YP as having "slight" or "minimal" risk, when it actually was extremely

---

[18] One of Lipper's criteria also was that a ultrashort bond fund had to have an average maturity of no more than one year.  In light of YP's failure to meet that requirement, it is unclear why Lipper so classified YP.

risky.[19]  Because he affirmatively represented that YP had low risk, he cannot find shelter in, for example, an SEC website that describes USB funds and their risks (Daifotis Mo. at 19 & Bayless Decl. exhibit 41),[20] or by arguing that USB funds are not "homogeneous" in their holdings.  Mo. at 20.  Daifotis defined YP as having an average maturity of "91 to 365 days" (which was false) and he said it had slight or minimal risk (also false).  Thus it is entirely irrelevant whether other USB funds were permitted to have longer maturities, different holdings or to undertake various levels of risk.

Daifotis argues that YP listed its individual securities holdings, the ranges of maturities and other characteristics in its filings and reports.  The law in this circuit is that, "[o]rdinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public."  *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1114 (9th Cir. 1989); *see also Miller v. Thane,* 519 F.3d at 887 ("investors are not generally required to look beyond a given document to discover what is true and what is not").[21]  Thus, Daifotis could not lie or mislead about YP in his presentations and then escape the consequences by pointing to supposed disclosures in other documents.

_____

[19] *See, e.g.,* S/J Ex. 15 (Trial Ex. 15) at SCH_16330798 (as a USB fund, YP had only a "slightly increased risk to principal" compared to "traditional cash holdings"); S/J Ex. 16 (Trial Ex. 17) slide 19 (SCH2001617) (stating that YP had "minimal principal fluctuation" and a "high degree of price stability"); S/J Ex. 17 (Trial Ex. 18) at SCH2001583 & 1584 (management approach tries to maximize current income "without putting a great deal of capital at risk" and "we are not necessarily taking on excessive risk").

[20] Daifotis fails to mention that the SEC website states that USB funds have "extremely short maturities."  As discussed above, YP did not meet that criterion, so the SEC website has no relevance to YP.

[21] The exception is in fraud-on-the-market cases, in which the plaintiff complains about an artificial stock price resulting from all material information that has entered the market, whether directly from defendant or otherwise.  *In re Apple,* 886 F.2d at 1114.  That is not involved in the present case.

1

**VIII.   Daifotis Misled by Characterizing YP as**
      **Being Almost Like a Money Market Fund**

2

3          Daifotis represented that YP was almost as safe as a money market fund ("MM fund")

4   and held assets subject to almost the same stringent requirements as an MM fund.  *See, e.g.,*

5   S/J Ex. 15 (Trial Ex. 15) (Aug. 9, 2006 article) and S/J Ex. 14 (Trial Ex. 3) (Nov. 30, 2005

6   article), stating that YP was an "alternative to traditional cash holdings, like money market

7   funds" (S/J Ex. 15) and "was free to use many investments just outside approved limits of

8   money funds."  In his September 20, 2006 presentation, Daifotis said that USB funds only "go

9   a little bit further down in the quality spectrum" compared to MM funds (S/J Ex. 17 (Trial Ex.

10  18) at SCH2001583).  Daifotis might argue that in those materials he only meant to refer to

11  USB funds in general.  But each of those materials identifies YP as one such USB fund, so it is

12  for the jury to decide whether Daifotis was characterizing YP by his statements.

13         Daifotis's statements were false.  The Fong Report (S/J Ex. 1) at 40-46 discusses the

14  many ways in which YP was far riskier than a MM fund.  For example, as discussed in the

15  Fong Report at 43-44, MM funds must have an average maturity of no more than 90 days, and

16  cannot acquire any security with a maturity of more than 397 days.  YP, however, reported

17  average maturities higher than 90 days (and up to over 1050 days), and held securities with

18  maturities of more than 20 years.  S/J Ex. 1 (Fong Report) at 44.  Moreover, YP held many

19  securities with much lower credit ratings than MM funds (Fong Report at  45-46).  In short, it

20  was false for Daifotis to represent YP as holding investments "just outside the limits" of a

21  MM fund, or just "a little bit further down in the quality spectrum."

22         Daifotis argues that YP's filings contained generalized disclosures that YP "was not" a

23  MM fund, and included lists of "risks," but those boilerplate, generalized disclosures cannot

24  overcome Daifotis's direct misrepresentations that falsely compared YP to a MM fund.

25  Daifotis's false and misleading statements are not cured because other Schwab documents

26  contain supposed disclosures.  *In re Apple,* 886 F.2d at 1114; *Miller v. Thane,* 519 F.3d at

27  887.

28

## IX. <u>Daifotis Mischaracterized the Reasons Why YP Was Holding Cash</u>

Daifotis stated that "we continue to maintain higher-than-normal cash positions in an effort to capitalize **on purchasing opportunities in the current market environment** and to effectively manage the timing of any redemption requests." S/J Ex. 22 (Trial Ex. 27) (Sept. 18, 2007) at SEC-FINRA_AD-0000170 (emphasis added); S/J Ex. 23 (Trial Ex. 28) (Nov. 19, 2007). This statement misleadingly gave the impression of business-as-usual, covering up the fact that YP was primarily holding cash because of the unprecedented redemption requests -- not to buy more holdings in the then "current" environment.

Daifotis cites testimony by Randall Merk that, "at some point" the market might turn around and YP might buy more securities. Motion at 22. Daifotis's statements (above) did not say "at some point" – he said "in the current market environment." And ample evidence is that at that time – in the fall of 2007 – YP was holding cash just to meet anticipated redemptions. *See* S/J Ex. 8 (Hastings Investig. Testimony at 42 (Merk had made a "strong suggestion" that they focus on selling assets rather than buying, and Hasting "followed" it).

Daifotis argues that YP actually purchased securities, but the argument does not survive scrutiny. Daifotis filed the Declaration of Mathew Hastings (Dkt. No. 128), which attaches a schedule of YP's purchases. Notably, YP purchased nothing in the months in which Daifotis made his statements, i.e., September and November 2007. Prior to his September 18 statement (quoted above), the last purchase was on August 21 and the next on October 30. Daifotis repeated his statement on November 19, but YP did not make another purchase until January 2008. These do not support Daifotis's statement that YP was going to "capitalize" on purchasing in the "current market environment." In light of those paltry purchases, it was not a fair characterization to say that YP was holding cash to capitalize on buying opportunities.

Nor is it a sufficient excuse to say that Daifotis was only expressing intent. A projection or statement of belief contains the "implicit factual assertion[]" that "that the speaker is

not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."

*Webster v. Omnitrition Intern., Inc.,* 79 F.3d 776, 785 (9th Cir. 1996) (quoting *In re Apple,* 886

F.2d at 1113). A "projection or statement of belief may be actionable to the extent that [such an]

implied factual assertion[] is inaccurate." *Id.* In light of the facts discussed above, Daifotis did

not have a reasonable basis for his statements.

X.      **Daifotis Misled By His Representations that YP Was "Highly Diversified"**

Daifotis points to "one statement" in a March 10, 2008 letter (S/J Ex. 24 (Trial Ex.

30)), in which he said that YP was "highly diversified." Mo. at 23. He argues that YP met

the statutory definition of 15 U.S.C. § 80a-5(b). That section defines a "diversified company"

as essentially not having too many securities from "any one issuer."[22] Daifotis erroneously

argues that because YP supposedly met that definition, his statement was not false.

Daifotis's argument fails because he did not make only "one statement" about YP's

diversification, and his statements were not related to the statutory definition of a "diversified

company." One of Daifotis's own expert witnesses admitted that there is no statutory

definition of the phrase that Daifotis used, "highly diversified." S/J Ex. 3 (Marco Adelfio

Dep.) at 75. And contrary to his Motion, Daifotis admitted in deposition that, when used with

regard to a portfolio, "diversification" means "a portfolio that has bonds across various

sectors and industries and structures." S/J Ex. 4 (Daifotis Dep. at 222). Daifotis points to

deposition testimony of Steven Schantz and an SEC examiner, but they both testified that

there are different types of "diversification" and that diversification by "security" is different

from diversification by "industry" or "sector." *See* S/J Ex. 12 (Schantz Dep. at 130-134); S/J

Ex. 5 (Gould Dep. at 246-247).

---

[22] 15 U.S.C. § 80a-5(b)(1) defines "diversified company" as a "management company in which at least 75 per centum of the value of its total assets is represented by cash and cash items (including receivables), Government securities, securities of other investment companies, and other securities for the purposes of this calculation limited in respect ***of any one issuer*** to an amount not greater in value than 5 per centum of the value of the total assets of such management company and to not more than 10 per centum of the outstanding voting securities of such issuer." (Emphasis added).

Daifotis repeatedly characterized YP as diversified in ways other than just being a "diversified company." He said YP was "incredibly diversified" by "sector" (S/J Ex. 19 (Trial Ex. 22) (8/14/07 conference call) at SCH0000149-150), had "industry diversification," (S/J Ex. 18 (Trial Ex. 19 at SCH_15333908) (3/21/07), was "highly diversified" (S/J Ex. 24 (Trial Ex. 30) (3/10/08 letter), and that it had "sector and credit diversification" (S/J Ex. 15 (Trial Ex. 15) (8/9/06).

The Fong Report indicates that YP was not accurately called "diversified" by sectors and industries because YP had such a high level of non-agency mortgage-backed securities and corporate bonds issued by financial institutions. S/J Ex. 1 (Fong Report) at 66; *see also* *id. at* 49, Table 9 (concentration in non-agency CMO (collateralized mortgage obligations), MBS (mortgage-backed securities) and CMBS (commercial mortgage-backed securities), 62-65 & Fig. 21 (concentration in corporate bonds in financial sector), and 94-96.

Thus, there is at least a jury question over the type of diversification to which Daifotis referred and whether YP really was diversified in that regard. Summary judgment, therefore, cannot be granted.

## XI.   The Scheme Liability Claims Are Asserted to Preserve Them for Possible Appeal

Daifotis argues that the Court dismissed the SEC's scheme liability claims against him. Actually, the Court dismissed the SEC's scheme liability claims against defendant Randall Merk only, not Daifotis.[23] But in any event, the SEC's First Amended Complaint asserts the scheme liability claims simply to preserve them for possible appeal.

## CONCLUSION

For the foregoing reasons, Daifotis's Motion should be denied.

DATED:  May 17, 2012                              Respectfully submitted,

                                                    /s/ David J. Gottesman
                                                 David J. Gottesman
                                                 Frederick L. Block

---

[23] The Court's June 6, 2011 Order (Dkt. No. 58) at 13 states that "Merk's motion to dismiss the Commission's scheme liability theory" was granted. Daifotis later asked the Court to clarify whether that meant that the scheme liability claims were dismissed against him too. In the August 1, 2011 Order (Dkt. No. 74) at 9, the Court specifically said no.

David S. Mendel
Melissa R. Hodgman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, DC 20549-4030
Telephone:  (202) 551-4470 (Gottesman)
Facsimile:  (202) 772-9245 (Gottesman)