**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

KIMON P. DAIFOTIS and RANDALL MERK,

Defendants.

No. C 11-00137 WHA

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT OPINION OF CHARLES R. LUNDELIUS**

## INTRODUCTION

This order addresses an all-too-common misuse of retained forensic expert witnesses, namely the tactic of presenting an expert who purports to have investigated the facts and proposes to tell the jury what actually occurred in the case at hand.

## STATEMENT

In this enforcement action, the Securities and Exchange Commission moves to exclude opinions in various sections of the expert report of Charles R. Lundelius. For the reasons stated below, the motion to exclude is **GRANTED IN PART AND DENIED IN PART**.

The Commission has alleged various securities law violations by defendant Kimon P. Daifotis — an executive of subsidiaries of Charles Schwab Corporation — in his management of the Schwab YieldPlus Fund, an ultra-short bond fund. The Commission brought this enforcement action alleging, generally, that defendant Daifotis violated the securities laws through various misrepresentations and misleading omissions of material fact about the YieldPlus Fund. Trial is near.

Defense counsel have retained four expert witnesses to opine on various matters in this action. For one, Mr. Charles R. Lundelius was retained to proffer his expert opinion on the regulatory framework within which communications with the public are created, reviewed, approved, and issued by mutual funds, like the YieldPlus Fund, a subject this order will find is proper for expert testimony. Many of the alleged misstatements for which the Commission claims defendant is liable were communications with the public.

No challenge is made to the witness' qualifications. Rather, the challenge is made to findings and opinions that purport to tell the jury what actually occurred in our case. For example, the witness proposes to tell the jury that defendant Daifotis "reasonably relied" on various internal Charles Schwab procedures and to opine that Charles Schwab's procedures in fact conformed to industry practice. At the hearing, defense counsel went so far as to say the witness would testify on scienter.

**ANALYSIS**

Rule 702 governs the admissibility of expert opinions. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The general evidence problem at issue requires consideration of two distinctions. The first distinction is between custom-and-practice evidence versus evidence as to what actually happened in the specific case at hand. Subject to Rule 403, it is usually proper for an expert to explain custom and practice to a jury. When, however, it comes to what actually occurred in the specific case at hand, an expert should be allowed to state what happened *only* as to those specific aspects as to which his specialized knowledge and training and lab work are critical to the analysis. For example, a ballistics expert may compare two bullets and tell us the likelihood they were fired through the same barrel. Such testimony is based on the witness' own side-by-side comparison, which in itself requires specialized training. Or, a DNA expert may tell us the

2

1 probability that a DNA sample came from an accused by personally running the lab-tests and
2 calculating the probability. Or, a physician may tell us a diagnosis based on her actual review of
3 the patient. But where the expert does little more than read depositions and deposition exhibits
4 and other such materials, and then proposes to render findings to the jury as to what happened,
5 we should draw the line and bar such testimony. Here are the reasons:

*First*, when it comes to testimony and other trial-type evidence, our jury system looks to the jury itself to make the critical evaluations as to what actually occurred and what the key actors were thinking or relying on. Juries do this role well and they do not need retained advocates to testify on their respective slants on the evidence. That should be saved for closing argument by counsel. Converting the trial into a question of whose fact-finding "investigator" is more credible is a dangerous idea. The jury itself should be making the findings.

*Second*, retained experts of the type in question have no personal knowledge of what actually happened. They did no lab work. They made no side-by-side comparisons of bullets, for example. Insofar as what actually happened in the specific case at hand, they bring little to the table. They really amount to no more than advocates dressed up like sworn witnesses.

*Third*, the supposed foundation for such fact-finding investigators is usually, as here, a deposition record. But there are differences between a deposition record and the trial record. The trial record will include evidence not in the deposition record — and vice versa. In most trials, for example, there are witnesses who were not deposed. Even for trial witnesses who were deposed, the questions posed are different. Always remember that in most depositions one side only chooses to ask questions, so the deposition story is not the full story. And, there are often documents that contradict the deposition testimony or failures to recall. Those materials may or may not surface in a deposition. In short, the trial record is the record on which the jury decides the facts of what actually occurred and that record will almost always be different and usually more complete than the deposition record.

*Fourth*, much of the deposition record is inadmissible at trial anyway, at least at the instance of the deponent. If a defendant wishes to testify before the jury and be cross-examined there, then that is the American way. But a defendant may not avoid that opportunity by saying

3

1  that he will stand on his deposition testimony and send up a friendly forensic advocate to
2  summarize his deposition testimony for the jury.  The deposition testimony of a party (and
3  anyone aligned with the party) is self-serving and inadmissible hearsay when offered by the
4  party himself.  This is another important reason why the trial record will always differ from the
5  deposition record.

6      *Fifth*, such experts invariably try to tell the jury whose version is truthful.  This is usually
7  done through artful use of the word "understanding," as in "it is my understanding that there is
8  no evidence that . . . ".  The retained witness, of course, has no personal knowledge of what
9  really occurred and should never be allowed to pretend to divine for the jury the truth of what
10 actually occurred or what the mental state of an actor was.  It is no answer to say that the expert
11 will do so only when the evidence is undisputed, for this line of argument invariably turns on
12 qualitative judgments as to what is disputed, what the evidence shows and what inferences may
13 (or may not) be drawn from the evidence.  It also invariably treats failures to recall by deponents,
14 especially by accused deponents, as equivalent to affirmative proof something did not occur.  In
15 truth, a failure to recall can lack credibility in light of all other circumstances.  In short, experts
16 should not be vouching for whose fact version is more credible.

17      Importantly, subject to Rule 403, an expert may be allowed to state an opinion on the
18 actual matter in controversy where the opinion clearly identifies what is *assumed* versus what is
19 opinion.  For example, an expert might advise the jury that he *assumes* certain points in
20 controversy will be found by the jury in a given way and based on those assumed facts, the
21 expert is of the opinion that the conduct at hand conformed (or did not conform) to custom and
22 practice (or to the applicable standard).  This type of testimony is often allowed because it assists
23 the jury in recognizing the fact issues (for the jury) versus the opinion issues (ultimately also for
24 the jury but specialized testimony may assist the jury).

25      The Lundelius report does not come close to this latter acceptable format.  Instead, it
26 claims to be a thorough investigation and instructs the jury on the findings by the expert, going
27 so far as to find that defendant "reasonably relied" on certain items.  The case management order
28 in this case specifically warned against this type of misuse of experts (Dkt. No. 28 at ¶ 8).

4

1  Counsel have disregarded an express warning. This order will now apply the foregoing
2  groundrules and rule as follows.

### 1. SECTION V OF THE LUNDELIUS REPORT.

The Commission contends that there is nothing in Section V, titled "Mutual Fund Communications with the Public," that requires any particular expertise, nothing that involves the application of any cognizable expert methodology, and nothing a jury is incapable of understanding from a presentation of fact witnesses. Thus, they seek to exclude this section.

Generally, Section V of the report opines on the process for mutual fund product advertising. Specifically, it discusses the regulatory framework established through NASD and Commission rules and regulations that relate to communications with the public, as well as the purpose behind certain regulatory requirements, offering an opinion regarding the industry practice. It describes the mutual fund marketing process, including the professionals typically involved with communications with the public, and their standard qualifications.

Mr. Lundelius' opinion regarding the industry practice and regulatory framework for a mutual funds' communications with the public, the process by which communications with the public are created, reviewed, and approved, is the proper subject of expert testimony and may be helpful to the jury in understanding the technical regulatory process and industry practice. This testimony is relevant to assisting the jury in its determination of whether defendant, who is alleged to have made various misstatements and misleading omissions, did so with the requisite scienter. Defendant contends that "if a purported misstatement was made with scienter, facts demonstrating that the maker of a statement may have relied on a process designed to ensure such statements complied with legal and regulatory requirements [the framework analyzed in this section of Lundelius' report], is entirely probative" (Opp. 18). Subject to time limits and the need to omit long-winded presentations, the motion to exclude the opinions in Section V is **DENIED**.

### 2. SECTIONS VII, VIII, AND IX OF THE LUNDELIUS REPORT.

For the reasons stated above, Sections VII, VIII, and IX of the Lundelius report go beyond the pale and will not be allowed.

5

Section VII of the report, titled "Role of Others at Schwab in Communications with the Public," presents Mr. Lundelius' findings regarding Schwab's process for the creation, modification, and approval of communications with the public regarding the YieldPlus Fund. The Commission rightly seeks to exclude these findings on the basis that they are not the proper subject of expert testimony. The Commission also seeks exclusion on the basis that they are unreliable.

The opinions in Section VII summarize fact witness deposition testimony. The jury, however, should hear the testimony of percipient witnesses during the trial and based on the *trial testimony* decide what occurred, for the many reasons stated above. The expert will not be permitted to usurp the jury's fact-finding role and instruct the jury on findings. Thus, the motion to exclude the opinions in Section VII of the report is **GRANTED**.

Section VIII, titled "Schwab's Process for Communications with the Public was Consistent with Industry Practice," evaluates how Schwab's process for communications with the public measured up against industry standards and concludes that, as a general matter, Schwab's process met the applicable regulatory standards, was designed to ensure that communications with the public were fair and balanced, and was consistent with industry practice. The Commissions seeks exclusion of the opinions in Section VIII on the basis that they are irrelevant and unreliable.

Section IX, titled "The Statements at Issue were Reviewed and Approved in a Manner Consistent with Schwab's Policies and Procedures for Communications with the Public," analyzes the documents associated with the communications challenged by the Commission to determine whether a particular document was created in a manner consistent with Schwab's policies and procedures. Statements are organized into various "types," such as statements in articles and statements made on webcasts, and there is an explanation of how the relevant personnel involved in the process at Schwab varied according to the type of communications with the public. The Commission seeks to exclude the opinions in Section IX on the grounds that they are irrelevant, invade the province of the jury, and are unreliable.

As previously stated, the expert will be permitted to testify to industry standards and

practices for communications with the public. The expert will not be permitted to testify and render findings on the issue of whether Schwab's actual conduct was in compliance with industry standards or whether the subject statements were approved pursuant to that practice. These are factual issues for the jury to consider after hearing the evidence at trial. An expert may not vouch for one side's fact scenario and purport to tell the jury what actually occurred. The jury is entitled to hear testimony from individuals who have first-hand knowledge of the events that occurred. At trial, those witnesses will be subject to cross examination and their knowledge and credibility will be tested in the presence of the jury. For these reasons, the motion to exclude the opinions in Sections VIII and IX of the report is **GRANTED**. The order need not reach any other basis for exclusion.

### 4. SECTION X OF THE LUNDELIUS REPORT.

In Section X, Mr. Lundelius offers his opinions about specific alleged misstatements. Defendant contends that these opinions rebut the opinions of the Commission's expert, H. Gifford Fong, who claims that alleged misstatement were materially misleading and that defendant knowingly or recklessly failed to correct them. The Commission again argues that the opinions in Section X of the Lundelius report about what was "clearly disclosed" to investors, what investors would have understood, and whether defendant "reasonably relied" on Schwab's process, are either legal conclusions or opinions that improperly invade the province of the jury. The Commission does not seek to exclude the opinions in the following paragraphs of Section X: 230–37; 242–48; 273–75; 291–93; 315–17 (Reply Br. 13 n.3). Those paragraphs are, therefore, not considered herein. The motion specifically seeks to exclude the opinions in the following paragraphs: 238; 254–55; 240–41; 277; 256; 258; 262–63; 269–70; 284–90; 264–66; 313; 306–12; 323–334; and title "F" on page 87.

*First*, the Commission contends that Mr. Lundelius' opinions about what investors "actually understood" or "should have understood" based on the YieldPlus Fund's disclosures is unhelpful and not the proper subject of expert testimony, especially given that Mr. Lundelius did not speak to a single investor in the YieldPlus Fund. This order agrees. At least on the facts of this action, this is not an instance where the expert's specialized knowledge is required to assist

7

the jury.

*Second*, the Commission also seeks to exclude Lundelius' opinion about whether defendant Daifotis "reasonably relied" on Schwab's process for the review and approval of certain statements and whether defendant "made" certain statements on the basis that such opinions invade the province of the jury. For all the reasons stated above, it is up to the jury to decide, based on the admissible evidence whether defendant's reliance on Schwab's process was reasonable and whether defendant made the alleged misstatements. The Commission is correct that expert testimony as to these issues squarely invades the province of the jury. Mr. Daifotis may testify himself about his reliance and be cross-examined in the presence of the jury. This will be the best way to get to the bottom of the issue for the jury. The motion to exclude the challenged opinions in Section X is **GRANTED**.

## CONCLUSION

For the reasons stated above, the motion to exclude the opinions of Charles R. Lundelius is **GRANTED IN PART AND DENIED IN PART**. As stated in the standing order, at the pretrial conference stage, each side is usually permitted five or fewer motions *in limine* (without prejudice to raising matters *in limine* as the trial progresses). The Commission should remember that this motion will count as one of its motions in *limine*.

**IT IS SO ORDERED.**

Dated: June 7, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE