1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

  v.

KIMON P. DAIFOTIS and RANDALL MERK,

        Defendants.

_____/

No. C 11-00137 WHA

**ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

**INTRODUCTION**

    In this enforcement action by the Securities and Exchange Commission, defendant moves for summary judgment. For the reasons stated below, the motion is **GRANTED IN PART**.

**STATEMENT**

    The Commission has alleged various securities law violations by defendants Kimon P. Daifotis and Randall Merk — executives of subsidiaries of Charles Schwab Corporation — in their management of the Schwab YieldPlus Fund, an ultra-short bond fund. Defendant Daifotis was the Chief Investment Officer of fixed income at Charles Schwab Investment Management, Inc., ("CSIM"). CSIM is the investment adviser for the Schwab family of mutual funds, including the YieldPlus Fund, which were distributed by Charles Schwab & Co., Inc. ("CS&Co"). Both CSIM and CS&Co. are wholly owned subsidiaries of Charles Schwab Corporation (collectively "Schwab"). YieldPlus Fund's value began to decline in the summer of 2007 and investors began withdrawing their funds. Within the first two weeks of August 2007,

redemptions exceeded one billion dollars.  The alleged misstatements and omissions at issue in this motion were supposedly made by defendant between 2005 and 2008.

On November 21, 2011, the Commission entered into a settlement with defendant Merk and final judgment was entered as to him.  Defendant Daifotis, is the sole remaining defendant.

During discovery, defendant served the Commission with interrogatories asking it to identify each alleged misstatement or material omission for which it contended defendant was liable.  The Commission complied.  On November 23, 2011, it produced two tables, one which identified statements for which defendant was alleged to be primarily liable and another, named schedule 2, that identified statements for which defendant was alleged to be liable as an aider and abettor.  On March 14, 2012, after further discovery, the Commission amended schedule 1 and withdrew schedule 2 in its entirety.  The Commission also identified "a few additional misstatements or misleading omissions . . . in the March 30, 2012, report of Gifford Fong," the Commission's expert witness on, among other things, investment management and risk analysis of fixed-income investments (Opp. 9).

Schedule 1 is titled "Misrepresentations and Misleading Omissions of Material Fact for which Daifotis is Liable Under Primary Liability Provisions."  It has been submitted as exhibit one to the declaration of Attorney David Bayless and is referred to herein as "schedule 1." (Schedule 1 is also appended as an exhibit to this order.)  The table in schedule 1 contains the following columns: (1) row number; (2) "statements (affirmative misrepresentations and statements rendered misleading by an omission of material fact); (3) exhibit numbers referring to exhibits used or produced in connection with the depositions in this action; (4) "statute/rule violated"; (5) first amended complaint paragraph number; and (6) "falsity or misleading omission explained (FAC)."  The parties both refer to the alleged misrepresentations and statements rendered misleading by omission by reference to schedule 1 and the specific row number that contains the subject statement.  This order will use the same convention.  Unless otherwise stated, all references in this order to "row(s)" are to the rows listed in schedule 1, appended hereto.

United States District Court

For the Northern District of California

2

**United States District Court**
For the Northern District of California

The first amended complaint states eight counts for relief:  (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder against both defendants; (2) aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder against both defendants; (3) control-person liability under Exchange Act Section 20(a) for violations of Section 10(b) of the Exchange Act against defendant Merk; (4) violations of Section 17(a) of the Securities Act against both defendants; (5) aiding and abetting violations of Section 206(1) and (2) of the Advisers Act against defendant Merk; (6) aiding and abetting violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder against both defendants; (7) violations of Section 34(b) of the Investment Company Act against both defendants; and (8) violations of Section 48(a) of the ICA against both defendants.

Defendant Daifotis moves for summary judgment on (1) various alleged misstatements for which, he argues, the evidence shows he was not involved in drafting, reviewing, or publishing; (2) various alleged misstatements for which, he argues, there is failure of proof of the statements made; (3) numerous statements that he argues were only communicated within the Charles Schwab corporate entities; (4) aiding and abetting claims under Section 10(b) and Rule 10b-5 (count two) and Sections and 206(4) and Rule 206(4)-8 of the Investment Advisers Act (count six); (5) claims under Sections 34 and 48 of the Investment Company Act of 1940 (counts seven and eight), and (6) various statements for which he argues the evidence shows that the statements were truthful and not misleading.

**ANALYSIS**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough

**United States District Court**
For the Northern District of California

1    evidence of an essential element to carry its ultimate burden of persuasion at trial.  If the moving

2    party satisfies its initial burden of production, then the non-moving party must produce

3    admissible evidence to show there exists a genuine issue of material fact.  *See Nissan Fire &*

4    *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

5         **1.**      **Primary Liability and *Janus*.**

6           Defendant seeks summary judgment in his favor on the Commission's claims against him

7    alleging primary liability under Section 10(b) and Rule 10b-5 (count one), Section 17(a) of the

8    Securities Act (count four), and Section 34(b) of the ICA (count seven) as to statements in four

9    documents identified in rows 9, 11, 13, and 34.  The basis for his motion is primarily that he did

10    not have a role in drafting, reviewing, or publishing the statements.  Additionally, he contends

11    that there is a failure of proof as to various of the statements and he cannot be liable for internal

12    statements made to Schwab employees.  This order first addresses the Section 10(b) and Rule

13    10b-5 claim.

14           To prevail on a claim under Section 10(b), a plaintiff must prove "(1) a material

15    misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

16    misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

17    misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv.*

18    *Partners, LLV v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  "Rule 10b-5 encompasses only

19    conduct already prohibited by Section 10(b).  *Ibid*.  Under Rule 10b-5, it is unlawful for "any

20    person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to

21    state a material fact necessary in order to make the statement made, in light of the circumstances

22    under which they were made, not misleading" "in connection with the purchase or sale of any

23    security."

24             **A.**      ***Janus Capital Group, Inc. v.***
                            ***First Derivative Traders.***

25

26          Defendant argues that he cannot be held primarily liable under Section 10(b) and Rule

      10b-5, relying on the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First*

27    *Derivative Traders*, 131 S. Ct. 2296 (2011).  In *Janus*, the Supreme Court considered whether a

28    mutual fund investment adviser could be held liable in a private action under Rule 10b-5 for

false statements included in its client mutual funds' prospectuses.  The issues in *Janus* arose in the context of a motion to dismiss.  The Supreme Court concluded that the mutual fund investment advisers could not be held liable because it did not "make" the statements in the prospectuses.  In relevant part, the Supreme Court stated:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its makers.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by — and only by — the party to whom it is attributed.  This rule might best be exemplified by the relationship between a speechwriter and a speaker.  Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers its.  And it is the speaker who takes credit — or blame — for what is ultimately said.

*Id*. at 2302.  In developing this rule, the Supreme Court cited to its opinion in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, *N.A.*, 511 U.S. 164 (1994), where it held that Rule 10b-5's private right of action does not include suits against aiders and abettors.  Thus, the Supreme Court ruled that "[i]f persons or entities without control over the content of the statement could be considered primary violators who 'made' the statement, then aiders and abettors would be almost nonexistent."  *Janus*, 131 S. Ct. at 2302.

## B.    Specific Statements.

The statements at issue are in various documents:  (1) Schwab Internal Website dated June 30, 2007 (row 9); (2) Schwab Internal Website dated December 23, 2005 (row 11); (3) September 2005 advertisement (row 13); and (4) May 2005 advertisement (row 34).  The Commission has "agree[d] that it will not contend that Daifotis is liable for . . . the June 30, 2007 internal website item ([] Row 9) and a May 2005 ad ([] Row 34) (Opp. 4).  Defendant's motion for summary judgment as to the Commission's claims under Section 10(b) and Rule 10b-5, Section 17(a)(2) of the Securities Act, and Section 34(b) of the ICA for primary liability for the statements at issue in rows 9 and 34 is **GRANTED**.  The order addresses the statements contained in the remaining two documents.

United States District Court

For the Northern District of California

### *(1)      Schwab Internal Website dated December 23, 2005 (Row 11).*

The Commission alleges primary liability under Section 10(b) and Rule 10b-5 thereunder and Section 17(a)(2) of the Securities Act against defendant for statements contained in a Schwab internal website.  Specifically, the Commission claims that on or about December 23, 2005, the Schwab internal website quoted defendant himself as referring to the YieldPlus Fund as a "smart cash alternative for your client," but did not disclose the ways that the YieldPlus Fund differed significantly from ultra-short bond funds and the ways in which the YieldPlus Fund was significantly riskier (First. Amd. Compl. ¶ 86(e)).  In full, the quote on the website stated (Bayless Exh. 12):

> "With exceptional performance, the Schwab YieldPlus Fund may be a smart cash alternative for your clients in the current rising-rate environment, providing enhanced yield potential over money market funds," said Kim Daifotis, senior vice president and chief investment officer for fixed income with Schwab Funds.

Even though the statement itself attributes the quote to defendant and defendant only, defendant argues that there is "no evidence" that he saw the contents of this webpage before it was published.  The Commission's compliance folder does not name defendant as one of the website's reviewers (Bayless Exh. 14 at 217–40).  Defendant testified he did "not recall" the website article or whether he provided the subject quote (Bayless Exh. 10 at 200).  *Even so, the statement specifically attributed the quote to defendant.*  That is evidence.  That is enough to present a jury question.

To be sure, other evidence shows that it was the practice at Schwab for an employee in the product management or client experience divisions to invent the quotes used in the advertisements (Bayless Exh. 11 at 204).  Product managers would "try" to get the individual to whom the quote was attributed to review it (*ibid.*).  This "try" practice is also evidence he saw it even though defendant testified he has no memory on the subject.  Failure to recall something hardly translates to "it didn't happen."

The Commission reminds us that *Janus* stated that "*attribution within a statement . . . is strong evidence that a statement was made by — and only by — the party to whom it is attributed.*"  131 S. Ct. 2302.  Attribution is enough to go to the jury.  The carefully constructed

6

United States District Court

For the Northern District of California

1   responses in defendant's deposition testimony are not inconsistent with the subject quote having

2   been shown to defendant and his having been approved for publication on the website.  Even if

3   they were somehow deemed to be inconsistent, it would only show a question of fact for the jury.

4   A jury will have to decide.  The motion summary judgment as to the claim for primary liability

5   under Section 10(b) and Rule 10b-5 for the statement identified in row 11 is **DENIED**.  The claim

6   for primary liability under Section 17(a)(2) as to the statements identified in row 11 is addressed

7   below.

8                    *(2)     September 2005 Advertisement (Row 13).*

9           The Commission also seeks to hold defendant primarily liable for statements in a

10  September 2005 YieldPlus Fund advertisement, which bore his picture and a quote attributed to

11  him.  The Commission alleges that, on or about September 2005, an advertisement ran with a

12  picture of defendant and a quote attributed to him reading (Hodgman Exh. 13 at 20202292):

13              With consistent, exceptional performance, The Schwab YieldPlus
                Fund is a smart cash alternative for your clients in the current
14              rising-rate market, providing enhanced yield potential over money
                market funds.
15

16  Defendant testified at deposition, that "he did not give" the quote and "did not recall" seeing the

17  advertisement (Bayless Exh. 10 at 199).  No other witness who was deposed testified to recalling

18  that defendant reviewed this advertisement prior to its use (Bayless Exhs. 11 at 203–08; 15 at

19  241–45; 13 at 211–16).  As before, a jury could reasonably find that it was the standard practice

20  at Schwab for persons in the product management or client experience divisions to invent the

21  quotes used in advertisements and then to try to run them by the attributee.

22          The Commission puts forward three items of evidence.  *First*, an email from a product

23  employee, Keith Maddock, appending a copy of the advertisement containing the subject

24  statement.  In relevant part, the email stated, "Here is an ad that Kim [our defendant] liked and

25  was very involved with in creating" (Hodgman Exh. 31).  However, during his deposition, Mr.

26  Maddock stated he "no longer recalled" what had "occurred," regarding the September 2005

27  advertisement, but confirmed that he wrote the email when the events were fresher in his mind

28  (Hodgman Exh. 9 at 316–20).  This email at least is admissible as past recollection recorded

    and/or under the residual exception.  It would be admissible under the residual exception because

                                                  7

the statement bears circumstantial guarantees of trustworthiness. Mr. Maddock made the statement in an email regarding development of an advertisement for YieldPlus Fund, wherein he was tossing around ideas for future advertisements. He would likely have had a motivation to be truthful, as his goal was to put forward the strongest possible advertisement campaign. Furthermore, the statement goes to evidence of defendant's involvement in the making of the statement, a material fact, and is more probative on the point for which it is offered than any other evidence that the Commission can obtain through reasonable efforts, as the events in question occurred more than five years ago. Admission of the statement under the residual exception, if it is not admitted under the past recollection recorded exception, will therefore best serve the interest of justice.

*Second*, the Commission points to defendant's own deposition testimony wherein he stated, "I'm sure that I discussed this ad with him [Maddock]" (Hodgman Exh. 4 at 529–31).

*Third*, the Commission again relies on the fact that the quote was attributed to defendant in a public statement released to investors, arguing that this is sufficient to overcome summary judgment. Of course, this is correct under *Janus* itself. If defendant had not blessed the quote, it would have been a fraud on the investing public. The motion for summary judgment as to the claim for primary liability under Section 10(b) and Rule 10b-5 for the statement identified in row 13 is **DENIED**.

### (3)     *Section 17(a)(2) and Section 34(b) Claims (Rows 11 and 13)*.

Previously, this Court ruled that *Janus* only applies to Section 10(b) and Rule 10b-5. Defendant sought a certificate of appealability as to whether *Janus* should be extended to narrow the ICA and the Securities Act. A certificate of appealability was denied (Dkt. No. 97). Still, defendant maintains his position that "*Janus* also applies to primary liability under Section 17(a) of the Securities Act and Section 34(b) of the ICA" (Br. 4 n.5). As such, defendant makes no arguments in his briefs specific to Section 17(a)(2) or Section 34(b). Neither does the Commission address the issue. The Court will not make counsel's arguments for them. The motion for summary judgment on rows 11 and 13 as to the claims for primary liability under Section 17(a)(2) and Section 34(b) is **DENIED**.

8

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    "Catch-All" Allegation (Row 5).

Defendant moves for summary judgment on the Commission's allegation that defendant made misstatements at speaking events around the country from 2005 to 2008 in violation of Section 10(b), Rule 10b-5, 17(a)(2), and Section 34(b) (row 5).  Defendant argues generally, that the Commission has failed to produce evidence to support this "sweeping allegation" (Br. 7). But the evidence shows that defendant travelled around the country making presentations about the YieldPlus Fund, that he made oral presentations to independent investment advisors, that he showed and spoke "off the slides" (Hodgman Exh. 4 at 77).  Defendant admitted that he travelled to the locations listed in paragraph 83 of the first amended complaint (Dkt. No. 99).  The events detailed in paragraph 83 and their corresponding locations, are the events at which, the Commission has alleged, defendant made the misrepresentations and misleading omissions identified in row 5.  The record specifically documents several of defendant's presentations and includes specific power point presentations and admissions by defendant that he was involved in creating at least some of the slides.

There is enough evidence to carry the Commission's ultimate burden of persuasion at trial on the claims at issue here.  It will up to the fact finder to determine if the Commission can prove up its case as to each of the misstatements the Commission alleged defendant to have made at the events identified in paragraph 83 of the first amended complaint.  Summary judgment as to row 5 on the basis that the Commission has failed to produce evidence sufficient "to support this sweeping allegation" is **DENIED**.

### D.    Liability for Internal Statements to Schwab Employees (Rows 4, 5, 9, 11, 15, 15.a).

Defendant argues that he cannot be held liable for securities law violations based on allegedly purely internal statements made solely to company insiders.  The Commission alleges that defendant is liable for purported misstatements he made internally to Schwab employees, including statements made during a conference call on August 16 (rows 4, 15, 15.a), various presentations to Schwab registered representatives and regional bond specialists (row 5), and mutual fund commentaries posted on Schwab's internal website (rows 9 and 11).  The Commission now states it will not contend that the commentary on June 30, 2007 (row 9) is a

United States District Court

For the Northern District of California

misrepresentation (Opp. 11 n.10).  Thus, defendant's motion for summary judgment on the grounds that he cannot be held liable for internal statements made to Schwab employees, as to the statements identified in row 9, is **GRANTED**.[*]  As stated above, in Section C, there is evidence in the summary judgment record that as to the statements identified in row 5, defendant made statements to the investing public.  Thus, defendant's motion for summary judgment summary on the grounds that he cannot be held liable for internal statements made to Schwab employees, as to the statements identified in row 5, is **DENIED**.

### *(1)* *Conference Call on August 16, 2007*
### *(Rows 4, 15, and 15.a).*

It is undisputed that only Schwab employees were on the conference call on August 16, 2007.  The evidence shows that many of the Schwab employee participants on the call were investors in the YieldPlus Fund (Ordelt Decl. ¶¶ 5, 7).  However, they will be treated as wearing only their hat as Schwab financial consultants during the internal call, not as a member of the investing public.  To do otherwise would prevent companies like Schwab from communicating among themselves so as to conduct business.

The question remains whether any of the statements were then repeated to members of the investing public.  The call on August 16, was a pre-arranged call in which defendant spoke to approximately 350 Schwab financial consultants or other Schwab personnel (Hodgman Exhs. 21; 4 at 39).  Defendant began the call by stating (Hodgman Exh. 21 at 1–2):

> I will try to make this call as efficient as possible so everybody can get back to their clients and respond to them with any questions that they might have.  So today's call is essentially meant to provide you with some sounding points to provide your clients with regards to what's just going on in the fixed income market, and also what's going on in particular with the YieldPlus fund.

During the call, a participant asked defendant about the level of redemptions and defendant responded, "[i]t's not that much . . . [s]o outflows have been minimal" (*id*. at 10).  The Commission stated in its opposition that "this was false because redemptions topped $1 billion by that time" (Opp. 9).

---

[*] Possibly this will be nonetheless admissible under Rule 404 depending on how the trial record unfolds.

The record shows that the financial consultant who asked defendant about the redemptions during the August 16 call later called one of his clients and relayed defendant's allegedly false statement about the redemptions and expressly attributed the remarks to defendant by name. The record contains a transcript of a subsequent phone call between financial consultant Joe Minarik and one of Mr. Minarik's clients who was an investor in the YieldPlus Fund. During the call, which took place on August 21, 2007, Mr. Minarik told the investor (Hodgman Exh. 32 at 5–6):

> And what we really have to be concerned about, is what have the outflows been on the fund. And surprisingly — and this — Ken Defotis (phonetic), who is the head of Schwab Investment Management said that he was very surprised, and he said the redemptions were negligible on the fund.

During his deposition, Mr. Minarik testified that this statement was based on defendant's comments during the August 16 call (Hodgman Exh. 10 at 34–35). At trial, the above-quoted statement by Mr. Minarik to an investor is the only statement the Commission will be permitted to put forward to show that defendant's statement made during the August 16 conference call was repeated to the investing public. This is on the premise that the Commission proves the statement was in fact false.

Before *Janus*, our court of appeals held that a defendant "cannot escape liability simply because it carried out its alleged fraud through the public statement of third parties." *Warshaw v. Xoma, Corp.*, 74 F.3d 955, 959 (9th Cir. 1996). The Commission notes that in a case brought under the PSLRA, this Court previously held that it is sufficient — at the motion to dismiss stage — that "defendants made the statement to analysts with the intent . . . that analysts communicate them to the market." *In Re PeopleSoft, Inc.*, 2000 WL 1737936, at *4 (N.D. Cal. 2000). *Janus* explicitly declined to rule on the question of what constitutes making statements to the public. 131 S. Ct. at 2304 n.9 ("We do not address whether and in what circumstances statements would qualify as public."). Defendant states that "statements made to third party analysts are obviously different from statements made internally to company employees," but provides no explanation as to why they are "obviously" different in ways that are significant for purpose of our analysis here (Reply Br. 5).

United States District Court

For the Northern District of California

1    Citing to authority outside our court of appeals, defendant argues that internal statements

2    cannot violate the federal securities laws because the Commission has not alleged that defendant

3    made them to the investing public.  *See Hawaii Ironworkers Annuity Trust Fund v. Cole*, 2011

4    WL 3862206 (N.D. Ohio Sept. 1, 2011); *United States v. Skilling*, 638 F.3d 480, 484 n.4 (5th

5    Cir. 2011).  But in *Hawaii Ironworkers*, the defendants were subordinates who, pursuant to a

6    mandatory directive, provided information to the corporate office, who made the "necessary

7    adjustment" to the information before the information was used in statements communicated to

8    the general public.  And in *Skilling,* there was no indication that the defendant communicated the

9    information to the board of directors with the intent that it be transmitted outside the company.

10    The Court is persuaded that in the wake of *Janus*, an executive who undisputably

11    exercised authority over his own non-casual statements with the intent and reasonable

12    expectation that such statement would be relayed to the investing public, should be deemed to be

13    the person who "made" the statements to the investing public (so long as it is proven that the

14    statement was made to the investing public).  The motion for summary judgment on the basis

15    that defendant cannot be held liable for internal statements made to Schwab employees as to

16    rows 4, 15, and 15.a, is, as to all statements, *except* the statement repeated by Mr. Minarik,

17    specifically identified above, **GRANTED**.  The statement repeated by Mr. Minarik will go forward

18    to trial.

19                    *(2)    Other Statement (Row 11).*

20    Defendant also argues that summary judgment should be granted as to the statement

21    identified in row 11 because that statement was not made to the investing public.

22    Defendant concedes that there is a material fact as to whether the statement at issue in

23    row 11 was publicly available, and argues, instead that summary judgment is warranted because

24    under *Janus*, defendant cannot be said to have "made" the statement (Reply Br. 6 n.4).  For the

25    reasons stated in Section 1.B.(1), this order disagrees and holds that summary judgment cannot

26    be granted on this issue on this record.  Thus, the claims against defendant for primary liability

27    under Section 10(b) and Rule 10b-5 will proceed to trial.  And as stated in Section 1.B.(3), this

28    Court has ruled that *Janus* only applies to Section 10(b) and Rule 10b-5, not Section 17 of the

Securities Act.  Defendant, however, fails to argue why summary judgment is warranted in the absence of *Janus* governing our inquiry under Section 17.  Thus, on this point, summary judgment is **DENIED**.

> **2.    DISCLOSURES REGARDING THE YIELDPLUS FUND'S SUBPRIME HOLDINGS (Rows 14.c, 18, and 19).**

The Commissions alleges various securities laws violations against defendant for three statements he is alleged to have made in the fall of 2007, explaining how little the YieldPlus Fund held in securities backed by subprime mortgages (rows 14.c, 18, and 19).  The Commission states that it was misleading for defendant to "tout [the YieldPlus Fund's] relatively low level of subprime securities without disclosing that it held a significant amount of similarly risky Alt-A securities" (Opp. 24).  Defendants moves for summary judgment on the Commission's allegations as to three statements defendant made in the fall of 2007, identified in rows 14.c, 18, and 19, on the ground that there is no duty to disclose all material information in a fund's or company's possession and that failure to disclose information about Schwab's Alt-A securities when defendant disclosed information about its subprime securities was not misleading because of the "basic and well-recognized differences" between Alt-A and subprime securities.

By August 2007, "about one-third of [the YieldPlus Fund] was in Alt-A" and "almost half of [the YieldPlus Fund]'s mortgage-backed securities consisted of either subprime or Alt-A" (Hodgman Exh. 33 at 490; *see* Exh. 1 at 58; Opp. 16).  In the conference call on August 14, defendant stated that 4.7% of the YieldPlus Fund was in subprime securities but did not make any statement about what percentage of the YieldPlus Fund's assets were invested in Alt-A.  In August and November of 2007, defendant presented a written Manager's Discussion regarding subprime securities.  These were not spontaneous answers in response to questions (in which case defendant might be excused for his omissions), but were written answers crafted in response to written questions.  Specifically, defendant was asked the question:  "What is the direct exposure to subprime securities in the Schwab YieldPlus Fund?"  In the August document, he answered that the YieldPlus Fund "holds approximately 4.7% in subprime securities."  In the November document, he answered that the YieldPlus Fund "holds approximately 5.8% in subprime securities" (Hodgman Exhs. 20, 23).

United States District Court

For the Northern District of California

Our court of appeals has stated that the securities laws do not create an affirmative duty to disclose all information but that once information is disclosed, company's have an obligation to disclose information in a manner that would not mislead investors in a material way. *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

The Commission does not dispute that Schwab accurately disclosed the percentage of the YieldPlus Fund's subprime securities in three different disclosures during fall 2007. Instead, the Commission contends that the YieldPlus Fund's disclosures of its subprime holdings triggered an affirmative duty to also disclose its Alt-A holdings. The argument is that Alt-A securities are similar to subprime securities and that a failure to discuss them together was misleading. Of course, defendant argues that the disclosure of the YieldPlus Fund's subprime holdings, in response to specific inquiries about its subprime holdings "did not convey any impression, let alone a false or misleading one, about its Alt-A holdings" (Br. 25).

Alt-A loans are offered to borrowers who have "slightly below top-credit" but are "missing a standard credit history, documented source of income, or some other standard input used in credit scoring models" (Bayless Exh. 27). The Federal Reserve Bank of San Francisco observed in its 2007 Annual Report that "[o]n balance, Alt-A loans are viewed as having lower risk and, thus, carry lower interest rates than subprime loans" (Bayless Exh. 30 at 456). Courts have recognized that Alt-A loans "fall just above subprime status." *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *1 n.6 (S.D.N.Y. 2011). Others have analyzed Alt-A loans as a type of subprime loan. *See Vissuet v. Indymac Mortg. Servs.*, 2010 WL 2612153, at 1 n.1 (S.D. Cal. 2010). Schwab classified subprime securities as asset-backed securities and Alt-A securities as mortgage-backed (Bayless Exh. 33 at 487–94).

There is sufficient evidence in the summary judgment record to create a genuine issue of material fact over whether Alt-A and subprime loans were so similar in terms of danger and risk that it was misleading to tout the low-exposure subprime loans without disclosing the huge allied

United States District Court

For the Northern District of California

1  risks and damages posted by the Alt-A loans.  "[T]he disclosure required by the securities laws is

2  measured not by literal truth, but by the ability of the material to accurately inform rather than

3  mislead prospective buyers."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

4  Statements can be literally true such that no single fact is false, but the overall message may be

5  misleading by omission.  The motion for summary judgment on the statements identified in rows

6  14.c, 18, and 19 on the ground that disclosures regarding the YieldPlus Fund's subprime

7  holdings did not create a duty to disclose YieldPlus Fund's Alt-A holdings is **DENIED.**

8          **3.      STATEMENTS REGARDING YIELD PLUS FUND**
                   **AS AN "ULTRA-SHORT BOND" FUND**
9                  **(ROWS 8, 9, 11, 13, 18, AND 34).**

10         The Commission alleges various securities law violations against defendant on the basis

11  that he characterized the YieldPlus Fund as an "ultra-short bond" fund and that statements

12  characterizing it as such were misleading because they were not accompanied by disclosures of

13  the ways the YieldPlus Fund "differed significantly from ultra-short bond funds and the ways in

14  which it was significantly riskier" (rows 8, 9, 11, 13, 18, and 34).  Defendant seeks summary

15  judgment in his favor that he is not liable for securities law violations for statements representing

16  that the YieldPlus Fund was an ultra-short bond fund without disclosing that it was different

17  from other ultra-short bond funds.

18         The undisputed evidence shows that the YieldPlus Fund was an ultra-short bond fund.

19  Morningstar and Lipper, two independent third-party research firms that categorize mutual

20  funds, categorized the YieldPlus Fund as an ultra-short bond fund (Bayless Exh. 37 at 601–04;

21  17 at 248; 38 at 19).  The Commission's branch chief who led the Commission's examination of

22  Schwab's fixed-income bond funds in 2006 conceded that the YieldPlus Fund was an ultra-short

23  bond fund (Bayless Exh. 40 at 48).

24         The Commission, however, claims that the YieldPlus Fund was riskier than other ultra-

25  short bond funds and that these risks were not adequately disclosed.  *First*, the Commission

26  contends that it was misleading for defendant "even to call [the YieldPlus Fund] an USB fund

27  without disclosing that it did not meet the definition that [he] himself applied to USB funds"

28  (Opp. 19).  The gravamen of the Commission's argument is that defendant stated that "an ultra-

1  short bond fund has to maintain an average maturity between three months and one year" but did

2  not disclose, as the Commission alleges, that the YieldPlus Fund's average maturity was greater

3  than a year (Hodgman Exh. 17 at SCH2001583). But that statement was not made in the

4  statements that are the subject of defendant's motion for summary judgment on this issue.

5  Defendant did not move for summary judgment on that statement or others containing the same

6  information.

7         *Second*, the Commission argues that defendant "misled by characterizing [the YieldPlus

8  Fund] as having little risk" (Opp. 20). In support of this argument, the Commission points to

9  various statements wherein defendant allegedly mischaracterized the YieldPlus Fund by stating,

10  it had only a "slightly increased risk to principal" compared to "traditional cash holdings" that

11  the YieldPlus Fund had "minimal principal fluctuation" and a "high degree of price stability"

12  (Hodgman Exhs. 15 at SCH16330798; 16 at SCH2001617). But none of these statements are the

13  subject of defendant's motion for summary judgment on the statements identified in rows 8, 9,

14  11, 13, 18, and 34. The Commission claims that defendant's statements representing the

15  YieldPlus Fund as an ultra-short bond fund were misleading. The Commission does not cite to

16  evidence in the summary judgment record in support of its allegation that the ultra-short bond

17  fund statements identified in the rows at issue here were misleading. Thus, as to the claim that

18  defendant can be held liable under the various securities laws for statements that "mislead by

19  characterizing [the YieldPlus Fund] as having little risk," defendant's motion for summary

20  judgment on rows 8, 9, 11, 13, 18, and 34 is **GRANTED**.

21         **4.    STATEMENTS REGARDING THE YIELDPLUS FUND'S COMPARISON
               TO MONEY MARKET FUNDS (ROWS 2, 3, 4, 5.a, 34).**

22

23         The Commission alleges that statements made by defendant comparing the YieldPlus

24  Fund to money market funds were misleading, in violation of various securities laws, because

25  the YieldPlus Fund was riskier than money market funds and did not disclose such risks. For

26  example, defendant stated that ultra-short bond funds only "goes a little bit further down in the

27  quality spectrum" (Hodgman Exh. 17 at SCH2001583). Defendant represented in two Schwab

28  reports that the YieldPlus Fund was an "alternative to traditional cash holdings, like money

market funds," and "was free to use many investments just outside the approved limits of money

16

market funds" (Hodgman Exhs. 14, 15).  Defendant argues that Schwab's public

communications about the YieldPlus Fund uniformly disclosed, "in no uncertain terms" that the

Fund was not a money market (Br. 30).  The prospectus for the YieldPlus Fund's offering

document stated (Bayless Exh. 45 at SCH16148781):

> The fund's investment strategy is designed to offer higher yields
> than a money market fund while seeking minimal changes in share
> price.  The fund is an ultra-short bond fund and is not a money
> market fund.  The fund has a higher risk profile than a money
> market fund (please see the Principal risks section) and, unlike a
> money market fund, its share price will fluctuate.  As an ultrashort
> bond fund, the fund is not subject to the maturity, credit or
> diversification limitations of a money market fund and may invest
> in financial instruments that a money market fund may not
> purchase.

Other public communications about the YieldPlus Fund that compared the YieldPlus Fund to

money market funds either disclosed that it was not a money market fund and that it was riskier

and/or referred the investor to the prospectuses which contained the above-stated disclosures

(Bayless Decl. Exhs. 17 at 248; 47 at 740–42; 48 at 743–50; 49 at 751–57; 50 at 758–74).  The

Commission does not dispute that Schwab made these disclosures.

According to the Commission, such disclosures are irrelevant (Opp. 22).  The

Commission cites *In re Apple Computer Securities Litg*., 886 F.2d 1109 (9th Cir. 1989), for the

proposition that "false and misleading statements are not cured because other Schwab

documents contain supposed disclosures" (Opp. 22).  In *Apple*, however, the question was

whether media coverage that cast doubt on Apple's optimistic forecasts about its new products

could cure Apple's own omissions.  The Commission is correct that a blatantly false statement

is not cured by the truth being set forth elsewhere in a prospectus.  A reasonable jury could find

that an investor could have been misled by defendant's statements to believe that the YieldPlus

Fund was hardly more risky than a money market fund.  Thus, summary judgment on the

statements identified in rows 2, 3, 4, 5.a, and 34, regarding the money market comparison is

**DENIED**.

**5.    THE YIELDPLUS FUND'S CASH HOLDINGS (ROWS 16 AND 17).**

In September and November of 2007, defendant stated during a webcast and Manager's Discussion, respectively, that the YieldPlus Fund maintained higher than normal cash balances to capitalize on investment opportunities and to meet redemption requests (Hodgman Exhs. 22 at SEC-FINRA_AD-0000170; 23 at SCH0000275.  The Commission alleges that these statements were fraudulent, in violation of securities laws, because the only purpose for maintaining higher than normal cash balances was to "cover[] up the fact that [the YieldPlus Fund] was primarily holding cash because of the unprecedented redemption requests — not to buy more holdings in the then "current" environment as represented (Opp. 23).  Defendant seeks summary judgment in his favor that he cannot be held liable for securities law violations for a statement representing that one of the purposes for maintaining a higher cash balance in the YieldPlus Fund was to capitalize on investment opportunities where, he argues, the undisputed evidence shows that the statements were subjectively and objectively true.

There is a genuine dispute as to material facts at least with regard to whether defendant believed the YieldPlus Fund was looking for current buying opportunities and whether his statements were supported by a reasonable factual basis.  Summary judgment on rows 16 and 17 is **DENIED.**

**6.    REPRESENTATION THAT THE YIELDPLUS FUND WAS HIGHLY DIVERSIFIED IN 2008 (ROW 8).**

The Commission alleges that one statement from defendant to investors in a March 10, 2008, letter to investors was false in violation of various of the securities law.  In its entirety, the statement reads:  "Even though [the YieldPlus Fund] is a highly diversified fund, it reflects the declines we have seen in non-Treasury securities, including mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations.  The average credit rating of the YieldPlus Fund holdings continues to be AA" (Bayless Exh. 54 at 783).  The Commission takes issue with defendant's labeling the YieldPlus Fund as a "highly diversified fund."  Defendant seeks summary judgment on this statement identified in row 8.

United States District Court

For the Northern District of California

Under Section 5(b) of the ICA, mutual funds are diversified if they invest, with respect to 75% of their total assets, not more than 5% of their total assets in the securities of any one company and in securities representing not more than 10% of the outstanding voting securities of any one company. The YieldPlus Fund informed investors that "diversification" has a specific meaning under the ICA and recited the definition as set forth in Section 5(b) (Bayless Exhs. 55 at 784–85; 56 at 786–87).

CSIM maintained a written internal policy regarding diversification, called "CSIM Operational Guidelines for Diversification," which conformed to this statutory requirement for diversified funds (Bayless Exh. 22 at 360–63; 57 at 788–93). The Commission's own branch chief testified that the definition of "diversified" fund in the CSIM Operational Guidelines for Diversification conformed to her understanding of what it means for a mutual fund to be diversified (Bayless Exh. 40 at 615–21). Steven Schantz, an in-house lawyer assigned to Schwab's mutual funds reviewed a draft of the subject letter and testified that when Schwab publicly disclosed that the YieldPlus Fund was a diversified fund, it meant "that it was diversified in accordance with SEC requirements" (Bayless Decl. Ex. 58 at 794–97). It is undisputed that the YieldPlus Fund met the ICA statutory definition of diversification as of March 10, 2008 (Bayless Exh. 58 at 794–97).

The Commission responds that defendant's own expert admitted that there is no statutory definition of the phrase "highly diversified." But the expert went on to say that he interpreted the term "highly diversified" to mean "issuer diversification" as defined in the ICA. The Commission further argues that there is a jury question over "the type of diversification" to which defendant referred and whether "[the YieldPlus Fund] really was diversified in that regard," pointing to statements, not at issue here, where defendant allegedly characterized the YieldPlus Fund as diversified in ways other than just being a diversified company (Opp. 25). But the statement at issue in row 8 does not discuss industry or sector diversification.

The undisputed evidence shows that the YieldPlus Fund was a diversified fund as of March 10, 2008. The Commission does not raise a challenge that defendant's inclusion of the adverb "highly" was misleading. Summary judgment as to row 8 is **GRANTED**.

19

United States District Court

For the Northern District of California

**7.     AIDING AND ABETTING (COUNTS TWO AND SIX).**

The Commission alleges in counts two and six of the first amended complaint that defendant can be secondarily liable for each alleged misstatement in schedule 1 even if he is found not primarily liable for it, including his own oral statements.  Defendant moves for summary judgment, arguing that plaintiff's second and sixth counts fail because defendant's alleged scienter cannot be used to "satisfy the requirements for both the primary violation he aided and abetted *and* his secondary liability for this primary violation" (Br. 10).  Claim two alleges aiding and abetting violations of Section 10(b) and Rule 10b-5.  Claim six alleges aiding and abetting violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

**A.     Section 10(b) and Rule 10b-5 (Count Two).**

Defendant may be held liable for aiding and abetting under the federal securities laws if the Commission proves a primary violation has occurred.  *Central Bank of Denver,* 511 U.S. at 168 (holding a *private* plaintiff may not maintain an aiding an abetting suit under Section 10(b); *see Janus*, 131 S. Ct. at 2302 (explaining "[s]uch suits — against entities that contribute 'substantial assistance' to the making of a statement but do not actually make it — may be brought by the SEC . . . but not by private parties.").

In order for there to be liability for aiding and abetting a violation of Section 10(b), there must be a primary violation of Section 10(b).  The Commission has alleged that defendant was the only natural person who had the scienter for primary liability (Bayless Exh. 8 at 194–95).  The Commission attempts to attribute the primary violation to one of Schwab's corporate entities (Bayless Exhs. 7 at 162–63; 8 at 123–24).  To that end, the Commission alleges that in the event that defendant is found to not have primary liability for violations under Rule 10(b) and Rule 10b-5 that Schwab is the primary violator and defendant can be held liable for aiding and abetting Schwab.

The problem, however, is that on this summary judgment record, defendant is the only natural person put forward as having scienter.  (Indeed, a corporation can only act through its agents, so the corporation itself, cannot have scienter.)  Even though there was previously another defendant in this action, Mr. Randall Merk, the Commission does not argue or point to

evidence in the summary judgment record that he had scienter for the primary violations alleged.  Instead, the Commission repeatedly argues that its aiding abetting theory is premised on defendant Daifotis supplying the necessary scienter for the primary violation.

Aiding and abetting requires proving a primary violation by someone else and that person would need to have scienter.  The Commission has not pointed to any evidence in the summary judgment record of a person other than defendant who had scienter for the primary violation.  Thus, defendant cannot be held liable for aiding and abetting a primary violation of Section10(b) or Rule 10b-5.  Defendant's motion for summary judgment as to count two is **GRANTED**.

### B.     IAA Section 206(4) and Rule 206(4) (Count Six).

Defendant moves for summary judgment on count six arguing that he cannot be held liable for aiding and abetting a primary violation of the IAA because no allegation of a primary violation of the IAA remains in this action, therefore, there can be no liability for aiding and abetting.  Significantly, count six, which involves aiding and abetting a primary violation of the IAA Section 206(4) and Rule 206(4) thereunder do not have a scienter or state of mind element. *SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992).

To defendant's argument, the Commission responds that in its response to interrogatory number four, the Commission stated (Opp. 14–15):

> If Daifotis were found not to be the primary violator with regard to any of the statements listed on Schedule 1 (revised 3/14/2012), the primary violators were Schwab Investments and/or Charles Schwab & Co.  Thus, contrary to Daifotis's argument, the SEC has indeed alleged primary liability on the part of Schwab with regard to the IAA.

But schedule 1 (revised 3/14/2012) does not set forth a primary violation of the IAA by *anyone*. Thus, substituting the Schwab *entities* for defendant as the primary violator is not sufficient. There can be no liability for aiding and abetting without a primary violation.  Thus, as to count six, the motion for summary judgment is **GRANTED**.

21

**8.      ICA VIOLATIONS.**

Defendant moves for summary judgment on count seven, which alleges a violation of Section 34(b) of the ICA and count eight, which alleges a violation of Section 48(a) of the same.

**A.      Section 34(b) of the ICA.**

Section 34(b) provides that any person who files, transmits or keeps a document pursuant to the ICA cannot misstate or omit material facts from such documents:

> It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title.
>
> It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.  For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.

15 U.S.C. 80a-33(b).

Defendant argues that he did not file or certify any documents with the Commission or any document filed with the NASD which is "deemed to be filed" with the Commission under Section 24 and Rule 24b-3 of the ICA.  Indeed, Schwab's Deputy General Counsel Koji Felton testified that documents filed directly with the Commission were filed by CSIM Legal or Fund Administration and that defendant was not involved (Bayless Exh. 22 at 362).

Defendant argues that there is no admissible evidence that shows that he was responsible or involved in filing advertising materials with the NASD ("deemed" filed with the Commission).  Schwab's internal policies provided that compliance personnel were responsible for filing marketing materials with the NASD and that these policies were followed with respect to the marketing materials regarding the YieldPlus Fund (Bayless Exhs. 23 at 369; 24 at 378–80, 105; 13 at 212).

Finally, defendant contends that there is no evidence to show that he transmitted or kept

22

United States District Court

For the Northern District of California

1    documents pursuant to the ICA.  Rather, he points to evidence in the record that this was the

2    responsibility of the departments or personnel who made the filings with the Commission and

3    the NASD (Bayless Exhs. 24 at 376–78, 43–46; 25 at 383–438; 26 at 439).

4        Nonetheless, to be held liable under Section 34(b), it is sufficient to show that defendant

5    made the false statements contained in the documents that were filed, transmitted, or kept under

6    the ICA.  And there is sufficient evidence in the summary judgment record on that point for the

7    Commission to make such a showing at trial.  Thus, defendant's motion for summary judgment

8    on count seven is **DENIED**.

9                    **B.    Section 48(a) of the ICA.**

10       Section 48(a) of the ICA prohibits "any person, directly or indirectly, to cause to be

11   done any act or thing through or by means of any other person which it would be unlawful for

12   such person to do under the provisions of the [ICA]."  15 U.S.C. 80a-47(a).  Defendant seeks

13   summary judgment in his favor on the Section 48(a) claim, arguing that the Commission has not

14   identified conduct for which he could be liable under the ICA.  This argument fails, as the

15   Commission has identified such conduct.

16       However, there is still a fatal problem with the Section 48(a) claim.  Defendant points

17   out that the Commission does not point to any evidence in the summary judgment record that he

18   "cause[d] to be done any act or thing through or by means of any other person which it would

19   be unlawful for such person to do under the provisions of the [ICA]."  The Commission

20   responds stating  that "there is no reason why Daifotis could not have" "personally file[d] or

21   transmit[ted] documents to the SEC or FINRA for filing," thus, he "faces liabilty under Section

22   48(a) for causing others at (Schwab) to do those things" (Opp. 16).  While defendant could be

23   held liable for causing others to "do those things," the Commission points to no evidence in the

24   summary judgment record to show that he did "cause" others to "do those things."  It is not the

25   Court's task "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*,

26   91 F.3d 1275, 1278 (9th Cir. 1996).  Thus, there is no basis to conclude that defendant can be

27   held liable under Section 48(a).  Defendant's motion for summary judgment as to count eight is

28   **GRANTED**.

23

**9.      SCHEME LIABILITY CLAIMS.**

Defendant requests confirmation from the Court that the scheme liability claims against him in counts one, two, four, and six of the first amended complaint have been dismissed.  The order dated August 1, 2011, stated defendant Daifotis was not entitled to a ruling that "defendant Merk's arguments in his motion to dismiss should also apply to defendant Daifotis" (Dkt. No. 74 at 9).  The order dated October 7, 2011, stated "defendants challenge claims based on 'scheme liability,' but those claims were dismissed by order dated June 6.  The Commission does not attempt to cure those claims in its first amended complaint but, rather, seeks to preserve them for appellate review" (Dkt. No. 94 at 4 n.2).  Thus, the scheme liability claims are no longer part of this case.

## CONCLUSION

For the above-stated reasons, the motion for summary judgment is **GRANTED IN PART**. The pretrial conference will be held as scheduled at **2 P.M. ON JUNE 18.**  A jury trial will commence at **7:30 A.M. ON JULY 9.**

**IT IS SO ORDERED.**

Dated:  June 12, 2012.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE